UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA    ) | |
| ) | |
| v.    ) | CRIMINAL NO. 05-10009-DPW |
| ) | |
| BERNARD SMITH    ) | |
| _____) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant has pled guilty to an indictment charging one count of conspiracy to import electronic components by false statement, and six substantive counts charging violations of 18 U.S.C. §542.   In various entries over the period from November 1998 through May 2000 defendant directly caused or conspired to cause the presentation of false invoices in order to understate the value of goods to U.S. Customs.

There is no plea agreement.  The Probation Office has submitted a Presentence Report which calculates the defendant's Total Offense Level under the Sentencing Guidelines as 16, which would, given defendant's lack of criminal history (Category I), if followed, produce a sentencing range of 21 to 27 months.  This determination involves two contested findings:  (1) a Base Offense Level under U.S.S.G. §2T3.1 of 17, which is based upon a loss calculation of $385,000; and (2) a two level upward adjustment for an aggravated role in the offense, under §3B1.1(c).  These determinations are erroneous.  The correct loss amount is $81,808.10, yielding a Base Offense Level of 14.  No adjustment for role in the offense is warranted.  Computed correctly, defendant's Guideline level is 12, which would, if followed, produce a sentencing range of 10-12 months.

Defendant seeks a sentence of home detention, or, alternatively, a half-way house

commitment, which could be followed by a period of home detention. This sentence would entail a small departure or variance from the advisory Guideline level, as correctly computed. The basis for this request follows below.

In Part I(A), below, we set forth why the PSR loss calculation is incorrect. In Part I(B) we argue that, even if the PSR calculation were technically correct, that amount would clearly overstate the seriousness of the offense, and thus, a downward departure would be warranted under the rules interior to the Guideline system. In Part I(C) we argue that, in any event, with the enhanced discretion authorized by United States v. Booker, U.S. , 125 S.Ct. 738 (2005), a realistic assessment of the offense, taking into account all of the circumstances as well as the underlying purposes of the regulatory scheme, leads to a lower evaluation of severity.

In Part II, we argue that defendant should not receive an adjustment under §3B1.1(c) since he did not organize, lead, manage, or supervise any other person, within the meaning of the Guideline.

In Part III, we discuss the applicability of the independent ground for departure, under United States v. Olbres, 99 F.3d 28 (1996), that incarceration of the defendant would put other, innocent persons, employed by his company, out of work.

Finally, in Part IV, we set forth why the sentence requested by defendant is most consonant with the statutory factors under 18 U.S.C. §3553(a), which requires the Court to find a sentence "sufficient, but not greater than necessary" to satisfy the statutory purposes of sentencing.

In support of defendant's request, we also submit the following, which are attached as exhibits:

-2-

A.    Memorandum of Arent Fox (defendant's Customs attorneys): Summary of the Structure and Background to the U.S. Antidumping Law and Its Application to a Review Request in *DRAMs from Korea* (hereinafter "Arent Fox Memorandum")

B.    Expert Report of W. Christopher Sorrels, CPA (hereinafter "Sorrels report")

C.    Affidavit of John Prymmer

D.    Examples of competitors' daily price lists

E.    Government's Spreadsheet of entries with false statements

F.    Affidavit of Douglas Sterling

G.    Affidavit of Richard MacKenzie

H.    Letters from colleagues and family members of Bernard Smith

## Statement of Facts[1]

### The offense conduct

The defendant, Bernard Smith, started Stealth Components Inc. at age 24, in 1996. The company is in the business of brokering semiconductors and other electronic components in the secondary market, i.e. it buys from manufacturers' or brokers' overstocks and sells to customers who experience parts shortages in particular parts, or need unusual or hard-to-find components. This "spot" market is extremely competitive, and profit margins are exceedingly thin, often a matter of pennies per item.[2]

By 1998, the company, still a very small (3 employee) operation, was struggling for its footing. That Fall, Smith had hired Josh Jacobs, the only salesperson other than himself. Smith

---

[1] Other facts are discussed below, where relevant to the various arguments.

[2] The name "Stealth Components" was intended to represent the fact that the business operated in the cracks and crannies of the market, in which speed and competitive price were essential.

and Jacobs were desperate for orders to keep the company going.   They were informed by

various customers of their interest in Korean DRAMs, a form of computer memory chip.   They

learned that the DRAMS were subject to an "antidumping" duty, which required a "cash

deposit" of a certain percentage amount – (the first that Smith had ever heard of this.)   However,

the deposit requirement was not reflected in domestic market prices for the product.[3/]   This was

explained, according to various domestic customers and Asian suppliers, by the fact that

"everyone" understated the value of the goods, since the duty, when ultimately fixed, would

always drop – by as much as 100% –   resulting in a refund of all, or nearly all, of the cash

deposit, with interest.   The suppliers offered to understate the value on invoices for Stealth

imports.   Accordingly, Stealth began to import DRAMS, misrepresenting the value of the items

to Customs, and rationalizing this conduct on the basis of the belief that this was a widespread, if

not tolerated, practice, and that because of the foreseeable ultimate reduction in rates, the

---

[3/] Exhibit D contains examples of daily price lists faxed out by various competitors of Stealth for the period in question.  These lists contain prices for DRAMs offered for sale within the United States – i.e. with no further duty left to pay.  In each of these instances, the faxes list DRAMs which Stealth also purchased and imported at the same time.  Since this was a highly competitive market, it is fair to assume that the price paid by the competitor was at least close to that paid by Stealth.  On that assumption, one can see from the prices listed below that the competitors' offering prices did not allow for payment of the cash deposits and also an immediate return.  Indeed, in some of these cases, the other broker would have had to undervalue by an even greater amount than Stealth in order to receive an immediate return of any amount.

| Date | Importer | Manufacturer | Offering Price | Stealth's Cost |
|------|----------|--------------|----------------|----------------|
| 9/1/99 | Advance Micro World | Goldstar | 2.95 | 2.95 |
| 9/13/99 | Top Phil | LGS | 3.10 | 2.95 |
| | | LGS | 3.00 | 2.80 |
| 9/15/99 | PQI-USA | LGS | 2.95 | 2.95 |
| 12/28/99 | Solar Technologies | LGS | 2.90 | 2.63 |

government would not actually be deprived of anything it would otherwise receive in the long run.

   All told, Stealth imported Korean DRAMs from on or about November 4, 1998 through on or about May 23, 2000 ( the "indictment period") consistently falsifying their value.  This practice enabled Stealth to reduce the cash deposits due on entry by slightly over $385,000.

   Stealth has, over time, imported numerous other items, not subject to any antidumping order, but subject to other customs duties.   Defendant has not made or participated in any deliberate misrepresentations or attempts to evade payments other than in connection with the intent to reduce antidumping deposits as set forth above.

**The antidumping regulatory scheme**

   The antidumping regulatory scheme is explained in some detail in the attached memorandum of Stealth's custom's attorneys (Arent Fox PLLC, "Summary of the Structure and Background to the U.S. Antidumping Law and Its Application to a Review Request in DRAMs from Korea)(Exhibit A),[4] and the Expert Report of W. Christopher Sorrels, CPA (Exhibit B),[5] and discussed below in connection with the argument on loss computation.  What follows here is a short summary, to put the facts in context.

   The purpose of the antidumping regulatory scheme is to prevent or remedy the

---

   [4] The firm has a specialization in Customs law and, in particular, antidumping duty proceedings.

   [5] Mr. Sorrels is a CPA who formerly was an accountant and program manager for the U.S. Department of Commerce International Trade Administration, where he was involved in antidumping investigations.  Since leaving Commerce, he has acted as a consultant to foreign and domestic companies in such proceedings.  He advised the Hyundai Electronics Co. in the first through fifth administrative review concerning DRAMs.

"dumping" of foreign goods into the U.S. market, that is, the sale of goods in the U.S. at prices lower than the value at which they are sold in other markets, or at "less than fair value." The regulatory program aims to achieve this result by assessing an antidumping duty based upon the antidumping "margin," calculated by the Department of Commerce, which is based upon the extent to which the goods are sold at less than fair value.

Antidumping duties are assessed in a unique "retrospective" method, which differs from the assessment of regular customs duties. In the antidumping system, the duty is fixed <u>after</u> the goods have been imported.[6/]   On an annual basis, a cash deposit rate is set, based on a provisional estimate. Then any manufacturer, exporter, or importer may request a review. Commerce then reviews the conduct of the exporter during the year preceding the request.[7/] After this review – which normally takes between 12 and 18 months –  a final rate is set, the duty is assessed, and the entry of the goods is "liquidated" by Customs. The cash deposit is considered security for later payment of the assessed duty – it is not itself considered payment of the duty or revenue to the government. The final duty may be assessed at the cash deposit rate –

---

[6/]  As described by Commerce:

> unlike systems in some other countries, the United States uses a "retrospective" system under which final liability for antidumping and countervailing duties is determined after merchandise is imported. Generally, the amount of duties is determined in a review of the order covering a discrete period of time.

19 C.F.R. §351.21(a)(2004).

[7/]  Previously, the review process was automatic. Since 1989 an interested party must request the review. It is initiated by a simple, written request, with no particular formalities or showing required.

but only if a party defaults, that is, if it does not request a review.[8]

In general, in the absence of unforseen and uncontrollable forces, antidumping duty rates tend to decline over the life of an antidumping order, because foreign exporters desiring to maintain their ability to compete in the U.S. market take steps to change marketing behavior so as to bring antidumping margins down.  Arent Fox Memorandum, pp. 14-16 and attachments 1 and 2; Sorrels report, pp. 3-4.  DRAM rates followed this overall pattern.  Arent Fox, pp. 16-21; pp. 5-6.  During the period of the offense, Hyundai, the major producer of DRAMs, in fact was telling its customers that its dumping margin was going down. Sorrels report, p. 6.

Stealth defaulted here because instead of requesting a review it undervalued the merchandise.  Accordingly, for Stealth, in each case the deposit rate became the final rate by default, and in due course Customs liquidated the entries at the deposit rate.

All of the Korean DRAMs imported by Stealth within the indictment period were manufactured by either Hyundai Electronics Industries Co. or LG Semicon, Ltd.  Each of these companies did request reviews for imports of their products during the periods in question, and

---

[8] According to Commerce:

> The amount of the dumping margin does not become "fixed" within the meaning of Article 11 of the Antidumping Code, and thus antidumping duties are not assessed, until the Department has completed an administrative review.  At that time duties would be assessed at the rate established in the final results of administrative review.  If an administrative review results in the "fixing" of a lower rate than had been deposited, the difference would be refunded in accordance both with U.S. law and the GATT Antidumping Code.  If no review of particular entries is requested, however, the cash deposit rate becomes the "fixed" rate, and the entries will be liquidated at that rate.

54 Fed. Reg. 12742, at 12756 (March 28, 1989).

in each case Commerce fixed final rates at levels far lower than the deposit rates for those products. For the reasons set forth in the Arent, Fox Memorandum, pp. 21-29, and the Sorrels report, pp. 10-14, as further discussed below, had Stealth requested reviews for entry of those products for the same periods it would have been assessed at the same rates as the manufacturers.

If the manufacturers' rates for the entries listed on the government's spreadsheet are used, instead of the cash deposit rate, the total antidumping duties for all entries during the indictment period would have been $128,139.70[9/] and the loss would be $81,806.40.[10/]

---

[9/]   This figure is computed by using the final rates for Hyundai and LG Semicon for the relevant periods. The rates for Korean DRAMs from those manufacturers for the relevant periods were as follows:

|  | 4/1/98-4/30/99 | | 5/1/99-12/31/99 | |
| --- | --- | --- | --- | --- |
|  | Cash Deposit Rate | Final Rate | Cash Deposit Rate | Final Rate |
| Hyundai | 3.95 | 2.30 | 3.95 | 2.92 |
| LGS | 9.04 | 1.18 | 9.04 | 2.92 |

[10/] The dispute between defendant and the government is whether to apply the manufacturer's rates or the default rates in computing the loss. Defendant does not believe that either the government or the Probation Office dispute that if the manufacturers' rates were to apply, that defendant has computed the duty, and loss, correctly.

The calculation is as follows:

1. Total antidumping duties due        128,139.70
2. Total MPF fee due                      14,220.59
3. Total due                              142,359.59

-8-

**Argument**

I.    **The PSR Loss Calculation of $385,000 Is Erroneous and Overstates the Seriousness of the Offense.**

    A.    **The Correct Loss Amount Under USSG §2T3.1 is $81,808.10.**

        The parties agree that the assessment of loss is governed by USSG §2T3.1,[11/] which defines loss as the <u>amount of duty evaded</u>.[12/] This requires the Court to determine what the government lost as a result of the criminal conduct: that is, what it would have collected – i.e. what duty would have been assessed had defendant acted legally (which it did not collect given the criminal conduct.)  Final antidumping dumping duties are determined in two ways: by default, when an interested party fails to request a review, or as a result of an after-the-fact review by the Commerce Department of the pricing conduct of the foreign exporter during the period of review.  The defendant contends that had he not understated the value of the goods, he would, necessarily, have requested a review and, further, that this review would have resulted in the application of the manufacturers' rates.

        Probation and the government contend that defendant has not established either that he

---

| | | |
|---|---|---:|
| 4. | Total antidumping duties deposited | |
| | (11/4/98-12/23/99) | 56,187.30 |
| 5. | Total MPF fee paid | <u>4,364.89</u> |
| 6. | Total deposited and paid | 60,552.19 |
| | | |
| | Total loss (3 minus 6) | 81,806.40 |

[11/]    This Guideline refers to the tax table found in §2T4.1.  The table as amended effective November 1, 1989 applies to this offense.

[12/]    §2T3.1(a) defines "tax loss" as the "amount of the duty."  The Application Note refers to this measure as the "'duty' evaded," an interpretation that is shared by all parties here, as the government, Probation and defendant all agree that monies actually paid as cash deposits are to be credited to defendant and reduce the amount of the loss.

would have requested a review, or what it would have produced.  PSR, pp. 30-31, 35-36, Gov't

Objections ## 4,5, Probation responses to Defendant's Objection #5.  Failing that, they contend,

the Court should apply the deposit rate that was in fact applied by Customs.  As to whether

defendant would have requested the review, they argue that whether he would have done so is

"hypothetical," and speculative, since a review, at least theoretically, could legally have resulted

in a higher duty and since it would, they argue, have entailed  the retention of Customs attorneys,

a substantial expense.  Second, they point out that Commerce was not obliged as a matter of law

to apply the manufacturers' rates to the entries at issue here and that, even assuming that the

defendant had requested a review, he has not established what rates that review would have

produced , as expressed by the government, "on the criteria that would have been looked at by

the Commerce Department."  PSR, Gov't Objection #5, p. 31.

     These contentions are fundamentally flawed.  Both the government and Probation

misconceive the nature of the loss inquiry and ignore the question of who bears the burden of

proof.  In the first place,  assessment of loss often entails inquiry into what Probation

characterizes as a "hypothetical" question: i.e. what <u>would</u> have happened <u>if</u> defendant had not

violated the law.  This is inherent in the "what was lost" sentencing issue.  Thus, for example,

when a defendant commits bankruptcy fraud by concealing an asset, the Court must determine

the value of the defendant's interest in the property, <u>United States v.  Rowe</u>, 202 F.3d 37, 41-42

(1st Cir.  2000), which, of course, entails the hypothetical question of what a willing buyer

"would" pay a willing seller.  See e.g. <u>Portland Natural Gas Tansmission System et al. v. 19.2</u>

<u>Acres of Land</u>, 195 F.Supp.2d 314, 320 (D.Mass. 2002)("Fair market value is defined as 'the

highest price which a hypothetical willing buyer would pay to a hypothetical willing seller in an

assumed free and open market[.]'").   In <u>United States v. Pimental</u>, 367 F.Supp. 2d. 143 (D.

Mass. 2005), the defendant was convicted of misrepresenting the nature of the company's

construction work and the size of its payroll to obtain lower Workers' Compensation insurance

premiums.  The sentencing court  rejected the government's loss figure, which was based upon

the supposed difference between premiums paid and that which should have been paid; the court

found that if the defendant had properly allocated his entire work force, he would have actually

paid even less.  <u>Id</u>. at 147, 155-56.[13]  In short, the Court must make a determination of what the

final duty would have been, on review, "<u>on the criteria that would have been looked at by the</u>

<u>Commerce Department</u>," to use the government's own phrase.

    Second, the government and Probation have reversed the burden of proof.  The

government bears the burden of proof on the issue.  Although the burden is by a preponderance,

it remains with the government.  Defendant has neither a persuasion nor production burden.

<u>United States v. Buchanan</u>, 987 F.Supp. 56, 62 (D.Mass. 1997).  See <u>United States v.</u>

<u>McAlpine</u>, 32 F.3d 484, 487 (10th Cir. 1994).

    Accordingly, in this case, the government must prove that had defendant not committed

the offense conduct, the Commerce Department would have assessed the final duty at the deposit

rate.  This reduces to two questions: (1) would defendant have in any event have failed to request

---

    [13]  In a sense, <u>any</u> loss finding here is hypothetical, since if defendant had not understated
the values, Stealth could not have afforded to make the transactions at all.  The U.S. domestic
market price for the components did not include any margin for the antidumping deposit, and
Stealth was not in a position to pay the deposit and then wait years for a refund.  Sorrels report,
pp. 7-8.  Thus, if hypothetical questions were really excluded, then one would have to conclude
that there was no loss at all, since if defendant followed the law, <u>no</u> duty would ever have been
owed.

a review, and thus caused the duty to be assessed at the deposit rate by default; and (2), if a review had been requested, what rate would have been used under the criteria the Commerce Department would have employed.   The government has proved neither.  On the contrary, defendant has shown both that there would have been a review and that it would have resulted in the manufacturer's rate being applied to the entries at issue:

    1. The request for a review.  It is true that a review, theoretically, can result in a rate higher than the deposit rate, but that would not have been a factor in this instance.  The industry belief was that the rates were on the decline: this is what defendant was told, and, in fact, what the manufacturers were telling the market.  This was consistent with the pattern of antidumping rates generally, and the DRAM rates during this period, in particular.  Sorrels concludes that:

> it would have been reasonable for Bernard Smith and Stealth – or any person familiar with the DRAM industry – to expect that an administrative review would lead to considerable refunds considering (i) the general trend in margins over time; and (ii) that Hyundai and LG Semiconductor, with far greater liability for the payment of antidumping duties, were actively trying to reduce their margins.

Sorrels report, p. 8.  More importantly, Stealth would never have imported the components, reported their true value, and then not requested a review:  the company would necessarily have lost money unless it obtained a lower rate on review, since it brokered DRAMs on a less than 5% margin (sales price less cost of goods), and the cash deposit rates were equal to or, mostly, far in excess of that margin.[14]  Thus, the only way not to lose money on the transactions would have been either to not import the goods at all (in which case the government would have lost

----

    [14]    As shown by the government's spreadsheet, Exhibit E, the vast majority of the entries had a cash deposit rate of 9.04%; others were at 3.95%.

nothing) or to request a review.   Sorrels report, p. 8.  Nor would the expense of retaining a

lawyer have deterred a request.  The suggestion to the contrary is pure speculation.  All it took

was a single one sentence letter to initiate a review.

2. The results of the review.  The government and Probation correctly point out that a

review of exports by a reseller of goods would not necessarily result in the same rate as sales by

the manufacturer -- since a "reseller . . . may be dumping to a greater extent than the party under

review during the period in question."  Consolidated Bearings Company v. United States, 348

F.3d 997, 1005 (Fed. Cir. 2003).[15/]   It follows, however, that if a reseller is selling at a higher

price than it paid for the goods – i.e. when it is making a profit on the sales – then review will

result in the same rate.  This is precisely the rule followed by Commerce.  The Arent Fox

Memorandum and the Sorrells report explain how Commerce goes about determining the

dumping margin for a reseller and show why it would have applied the manufacturer's rate.  In

short, Commerce applies the manufacturer's rate if either (a) the manufacturer knows that the

goods sold to the reseller are destined for the U.S., or (b) the reseller is selling above its

acquisition cost.  There is no suggestion that reseller involved in the entries at issue here --

Carton Technologies -- was selling the components at a loss.  The evidence is that it was selling

at a profit.  In fact, Carton, as other brokers, typically did not buy components unless it already

---

[15/]      In Consolidated Bearings Company v. United States, 348 F.3d 997, 1006 (Fed.
Cir. 2003) the court held that a party that does not request a review "has no statutory
entitlement" to the results found in a review of entries requested by some other party.  The
statute "neither requires nor precludes Commerce from applying those results to entries outside
the review."  Id.  Since Commerce is not precluded from doing so, the court remanded for
determination of whether Commerce had had a consistent past practice of with respect to
resellers, and whether it had departed from that practice in this instance.  Id. at 1008.  In
Consolidated Bearings Company v. United States, 412 F.3d 1266, 1269 (Fed. Cir. 2005), the
court held that Commerce did not arbitrarily depart from a past practice.

had identified a customer to whom it could sell at a profit.  See Prymmer affidavit (Exhibit C),

¶¶6-9, 11.  Accordingly, it is clear that if a review had been conducted, Commerce would have

applied the manufacturer's rate to these entries.

**B.    A Base Offense Level of 17, Premised on a Loss of $385,000
Overstates the Seriousness of the Offense.**

Under USSG §5K2.0 and <u>United States v.  Koon</u>, 518 U.S. 81 (1996), a departure from a

Guideline range is warranted in an atypical case, outside the heartland contemplated by the

Commission in Guideline.  In <u>Koon</u> the Court explained that the Guidelines were drafted to

cover a wide range of situations, and where factors in a particular case are not part of the

heartland considered by the Commission in drafting the particular Guideline, a departure may be

warranted.  In <u>United States v.  Brennick</u>, 134 F. 3d 10 (1st Cir.  1998),  the defendant was

convicted of failing to pay employee withholding taxes.   However, the district court found that

he always intended to pay (and often did, late).  Applying the above principles, the First Circuit

held that this feature could take the case out of the heartland, and that a downward departure

could be justified.

So it is here, in at least two respects.  First, USSG §2T3.1, applying to evasion of import

duties, covers a wide range of conduct, most of which far more egregious than here.   Defendant

never intended to deprive the government of any duties to which it was actually entitled.  At all

times he believed that all he was doing was avoiding a deposit which, if paid, would, in the end,

be refunded anyway. Significantly, the defendant's misconduct was limited to antidumping

deposits.  Had his intent been to cheat Customs out of its due, he had many opportunities to do

the same in connection with other imported goods which did not involve the unique antidumping

duty regime.    There is no suggestion that either he or the company ever did so.

-14-

Moreover, §2T4.1 – the Tax Table to which §2T3.1 refers – covers losses which, ordinarily, are much more definite and direct than those involved here. As discussed above, the cash deposit evaded is not a true measure of the actual loss to the government.

> **C.    The Court May Utilize its Discretion under <u>United States v. Booker</u>, 125 S.Ct. 738 (2005) to Fix a Realistic Loss Amount Consistent With the Circumstances of the Offense and the Purposes of the Underlying <u>Regulatory Scheme</u>.**

<u>United States v. Booker</u>, of course, obliges the Court to consider all of the statutory purposes in formulating an appropriate sentence, even while it still must "take account of " and "consider" the Guidelines. <u>Id</u>. at 764. However, the Court's discretion, as authorized by <u>Booker</u>, also bears specifically and directly upon its consideration of the Guidelines here, because it gives the Court the ability to avoid close or imponderable questions concerning the valuation of offense conduct:

> In one circumstance, however, precise calculation of the applicable Guidelines range may not be necessary. Now that the duty to apply the applicable Guidelines range is not mandatory, situations may arise where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies. This leeway should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters, for example, determination of monetary loss. Similarly, close questions may sometimes arise as to the precise meaning or application of a policy statement authorizing a departure, and a judge who has considered policy statements concerning departures need not definitively resolve such questions if the judge has fairly decided to impose a non-Guidelines sentence.

<u>United States v. Crosby</u>, 397 F.3d 103, 112 (2d Cir. 2005).

The <u>Booker</u> decision thus allows the Court to arrive at a realistic assessment of the

damage caused by a crime, that is, to measure the extent to which the offense caused damage to the objectives of the underlying regulatory scheme -- without also having to determine whether the case is within the heartland or not. The contentions that a default rate should be used to compute loss, and thus that $385,000 represents the loss amount, are totally at odds with actual reality. As discussed in the Arent Fox Memorandum, the purpose of the antidumping regime is exclusively remedial – it is designed solely to adjust the prices of imported goods by precisely that margin by which they were "dumped." But a loss value computed at a default rate does not represent real damage to anyone. Of course, in the civil context, a default has significant consequences, as it did here. Indeed, as a result of its default, Stealth had since paid the full amount of duty computed at the cash deposit rate[16/] and, further, will be liable for substantial civil penalties as well.[17/] The irony in this case is that not only has the government not actually lost duty commensurate with its proffered amount, it has received more in duty than it ever would have collected had defendant not committed the offense conduct.[18/]

_____

[16/]    Stealth has now paid amost $80,000 in excess of what it would have paid if it had followed the law. Arent Fox Memorandum, p. 8, n.5.

[17/]    On March 30, 2005, Customs initiated a civil penalty proceeding.

[18/]    It is significant that the original domestic complainant in the Commerce proceedings ultimately received an enormous windfall. Since passage of the Byrd Amendment, see Arent Fox Memorandum, at p.8, n.5, the complainant receives all antidumping duties paid. And here, Micron Technologies received not only what it would have received had Stealth sought a review, but the entire amount computed at the default rate. Id.

## II.     Defendant's Role in the Offense Does Not Warrant an Adjustment Pursuant to USSG §3B1.1(c).

The PSR concludes that defendant warrants a role adjustment under §3B1.1(c) solely on the ground that he was a leader because he "recruited" David Lu, of Carton Technologies, into the scheme, and that he instructed Lu and other suppliers as to how much to undervalue the orders.  There is, however, absolutely no evidence that defendant "recruited" Lu.  On the contrary, Lu volunteered to perform this service for the defendant, and assured him that he was doing the same for other customers.  Carton, as did the other off-shore suppliers, had much to gain and little to lose in rendering false invoices to enable their customers to avoid substantial cash deposits.  The PSR finding purports to be based upon an agent's report of an unsigned, unsworn statement of Mr. Lu.  Aside from the fact that the report is not worthy of any evidentiary weight – Lu, according to the proffered account, declines to provide sworn testimony – it does not, even on its face, support the finding.  Lu does not even deny defendant's contention that it was <u>Lu</u> who offered to undervalue the merchandise, and that he was already doing it for many other customers.

Both the government and Probation put emphasis on the fact that defendant "instructed" suppliers on how to undervalue the merchandise.  This is quite misleading.  Defendant did not educate Lu or any other supplier in the purpose or method of undervaluation -- they were experienced practitioners of the device.  To be sure, it was part of the offense conduct that defendant (or Jacobs) told the supplier what value to place on the invoice.  But this was no different than a buyer of illegal drugs giving directions for the type, amount and delivery of his order.  It is very well settled that this type of "instruction" does not merit an aggravated role under the Guidelines; it is just part of the purchase transaction.   Leadership, management or

-17-

supervision requires <u>control</u> over the other individual.   <u>United States v. Fuller</u>, 897 F.2d 1217,

1221 (1st Cir. 1990);   <u>United States v. Tejada-Beltran</u>, 50 F.3d 105, 111 (1st Cir. 1995).   The

dealings between Stealth and Lu were simple arms-length buyer-seller transactions, which did

not entail any arguable control.   A participant in such a transaction is not considered to have a

management role <u>even if he sets the terms of the sale</u>.   <u>United States v. Medina</u>, 167 F.3d 77,

81, n.4 (1st Cir. 1999).   See also <u>United States v.  Sayles</u>, 296 F.3d 219, 225 (4th Cir.  2002);

<u>United States v.  Vargas</u>, 16 F.3d 155, 160 (7th Cir.  1994).

        The government also contends that defendant warrants an adjustment because he was an

"organizer" of the illegal scheme and that he had a managerial role over Joshua Jacobs.[19]

Clearly, he was not an "organizer," as that term has been defined in the case law.[20]   The scheme

obviously required no organization; it consisted of a series of plain, one-on-one transactions.

The decision to undervalue the components was a simply a decision to make false statements.

        Nor was defendant a leader, manager or supervisor of Jacobs.  Jacobs is a former

employee of Stealth who was sued for misappropriation of confidential information and, in

response, called Customs to inform on Stealth, asserting that he had always acted under Smith's

orders.  But in fact defendant had no greater role than Jacobs in the crime.  It is true that

defendant was the President of the then tiny company.  However, the finding of leadership

cannot be based solely upon defendant's superior position in the company organization.  <u>United

States v. DeGovanni</u>, 104 F.3d 43 (3d Cir. 1997)(supervisor finding cannot be based solely on

_____

[19]      PSR pp. 29, 32, Gov't Objections ## 1, 7 and Probation response.

[20]      "An organizer is at bottom a person who forms diverse elements into a whole
consisting of interdependent, coordinated parts, geared for concerted action."  <u>United States v.
Tejada-Beltran</u>, 50 F.3d 105, 113 (1st Cir. 1995).

basis of supervisory position in police department); United States v. Arche, 134 Fed. Appx. 659,

2005 WL 1253830 (5th Cir. 2005)(same for bank director).   See also 3B1.1, Application Note 4

("titles . . . are not controlling"); United States v. Cali, 87 F.3d 571, 580 (1st Cir.

1996)(management responsibility over property or assets not sufficient).  Instead, "[t]he court

must focus on *what the defendant did,* in relation to at least one other participant, in the

commission of the offense."  United States v. Frankhauser, 80 F.3d 641, 655 (1st Cir.

1996)(emphasis in original).

Defendant did not exercise supervision or control over Jacobs.  Jacobs was not required

to participate.  (Another salesman, Scott Farmer, hired in 1999, never did.)  They acted

independently.  Each had his own customer base.  Jacobs dealt independently with suppliers.  He

decided what actual price to agree to, determined what the false value should be, and

communicated it to the suppliers on his own.  He also dealt independently with his customers,

setting the sales price on his own.   Given his 10% commission, and the slim profit margins on

DRAMs, he made more than Smith on his own transactions.  During the indictment period he

made roughly the same number of sales with falsified invoices.

### III.    Under the Pre-Booker Guidelines System the District Court Would Have Been Authorized to Impose a Sentence of Non-Incarceration In Order to Prevent the Failure of the Business Or the Loss of Employment to Innocent Employees.

Even before Booker was decided, the Court was entitled to consider whether the

incarceration of a defendant, who is the head of a small business, would have such a devastating

effect on a business that it would fail or that innocent employees would be thrown out of work.

United States v.  Olbres, 99 F.3d 28, 32- 37 (1st Cir.  1996).   That is the case here.

Stealth Components currently employs 23 persons other than defendant.  The employees

-19-

are treated generously in salary and benefits.  Most of them would have difficulty finding

replacement jobs; some them -- foreign citizens sponsored for H1B visas by Stealth -- would lose

their right to reside in the United States.

   The company remains entirely dependent on Bernard Smith's presence, management,

sales expertise and contacts.  The nature of the company's operations are discussed in the

Affidavits of Douglas Sterling, Vice President of Operations, (Exhibit F), and Richard

MacKenzie, a business consultant who has evaluated the impact of defendant's absence, (Exhibit

G) .  As these affidavits demonstrate, Mr.  Smith, himself, is responsible for approximately 30%

of the company's sales (his sales exceed those of the next two highest salespersons combined),

and contributes essential assistance and expertise to the sales of the other representatives.  The

success of the company is driven by his extensive industry knowledge, contacts, and reputation

in the industry, coupled with his personal hard work and attention.  He arrives at work at 4 am

every day, and is responsible for every aspect of the management of the enterprise.  There is no

significant second level of management.  According to MacKenzie's analysis, Mr.  Smith's

absence would likely cause the company to lose over $40,000 per month.  Over the very short

term, this could be covered by layoffs, but within a period of a few months, this "remedy"

would, in turn, cause a downward spiral, leading to the demise of the company.[21]

---

   [21] Of course, Mr.  Smith will do whatever is in his power to keep the business together --
the company is his life.  But it should be remembered that he is only a 25% owner.  The 75%
owners (one of whom is his maternal uncle) have been very supportive so far, but have informed
him that they are unwilling to put further capital into the company to compensate for losses
caused by his legal difficulties.

IV.    **The Defendant Should Receive a Non-Incarceration Sentence Since that is Sufficient to Achieve the Purposes of Sentencing and No More Punitive Sentence Is Necessary.**

United States v. Booker held that the sentencing judge must determine sentences in accordance with the principles of 18 U.S.C. 3553 (a).  That statute states that the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)[.]"   This has become known as the "parsimony principle."  See   See, e.g., United States v. Spigner, 416 F.3d 708, 711 (8th Cir. 2005); United States v. Gray, 362 F.Supp.2d 714, 717 (S.D. W. Va. 2005); United States v. Angelos, 345 F.Supp.2d 1227, 1240 (D. Utah Nov. 16, 2004); United States v. Lacy, 99 F.Supp.2d 108, 119 (D.Mass. 2000).

The statutory factors, set forth in 18 U.S.C. §3553(a), are as follows:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

A suitable period of home detention would be sufficient to achieve the sentencing objectives articulated in subsection (2) and would be most consistent with all of the purposes. (A fortiori a period of half-way house confinement would do so as well). In this connection, the Court should consider the following:

• The defendant was young, under considerable pressure, clearly over his head, and desperate to get his fledgling business off the ground.

• While he knew that he was acting illegally, he did not appreciate the seriousness of what he was doing. He did not believe he was actually depriving the government of revenue that ultimately would be collected by it. Instead, he thought he was cutting a corner – the same shortcut being taken across the industry – and merely trying to remain competitive. Lacking the mature judgment he has since acquired, this thinking enabled him to rationalize his conduct. As demonstrated by the letters attached in Exhibit H, defendant is fundamentally a very honest and generous person, who, other than this offense, has never even skated close to the edge of the law. In this sense, the offense was wholly situational and aberrational. There is plainly no chance of recurrence.

• Despite the fact that undervaluation of imports subject to antidumping orders clearly was a prevalent practice in the industry, defendant appears to be the only person ever prosecuted for it. While we do not suggest that this could be a defense on the merits, it may properly be considered by the Court in determining the appropriate sentence. Defendant's prosecution and plea is well known in the industry. (The government has issued press releases at every stage). It will not take more than defendant's conviction and a home detention sentence to bring home to importers the peril of evading antidumping deposits.

• The government has already obtained more in duty than ever would have been collected had defendant conducted his business in an entirely legal fashion. Customs is also seeking substantial civil penalties in the case.

• The case has taken many years to reach this point. It involves offense conduct which took place six and seven years ago. Defendant has been cooperative throughout the investigation and has never, from the outset, evaded responsibility for his conduct. After Mr. Jacobs originally informed Customs of the offense, Stealth's premises and defendant's home were searched on June 19, 2001. At that point, the government had more than sufficient evidence to prosecute. Nevertheless, defendant was not indicted until January of this year. The intervening period has been extremely stressful for the defendant and his family, never knowing when the ax will fall, or how hard. When the search was conducted, defendant was 28 years old and he and his wife did not yet have children. Now they have a two year old, with another due to be born in March 2006. Defendant's incarceration would be extremely hard on defendant's wife and children.

• Despite the investigation, defendant has continued to build his business – through hard work (defendant arrives before 4 am every day) and honesty – to the point where the company now employs 23 employees, who are well and generously treated. Still, the vitality and profitability of the enterprise depends entirely on defendant's active participation and management. But the continued viability of the company – and the employment of the work force – would be put in serious jeopardy by defendant's absence. And, the longer the absence, the more serious, more extensive and permanent the harm. Were defendant sentenced to home detention or half-way house, the Court could allow him to work, and thus eliminate this risk to innocent parties.

**<u>Conclusion</u>**

For the reasons set forth above, the Court should find that the Guideline level is 12, and the sentencing range is 10-12 months. The Court should depart or vary from this range, in order to sentence the defendant to a period of home detention or, alternatively, to a half-way house.

Respectfully submitted,

<u>/s/ Max D. Stern</u>
Max D. Stern
BBO No. 479560
Kenneth Resnik
BBO No. 637527
Stern, Shapiro, Weissberg
 & Garin, LLP
90 Canal Street, Suite 500
Boston, MA 02114-2022
(617) 742-5800

Dated: October 17, 2005.

G:\SSWG\Stealth Components\Defendant's sentencing memo1.wpd

# Memorandum



ATTORNEYS AT LAW

**ARENT FOX PLLC**
202.857.6000 DIRECT
202.857.6395 FAX

**Date:**   October 13, 2005

**To:**   Stern Shapiro Weissberg & Garin, LLP

**From:**   Matthew J. Clark
David R. Hamill *Arett*
Nancy A. Noonan
Patricia P. Yeh[1]

**Re:**   Summary of the Structure and Background to the U.S. Antidumping Law and Its
Application to a Review Request in *DRAMs from Korea*

---

## I.   INTRODUCTION

This memorandum responds to your request for a review of critical elements of the U.S.

antidumping ("AD") regime as they relate to certain aspects of the criminal proceeding brought

against Bernard Smith in *United States of America v. Bernard Smith*, Criminal No. 05-10009-

DPW, United States District Court of Massachusetts.  The area of particular concern is the

calculated loss of revenue advanced by the United States based on the antidumping duty

administrative review results under the antidumping duty order captioned "*Dynamic Random

Access Memory Semiconductors of One Megabit and Above from the Republic of Korea.*"

The United States government has alleged that the Defendant avoided a payment of

$384,530.81 to Customs in antidumping duties for Korean dynamic random access memory

---

[1] The authors of this memorandum are all attorneys practicing in the International Trade Group at Arent Fox PLLC.
Arent Fox is currently customs and international trade counsel to Stealth Components, Inc.  Mr. Clark has more than
20 years of private practice experience representing clients in dozens of antidumping duty and related trade
proceedings before the U.S. Department of Commerce and other agencies.  Mr. Hamill's practice includes over nine
years of service in the General Counsel's office of the Department of the Treasury advising senior Treasury officials
on customs and trade issues, and five years of private practice representing clients in a range of trade proceedings.
Ms. Noonan, a former clerk for the Hon. Evan J. Wallach, U.S. Court of International Trade, has represented clients
in antidumping duty and related trade proceedings for more than nine years.  Ms. Yeh also practices exclusively in
the international trade area and represents clients in antidumping duty and related trade proceedings.

MEMORANDUM
October 13, 2005
Page 2

("DRAMs") during a 13-month period from November 1998 through December 1999. The

antidumping duty order on DRAMs was terminated effective January 1, 2000. Because the U.S.

antidumping duty regime is of the retrospective type, meaning that the actual amount of

antidumping duty is not assessed until well after the date of importation following an

administrative review, we believe the total loss of revenue is overstated. We base this

conclusion on two propositions. First, that the actual assessment rates calculated by the U.S.

Department of Commerce ("Commerce") for the manufacturers of the DRAMs imported by

Stealth Components, Inc. ("Stealth") were far lower than the estimated antidumping duty rates

used by the government in its calculations. And second, legal analysis establishes that those

final calculated manufacturer rates are the rates that would have been applied to Stealth's

imports. To be clear, we do not see a basis for asserting that the antidumping duty assessment

rates that would have applied to Stealth, had it been reviewed, would be the estimated deposits

rates. In our opinion, the actual final assessment rates calculated by Commerce are the best

evidence of the rates that would have applied to Stealth's imports for purposes of assessing final

antidumping duties had it requested administrative review, something it had an unqualified

entitlement to do. The government's calculation, which assumes that the final antidumping duty

assessment would have occurred at the estimated deposit rates used at the time of importation for

security purposes, ignores the final rates that were calculated by Commerce and misapplies the

antidumping duty law.

     This memorandum summarizes the legal background to the statutes and regulations as

applied by Commerce in an antidumping proceeding that specifically relate to the role and

function of estimated cash deposits versus final assessments of antidumping duties. It reviews

the retrospective operation of the AD laws and the process by which final, actual liabilities are determined. This memorandum also provides an analysis that shows (i) how the antidumping duty system would have worked had the defendant, Bernard Smith ("Bernard Smith" or "Defendant"), and his company, Stealth Components, Inc., requested administrative review and (ii) the final assessment rate that Defendant would have paid had the proper procedures been followed and an antidumping administrative review been conducted on Defendant's DRAM imports.

## II.    THE U.S. ANTIDUMPING REGIME

Antidumping duty proceedings are complex administrative litigations that occur outside the scope of the Administrative Procedures Act and involve issues of international and national law, economic analysis, and business, accounting, and financial practice. The original U.S. AD law dates back to the early years of the 20th century, and has evolved into an extensive and complex body of statutes, regulations and practices administered through different U.S. federal agencies, specifically Commerce, the U.S. International Trade Commission ("ITC"), and U.S. Customs and Border Protection ("Customs").

The purpose of the AD regime is to address and remedy "dumping" of foreign goods into the U.S. market. That is, goods that are allegedly coming into the U.S. at prices lower than the value at which they are sold in other markets (*e.g.,* at "less than fair value") thereby unfairly capturing market share from U.S. producers. Commerce and the ITC determine whether (1) goods are coming into the country at less than fair value (Commerce determination) and (2) an

MEMORANDUM
October 13, 2005
Page 4

industry in the U.S. is being injured by the subject imports. (ITC determination). [2] "Affirmative" findings of both dumping and injury are required before an AD order or remedy may be imposed.

The AD process begins with the simultaneous filing of a petition at both Commerce and the ITC by one or more U.S. companies (called the Petitioner(s)) on behalf of a U.S. industry, or a self-initiation by Commerce (which are exceedingly rare). The petition will allege that the subject imported merchandise is being imported and sold in the U.S. at less-than-fair-value ("LTFV"), and that such LTFV imports are causing material injury. Commerce will investigate the allegations in the petition that relate to the existence of less-than-fair-value sales. Since the U.S. Government's calculation of loss of revenue as applied to the Defendant is based on the administrative reviews of Korean DRAMs, this memorandum will only briefly describe the investigation process. Under Commerce's regulations, the investigation will examine the "four most recently completed fiscal quarters" as of the month preceding the month the petition was filed. 19 C.F.R. § 351.204(b) (2004).

A.      **Dumping Margin Calculation**

For the investigation, and during administrative reviews of an AD Order, Commerce will collect extensive data on the relevant companies in the industry to calculate a dumping margin by comparing, using sales transactions, the price of the merchandise (called "subject

---

[2] As Commerce is solely responsible for determining whether dumping exists, calculating the amount of AD duties and duty deposits, and for administering the restrictions imposed under an AD order, it is only necessary for purposes of this memorandum to focus on the Commerce process.

MEMORANDUM
October 13, 2005
Page 5

merchandise") in the U.S. with its price in a foreign market, usually the home country market of

the producer.

The concept of "less than fair value" or "dumping" can be distilled into a straightforward

mathematical proposition:  If the U.S. prices are less than the prices in the home/domestic or

third country markets (also called "Normal Value"), then dumping has occurred.[3]  The margin of

dumping is the differences between the prices.  Commerce's dumping calculation, while simple

on its face, involves an intricate process of data collection, adjustments, deductions, and

allocations.

For example, the home market or third country market prices that will be used to

determine normal value can be analyzed to determine whether they have been priced below fully

absorbed cost of production.  If more than 20% of such sales have been made at prices that do

not cover the fully absorbed cost of production, those below cost sales will be excluded from the

determination of normal value. 19 U.S.C. § 1677b(b).  The result of that exclusion will be to

eliminate the lowest priced home market sales, leading to a higher normal value and a larger

dumping margin than would have existed had the below cost sales remained in the analysis.  This

is but one example of the complexities that pervade antidumping duty calculations.

Antidumping duty deposit rates are normally applied on an *ad valorem* basis (*i.e.*, against

the value of the merchandise).  The antidumping margin, expressed as a percentage of the U.S.

---

[3] The U.S. statute uses the term "less than fair value" to describe the comparison. *See, e.g.*, 19 U.S.C. § 1677b(a). The GATT defines dumping as when "products of one country are introduced into the commerce of another country at less than the normal value of the products...." Article VI:1 and Article 2 of the Uruguay Round Antidumping Agreement.  Under U.S. law normal value is defined as (1) the price in the exporting country, (2) if that price is not useable, the price in a third country, or the constructed value of the merchandise. 19 U.S.C. § 1677b(a)

MEMORANDUM
October 13, 2005
Page 6

price, is applied to the value of the merchandise at importation to arrive at the amount of the

estimated antidumping duty deposit.  For example, if the antidumping duty deposit rate in effect

at the time of the entry is 10%, and the transaction value of the merchandise entered is $100.00,

then the amount of estimated antidumping duty to be deposited in cash before the merchandise

can clear Customs is $10.00.

      **B.**      **The Nature of Cash Deposits When a Dumping Order is Issued and Their Lack of Relationship to Actual Liability**

As described earlier, the U.S. antidumping regime is of the "retrospective" type.  This

means that liability for antidumping duties, if any, is determined after goods are imported.  At

the moment of importation, whether a particular shipment will be liable for the final assessment

of antidumping duties is unknown, as is the amount of any such liability.  Commerce's

regulations confirm this reality:

> Unlike the systems in some other countries, the United States uses a "retrospective"
> assessment system under which final liability for antidumping and countervailing duties
> is determined after merchandise is imported.  Generally, the amount of duties to be
> assessed is determined in a review of the order covering a discrete period of time.
> 19 C.F.R. § 351.211(a)(2004).

There are three critical elements of the U.S. retrospective system that are relevant to a

discussion of the "actual" loss of revenue:  (1) the role of deposits as estimated antidumping

duties at the time of importation; (2) the administrative review process and how actual liability is

determined through administrative reviews; and (3) the application of those processes in this

instance.  A point that may be relevant to your evaluation, since this issue is arising in a criminal

context, is that the antidumping duty law operates on the basis of data analysis and interpretation

MEMORANDUM
October 13, 2005
Page 7

divorced from issues such as intent and culpability. Knowledge has no role in most antidumping

duty analyses. Instead the relevant facts are the prices, the costs, and the expenses associated

with producing and selling the subject merchandise.

The result of an antidumping duty investigation typically is the issuance of an

antidumping duty order by Commerce.[4] An antidumping duty order (1) directs the assessment of

antidumping duties within six months of the date on which Commerce has sufficient information

to determine that amount and (2) requires "the deposit of estimated antidumping duties pending

the liquidation of entries of merchandise," such deposits to be made at the same time that normal

duty deposits are made. 19 U.S.C. § 1673e(a). Deposits are exactly what their name implies:

deposits. The cash that is deposited at the time of entry serves as a security for future final

assessments, such assessments to be made at the conclusion of annual administrative reviews.

19 U.S.C. § 1675.

Prior to the enactment of the Trade Agreement Act of 1979 ("'79 Act"), imports of

merchandise subject to an antidumping duty order did not have to be accompanied by a deposit

of estimated antidumping duties. Instead, bonds, like those normally used to secure the payment

of ordinary customs tariffs were used. With the enactment of the '79 Act, Congress amended the

statute to require that imports of covered merchandise occurring after an order is issued be

accompanied by a cash deposit. 19 U.S.C. § 1673d.

Cash deposits were not intended to be revenue and they are not. It is at assessment, not

deposit, that revenue, if any, is created. Prior to assessment, deposits represent a contingent

---

[4] Pursuant to Executive Order Number 121888 (45 Fed. Reg. 989, Jan. 2, 1980), the U.S. Department of Commerce succeeded the U.S. Department of the Treasury as the administering authority under the statute.

MEMORANDUM
October 13, 2005
Page 8

security in the event a future review proceeding results in a finding that antidumping duties ought to be assessed. If the review process reveals that no dumping has occurred – or less dumping than is represented by the estimated margins – deposits are returned with interest dating from the date the deposit was made. 19 U.S.C. § 1677g(a) (1999).

The payment of interest on over-deposits and under-deposits is important because the purpose of the antidumping statutes is remedial, not punitive. *Huaiyin Foreign Trade Corp. v. United States*, 201 F. Supp. 2d 1351, 1363 (CIT 2002)(*quoting C. J. Tower & Sons v. United States*, 21 C.C.P.A. 417, 427-28 (1934), "[W]e cannot escape the conviction that the expressed purpose of Congress, in the Antidumping Act of 1921, was to impose not a penalty, but an amount of duty sufficient to equalize competitive conditions between the exporter and American industries affected;" and *quoting Union Camp Corp. v. United States*, 22 CIT 267, 278 (1998), "[d]umping duties are not penal in nature, but are 'additional duties' to equalize competitive conditions between the exporter and [affected U.S. industries].")[5] That deposits are subject to refund with interest, supports the proposition that deposits themselves are not revenue.

---

[5] The remedial nature of the antidumping statutes is underscored by the Byrd Amendment (The United States Continued Dumping and Subsidy Offset Act of 2000, 19 U.S.C. § 1675(c)). The Byrd Amendment authorizes distribution of antidumping duties to domestic producers and other interested parties that claim injury as a result of dumped merchandise. The statute is purely remedial as the amount of the distribution is based on the actual dumping duties paid and not the initial cash deposits made.

Stealth has now paid far in excess of what it would have paid had it requested a review. Had Stealth paid the correct deposit at the time of importation and subsequently sought review, it would have paid a total of $128,139.70 in duties and $14,220.59 in merchandise processing fees, for a total of $142,359.42. Stealth did pay $60,552.19 in deposits and fees at the time of importation, and since has paid $161,796.90 as a result of additional duties demanded by Customs in 2002 and 2003, after Customs became aware of the undervaluing. This, Stealth has paid $79,989.67 in excess of what it would have had it paid the full deposit and sought review.

All of the fees paid by Stealth, now $222,394.09, have gone not to the U.S. Government, but to Micron Technology. Indeed, Micron Technology has received over $33 million in Byrd Amendment distributions since 2001. *See* Exhibit 3 for excerpts of September 2005 Government Accountability Office report on *Issues and Effects of Implementing the Continued Dumping and Subsidy Offset Act*; *see also* http://www.cbp.gov/xp/cgov/import/add_cvd/cont_dump/.

MEMORANDUM
October 13, 2005
Page 9

### C.    Administrative Reviews

#### 1.    Requesting a Review

If Commerce, in its investigation, finds that dumping had occurred, it will determine an

estimated weighted average dumping margin.  These estimated weighted margins are revisited

during an administrative review if a party files a written request for such review during the

anniversary month of the publication of the order. 19 U.S.C. § 1675(a) (1999).  Where such a

request is made, Commerce must conduct a review, and the results of the review become (1) the

basis for final assessment of antidumping duties and (2) a new cash deposit rate for future import

shipments. 19 U.S.C. §1675(a)(2)(C) (1999).  An exception to the rule that review results control

liquidation arises only when no party requests review of the relevant entity (producer, exporter,

or importer) during the anniversary month.[6]  In that event, and only then, the cash deposit rate

that was in effect when the goods entered becomes the assessment rate by the failure of any party

to request administrative review.

Though Commerce may initiate an annual administrative review on its own authority, it

has never done so and will not conduct a review unless an interested party (either a Petitioner or

a Respondent) formally requests that one be conducted.  Requests for administrative review must

---

[6] The recent decision of the U.S. Court of Appeals for the Federal Circuit confirmed this rule and clarified its
application in the context of importers who purchase from resellers and distributors without knowledge on the part
of the manufacturer that such sales are being made.  *See Consolidated Bearings Company v. United States*, 348 F.3d
997 (Fed Cir. 2003).  Substantial confusion had existed as to the appropriate rate to apply in these situations when
review was not requested of or by the specific importer but review was requested by or of the manufacturer.
*Consolidated* resolves that confusion, establishing that the deposit rate is controlling where there is no review of the
importer or the reseller/exporter.  At the same time, *Consolidated* also confirms that administrative reviews set the
assessment rates for the entities that are subject to review.

MEMORANDUM
October 13, 2005
Page 10

be made during the anniversary month of the publication of the antidumping duty order.[7]

Administrative reviews normally take about 12 months to complete, but can be extended for up

to 18 months. Reviews cover all U.S. (and contemporaneous home market sales) of the

product(s) subject to the antidumping order by the relevant entities during a 12-month period, the

period of review ("POR"), running from the first day of the anniversary month of the order

through the last day of the month immediately preceding the anniversary month of the order.[8]

     In the case of Korean DRAMs, the Petitioner, Micron Technology, and, on several

occasions, the Korean manufacturers, requested administrative reviews. If an interested party (a

term of art that specifically includes importers like Stealth[9]) requests a review, Commerce is

obliged to conduct that review. The only exception is where the number of review requests is so

great that Commerce cannot "practicably" review all the entities for which review has been

requested.[10] Where this exception applies, Commerce will select a sample from the group of

entities for which review was requested, calculate individual rates for them, and calculate a

weighted average assessment rate using the whole sample group to apply to the entities not

selected by Commerce for individual examination. *See e.g., Certain Softwood Lumber Products*

*from Canada (Preliminary Results)*, 69 Fed. Reg. 33235, 33235 (June 14, 2004)(since more than

---

[7] For example, if an order was issued in August 2002, the request for the first annual review of that order must be made during August 2003. If a request were filed, Commerce would then formally initiate the review in late September or at the beginning of October 2003.

[8] If the order was issued in August, the annual POR would be August 1-July 31.

[9] 19 U.S.C. § 1677(9).

[10] 19 U.S.C. § 1677f-1. Under this provision, Commerce must review every entity for which a timely request is filed (§1677f-1(c)(1)), unless the number of entities involved in the review renders the determination of individual margins for each one "not practicable". §1677f-1(c)(2).

MEMORANDUM
October 13, 2005
Page 11

400 companies requested reviews, Commerce determined that it was not practicable to review each entity covered by review requests and chose instead to review the eight largest exporters/producers of softwood lumber. A review-specific average rate based on the eight individual reviews was assigned to the other companies that requested review).

In each administrative review under the Korean DRAMs order, Commerce conducted reviews on **all** companies that requested review or had reviews requested of them by Micron Technology. *See e.g.*, *Dynamic Random Access Memory Semiconductors of one Megabit or Above from the Republic of Korea (Preliminary Results)*, 63 Fed. Reg. 11411 (Mar. 9, 1998) (conducting reviews of the six entities for which review was requested). At no time did Commerce make any finding that the number of entities involved in any DRAM review made examination of all requesting entities impracticable.

### 2.    Administrative Review Process

The AD duty rates assigned under the order issued by Commerce at the close of the initial investigation do not represent the final amount of duty to be assessed on import entries that arrive after the order is published. Only if no party requests administrative review do cash deposit rates become the final assessment rates. The rates listed in an antidumping duty order merely establish the amount of estimated AD duty that must be deposited in cash on entries into the U.S. of products subject to an AD order before those products can clear Customs and be allowed into the flow of commerce. The final or liquidated amount of duties payable on entries of merchandise subject to an order will be determined in later administrative reviews under the

MEMORANDUM
October 13, 2005
Page 12

order. In other words, any actual antidumping duty liability is determined through a process of annual administrative reviews, not through the deposit of estimated antidumping duties.

Administrative reviews have two basic purposes. The primary purpose is to determine the final amount of AD duties actually payable on entries made during the period of review ("POR"). Thus, the principal function of annual administrative reviews is to measure the actual amount of dumping, if any, that occurred during the POR and to reconcile that amount with the estimated antidumping duty deposits made during that period. The secondary, residual purpose is to use the review results as updated, more current AD deposit rates for entries going forward from the conclusion of the review. If the final results of the review show that the amount of actual dumping during the POR was less than the duty deposits paid, the difference will be refunded, with interest. If the amount of actual dumping during the POR was higher than the deposits paid, then the difference must be made up, also with interest. The amount of actual dumping found during the POR will also be the basis for setting new antidumping duty deposit rates to go into effect going forward from the end of the review through the end of the next review.

If no review is requested, and none is conducted, all entries during the applicable POR will be closed out, or liquidated, at the antidumping duty deposit rate in effect for that period. There will be no refunds or additional payments to reconcile differences. The same antidumping duty deposit rates in effect during that period will remain in effect until a new review resulting in changes to those rates is actually conducted.

MEMORANDUM
October 13, 2005
Page 13

Duty deposit rates in effect at the time of the preliminary determination in an annual

review will remain unchanged until the final determination is issued. Similarly, all final

assessment or liquidation rates for the period will be based on the final results. If duty deposit

rates were the critical element in determining the amount of duties owed, this process would be

unnecessary. Indeed it was this process – determining final assessments – that was Congress'

priority in the '79 Act. The Ways & Means Committee described its primary goal as follows:

> The Committee is very dissatisfied with the past record of the Secretaries of the
> Treasury in assessing duties on entries subject to a dumping finding. Unless
> dumping duties are assessed in a timely fashion, the remedial effect of the law is
> negated. In this regard, the Committee finds the 3- to 3½-year average delay
> between entry of merchandise subject to a finding of dumping and assessment of
> dumping duties to be unacceptable. The bill therefore makes two major changes
> to present law to ensure expeditious administration of an antidumping order.
> Section 736(a) establishes maximum time limits on assessment whereby
> assessment must occur within 6 months after the date on which the Authority
> receives satisfactory information upon which to base assessment, but in no event
> later than 1 year after the end of the annual accounting period of the manufacturer
> or exporter during which the merchandise was entered.

H. REP. NO. 96-317 (1979).

The present structure of the statute and of the regulations, their plain language, and the

straightforward words of the Ways & Means Committee when the current statute was written,

establish that administrative reviews looking back over the imports on which deposits have been

made is the vehicle for determining final assessments. Review results, not deposits of estimated

antidumping duties, are therefore the only basis upon which any actual revenue effect can be

measured since reviews, not estimated deposits, are the vehicle by which deposits lead, if at all,

to assessments.

MEMORANDUM
October 13, 2005
Page 14

## III.    ANTIDUMPING DUTY RATES GENERALLY DECLINE OVER TIME

Because of the nature of administrative reviews as discussed above, antidumping duty rates generally decline over time.  Between 1988 and 1995, an eight-year period that precedes Stealth's import activities, 113 antidumping duty orders were put into effect by Commerce.  Because these orders were published throughout that eight-year period and reviews are conducted only pursuant to requests made during annual anniversary months of the publication of the orders, some orders have many reviews during the period, while others have few.  Nevertheless, these orders, and the review activity under them, represent the actual results of antidumping duty investigations and reviews by Commerce during the period that preceded Stealth's imports.  The relevant background data are appended in Exhibit 1.

We analyzed all 113 antidumping duty orders and the administrative reviews that were conducted pursuant to those orders to consider whether a discernible trend in antidumping duty margins was present over the initial reviews of antidumping duty orders.  For our analysis we relied on the published decisions of Commerce to collect final antidumping margins for all the companies reviewed under each order.  Because Commerce does not publish information regarding the value or volume of individual exporters' shipments, there was no way to weight the margins calculated and published by Commerce.  Instead we relied on simple averages of published final rates to assess the year-over-year change, up or down, in the final antidumping duty margins calculated by Commerce.

The graph appearing in Exhibit 2 summarizes the results of our analysis.  Starting with a simple average of all the individual margins issued for the 113 orders first published between

MEMORANDUM
October 13, 2005
Page 15

1988 and 1995, 61 of those orders had published results of a first review and the average margin

of dumping declined from 52.69% in the orders to 29.32% in those initial reviews. Again, this is

a comparison of the overall average order rate for the 113 orders to the overall average rate for

those orders that had a first review. As the graph shows, the downward trend in margins

continues as orders progress through successive administrative reviews, albeit at a much flatter

slope than in the first review and with occasional upward movements. These upward spikes

tend to be caused by exogenous market forces over which the producer, exporter, or importer

have no control. But the overall trend showing that antidumping duty margins decline over time

is obvious, even using such a coarse analysis.

This pattern is predictable, unsurprising, and mirrors general impressions among

practitioners. Antidumping duty investigations tend to arrive without warning and the results of

an investigation are based on a year's worth of sales (and costs) preceding the date of the

petition. In other words, little can be done to reduce or control antidumping duty margins in an

investigation. Since investigations establish deposit rates, not assessment rates, there is

opportunity for importers and foreign producers to adjust their sales and sales practices to reduce

or eliminate antidumping duty margins through the administrative review process and thereby

avoid or reduce the actual amount of antidumping duty ultimately assessed and obtain refunds,

with interest, on their earlier deposits of estimated antidumping duty. As importers and foreign

producers become more familiar with the complexities of the antidumping duty process, rates

tend to continue to decline and plateau as new business practices are adopted. Variability in the

pattern is introduced by outside factors not subject to the control of producers, exporters, and

importers that impact cost and or price and can cause a short-term increase in margins, including

MEMORANDUM
October 13, 2005
Page 16

sudden price declines, sudden increases in raw material or energy costs, shifts in exchange rates,

withdrawal from the U.S. market (leading to withdrawal from the proceeding and the application

of adverse findings based on the application of "facts available").

## IV.    HISTORY OF ANTIDUMPING DUTY ORDER ON KOREAN DRAMS

The history of the Korean DRAM Order spans the period from 1992 to 2000 – from the

filing of the petition seeking an order to its revocation effective January 1, 2000.  During that

time, Commerce conducted numerous administrative reviews of the DRAM Order, summarized

below, until it revoked the order effective January 1, 2000.

### A.    History Prior to Importations by Stealth

On May 12, 1992, Commerce initiated an antidumping duty investigation of Dynamic

Random Access Memory Semiconductors of One Megabit and Above from the Republic of

Korea.  *See* 57 Fed. Reg. 21231 (May 19, 1992).  Upon publication of Commerce's affirmative

preliminary determination on October 29, 1992, importers entering DRAMs into the United

States had to post bonds (or make voluntary cash deposits) ranging from 5.99 to 87.40 depending

on the manufacturer of the DRAMs.  Specifically, the preliminary determination stated:

> In accordance with section 733(d)(1) of the Act, we are directing the Customs
> Service to suspend liquidation of all entries of DRAMs from Korea that are
> entered, or withdrawn from warehouse, for consumption on or after the date of
> publication of this notice in the Federal Register.  The Customs Service shall
> require a cash deposit or posting of a bond equal to the estimated preliminary
> dumping margins… This suspension of liquidation will remain in effect until
> further notice.

57 Fed. Reg. 49066, 49070.  After an affirmative final determination by Commerce and

the ITC, an antidumping duty order covering certain Korean DRAMs (the "Order") was

MEMORANDUM
October 13, 2005
Page 17

published in the Federal Register on May 10, 1993. *See Antidumping Duty Order and Amended*

*Final Determination: Dynamic Random Access Memory Semiconductors of One Megabit and*

*Above from the Republic of Korea*, 58 Fed. Reg. 27520. Upon publication of the antidumping

duty order, cash deposits of estimated antidumping duties were required. The posting of bonds

was no longer permitted. The cash deposit rates established in that Order were:

> Goldstar Electron Co., Ltd................ 4.97
>
> Hyundai Electronics Co., Ltd............11.16
>
> Samsung Semiconductor Co., Ltd........0.82
>
> All Others.................................….3.85

Stealth only purchased DRAMs manufactured by Goldstar (LG Semicon Co. Ltd.) and Hyundai.

Therefore, the following discussion with respect to the DRAMs order will be limited to these

manufacturers.

The first administrative review was initiated on June 15, 1994, and covered DRAMs that

were entered into the United States from October 29, 1992 through April 30, 1994. 59 Fed. Reg.

30770 (June 15, 1994). Commerce published its final results of review on May 6, 1996, *see* 61

Fed. Reg. 20216, but amended the final results twice after that date (*see* 61 Fed. Reg. 51410

(Oct. 2, 1996) and 62 Fed. Reg. 2654 (Jan. 17, 1997)). Commerce determined the final dumping

margins and new cash deposit rates for LG Semicon Co. Ltd. ("LG Semicon") as 0.00 and

Hyundai as 0.10. Because these rates are less than 0.5 percent *ad valorem*, they are considered

to be *de minimis* and Commerce's practice is not to require cash deposits to be made and to

MEMORANDUM
October 13, 2005
Page 18

refund in full deposits made for the period in question. 19 C.F.R. § 351.106(c).  New entries

remain subject to suspension of liquidation pending a final determination of the assessment rate

(which could be zero) in a later administrative review that looks back to examine the actual

amount of dumping, if any, on those entries.

Based on the *de minimis* results of the first administrative review for LG Semicon and

Hyundai, cash deposits were not required for entries from these manufacturers entered into the

United States on or after May 6, 1996 and the antidumping duty deposits made on prior entries

during the period of review (Oct. 29, 1992 through April 30, 1994) were refunded in full, with

interest.

The second review period covered entries from May 1, 1994 through April 30, 1995.

For that second review period, Commerce determined that the new cash deposit rates were .01

(*de minimis*) for LG Semicon and .09 (*de minimis*) for Hyundai.

The third administrative review covering entries from May 1, 1995 through April 30,

1996 resulted in the same results—no dumping duties were owed for products manufactured by

LG Semicon and Hyundai and prior deposits for entries from May 1, 1995 through May 5, 1995

when deposits were required were refunded.  Both LG Semicon and Hyundai, individually, had

requested that Commerce revoke the antidumping duty order as to each of them.  Commerce

denied the request for revocation.

At the conclusion of the period of the third administrative review, dumping margins for

Korean DRAMs were at de minimis levels.  For the period covering the fourth administrative

MEMORANDUM
October 13, 2005
Page 19

review, however, the dumping margins increased.  The reasons for this increase are based on the

market conditions unique to the DRAM market in the mid 1990s as explained in the Report of

W. Christopher Sorrels, CPA.  Mr. Sorrels report explains (at pages 4-5) that significant excess

capacity existed among DRAM producers in late 1995 and 1996, leading to price declines and a

short-term increase in antidumping margins.  Following this period, dumping margins for Korean

DRAMs resumed their decline.

**B.      Korean DRAM Order Administrative Reviews Following Stealth
         Importations**

Stealth imported the majority of the 131 entries that are the subject of the Government's

loss of revenue calculations in 1998 and 1999.  Consequently, of particular relevance to this

proceeding are the cash deposit rates and final rates determined for entries from September 23,

1998 through December 31, 1999.

On September 23, 1998 and October 23, 1998, Commerce published the final results and

the amended final results of the fourth administrative review of the DRAM Order. 63 Fed. Reg.

50897 (Sept. 23, 1998); 63 Fed. Reg. 56906 (Oct. 23, 1998).  These notices contained cash

deposit instructions effective upon publication of these notices for DRAMs from Korea entered

on or after the publication dates.

On December 14, 1999, Commerce published the final results of the fifth administrative

review of the DRAM Order.  64 Fed. Reg. 69694 (Dec. 14, 1999).  This notice also contained

cash deposit instructions covering entries made on or after this date.  For both instructions, the

MEMORANDUM
October 13, 2005
Page 20

cash deposit rates to be assessed were the rates established for the producers of the DRAMs (*i.e.*,

Hyundai and LG Semicon) regardless of the exporter or importer of the merchandise.

For the Stealth importations made after the September 23, 1998 and October 23, 1998

notices (*i.e.*, those entries made between November 4, 1998 and December 13, 1999), the

estimated antidumping duty cash deposit rate was 3.95 percent *ad valorem* for Hyundai

merchandise and 9.04 percent LG Semicon merchandise. For the Stealth entries made under the

December 14, 1999 notice (*i.e.*, those entries made on or after December 14, 1999 and before the

January 1, 2000 revocation), the cash deposit rate for both Hyundai and LG Semicon

merchandise was 10.44 percent *ad valorem*.

The final assessment rates determined in the administrative reviews for those periods for

merchandise produced by Hyundai and LG Semicon were significantly less than the cash deposit

rates in effect at the time of importation. For entries Stealth made between November 4, 1998

and April 30, 1999, Commerce determined the final dumping rate for Hyundai merchandise to be

2.30 percent *ad valorem* (as compared to the 3.95 percent cash deposit rate for these entries) and

for LG Semicon merchandise, it determined the final dumping rate to be 1.18 percent *ad valorem*

(as compared to the 9.04 percent cash deposit rate for these entries).

The sixth period of review covered entries from May 1, 1998 through April 30, 1999.

For entries Stealth made between December 14, 1999 and December 31, 1999, Commerce

determined the final dumping rate for both producers' merchandise[11] to be 2.92 percent ad

---

[11] On June 7, 2001, Commerce announced in a *Federal Register* notice that due to Hyundai's acquisition of LG
Semicon, it would consider Hyundai and LG Semicon as one entity with one calculated final dumping rate for these

MEMORANDUM
October 13, 2005
Page 21

*valorem* (as compared to the 3.95, 9.04 or 10.44 percent cash deposit rates for these entries). The

seventh period of review covered entries from May 1, 1999 through December 31, 1999.

Finally, Stealth made seven entries of Korean DRAMs merchandise after December 31, 1999 for

which no cash deposits were required.

,

The DRAM Order was revoked effective January 1, 2000. *Notice of Final Results of Full*

*Sunset Review: Revocation of Antidumping Duty Order on DRAMs of One Megabit and Above*

*from the Republic of Korea*, 65 Fed. Reg. 59391 (Oct. 5, 2000) (stating that revocation is

effective January 1, 2000). No final duties were owed on these entries. The Order was revoked

through a five-year ("sunset") review proceeding. Commerce revoked the DRAM Order because

the only domestic producer of DRAMs, Micron Technology, stated it agreed the Order

should be revoked. Commerce's notice of revocation was published in the Federal Register on

October 5, 2000, but people in the industry knew that the DRAM Order would be revoked

(Micron Technology, the only domestic producer, had earlier indicated that it was no longer

interested in the order).

## V.    ANTIDUMPING ANALYSIS APPLIED TO STEALTH'S IMPORTS

As discussed above, the actual collection of any antidumping duty, and the amount to be

collected, is determined on an annual basis through administrative reviews. At the conclusion of

an administrative review, the antidumping duty margin calculated for the reviewed sales

becomes the basis for assessing final antidumping duty liability on those sales and becomes the

updated basis for security deposits on future imports. The following analysis discusses how an

---

entries made during this period. The new combined entity subsequently changed its name to Hynix Semiconductor,
Inc.

MEMORANDUM
October 13, 2005
Page 22

accurate margin calculation would have been made had Stealth requested review. Moreover, this
analysis will show that every methodology that Commerce could have used to determine final
dumping margins for Stealth entries would have resulted in Commerce applying the producer's
rates to Stealth's entries. Although Commerce prefers to compute importer-specific final
assessment rates, doing so requires access to data from the producer about its sales to the
importer. Stealth's imports were from middleman resellers, not directly from the Korean
producers from whom Commerce collects pricing data. As a result, it is unlikely Commerce
would have had the data to compute producer-importer specific margins, making the final
producer rates published by Commerce the most accurate rates available to apply to Stealth.

A.    **Under the Analytical Approaches Available to Commerce, Stealth Would
       Have Received the Manufacturer's Rate**

In the Korean DRAMs case, Commerce granted every review request it received and it
never received more than six review requests. Had Stealth requested a review, it would have
received one since there was no point in time when Commerce received a number of requests
that would have made it impracticable to conduct all the individual reviews that were requested.
Since Stealth would have been reviewed had it requested review, the relevant consideration is the
final assessment rate that would have been applied to Stealth. Estimating that rate begins with a
consideration of who, under the antidumping law, was selling to Stealth.

It is black letter law that the determination of the United States selling price in an
antidumping duty investigation must be based on the first sale to the U.S. and to an unaffiliated
purchaser. 19 U.S.C. § 1677a (1999). The statute provides two methods for determining the U.S.

MEMORANDUM
October 13, 2005
Page 23

selling price of imported merchandise for purposes of measuring whether that price is "dumped." The U.S. selling price can be a price that is set before the merchandise is imported (so-called Export Price or "EP") or after importation (the Constructed Export Price or "CEP"). *Id.* Since in either case the price used must be the first price to an unaffiliated purchaser, a critical first step in every antidumping duty proceeding is to identify the first sale to the United States.

Stealth's importations would qualify as EP or Export Price sales because the prices paid by Stealth (and by the resellers from which it purchased) were determined prior to importation and because there was no affiliation between Stealth and LG Semicon or Hyundai, the Korean producers. It is our understanding that the various resellers were also unaffiliated with LG Semicon or Hyundai, or with Stealth. Because prices were set prior to importation for the sales from the Korean manufacturers to the resellers and from the resellers to Stealth, the critical question is to ask which sales would be used to determine an antidumping duty margin for Stealth.

To correctly identify the seller and the sale that constitutes the first unaffiliated party sale to the U.S., Commerce uses a knowledge test, as seen in the Korean DRAMs review. *Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke the Order in Part*, 64 Fed. Reg. 69694 (Dec. 14, 1994), and accompanying Issues & Decisions Memorandum at LG Semicon Company-Specific Comment 1 (examining factors such as documents and correspondences from LG Semicon to determine the transaction's chain, nature, and characteristics and determining that LG Semicon had knowledge of its merchandise going to U.S. customers); *see also, Notice of Preliminary Results of Antidumping Duty Administrative*

MEMORANDUM
October 13, 2005
Page 24

*Review: Certain In-Shell Raw Pistachios From Iran*, 69 Fed. Reg. 48197, 48199 (Aug. 9,

2004)(stating that Commerce considers factors such as: "(1) Whether that party prepared or

signed any certificates, shipping documents, contracts or other papers stating that the destination

of the merchandise was the United States; (2) whether that party used any packaging or labeling

which stated that the merchandise was destined for the United States; (3) whether any unique

features or specifications of the merchandise otherwise indicated that the destination was the

United States; and (4) whether that party admitted to Commerce that it knew that its sales were

destined for the United States.").

If the seller, whether the manufacturer or another entity, knows (or should know) that its

customer is a U.S. buyer, or that its customer will resell the goods to the U.S., then that seller is

the party who sets the first price to the U.S. and is the correct starting point for the antidumping

analysis. *Certain In-Shell Raw Pistachios From Iran* at 48199. Conversely, if the seller does not

know (or has no reason to know) that its customer is a U.S. customer or will resell to the U.S.,

the seller is not setting pricing to the U.S. and its home market and third country sales truly are

non-U.S. sales. In these instances, Commerce must look further along the chain of commerce to

identify the entity that made the relevant U.S. sale.

The knowledge test applied by Commerce is objective. The pertinent inquiry is: did the

seller have actual knowledge that the goods were destined for the U.S. or, based on the

circumstances of sale, should the seller have known? Knowledge can be shown or inferred from

invoice and customer addresses, labeling or product characteristics unique to the U.S., orders

coming from U.S. entities, payment from U.S. entities, among other sources. Application of the

MEMORANDUM
October 13, 2005
Page 25

knowledge test has two possible outcomes. Either the manufacturer knew that it was selling to

the U.S. because its immediate customer was a U.S. entity or was an entity reselling to the U.S.,

or the manufacturer did not know that it was selling to the U.S., directly or indirectly. Where the

manufacturer has knowledge, the antidumping duty margin for the manufacturer will apply to all

of the manufacturer's sales. Where the manufacturer does not have knowledge, further analysis

is required. That analysis will lead to the application of the manufacturer's rate plus an add-on if

any further dumping is attributable to an intermediary, such as a reseller.

If Commerce concludes that a manufacturer knew (or should have known) that it was

selling to the U.S., or that its intermediate customer was selling to the U.S., antidumping duty

margins will be calculated for the manufacturer based on all of the U.S. sales made by that

manufacturer. If the producer does not have knowledge that its merchandise is destined for the

United States, Commerce must apply a two-step process to determine whether any dumping

occurred and whether the intermediary reseller (the middleman) engaged in any incremental

dumping. If so, the middleman's dumping will be added to the manufacturer's dumping margin

to arrive at a combined rate. If the middleman did not engage in any incremental dumping, the

addition is zero and the manufacturer's rate applies.

### B.    The Middleman Calculation

Where a manufacturer sells without knowledge that its customer will resell to the U.S.,

the statute directs Commerce to compute the antidumping margin that results from this

middleman's pricing actions. Commerce's analysis has two components. First, Commerce must

determine whether a "substantial portion" of the middleman's resales to the U.S. were made at

MEMORANDUM
October 13, 2005
Page 26

prices below its acquisition cost from the manufacturer. If the answer is "yes," the next step is to

determine the amount of this dumping (the differential between the middleman's acquisition cost

and its resale price) and add it to the dumping by the manufacturer. *Notice of Final*

*Determination of Sales at Less Than Fair Value: Stainless Steel Plate in Coils From Taiwan*, 64

Fed. Reg. 15493, 15494 (Mar. 31, 1999). Neither the statute, the regulations, nor the

Department's practice define "substantial portion." Where Commerce has applied its middleman

analysis, it has deemed 44% of total U.S. sales at below acquisition cost to be "substantial."

Additional guidance to the meaning of substantial comes from the text of § 1677b(b), the only

provision in the statute that uses the phrase "substantial quantities" in the context of testing

whether certain sales are suitable for use in an antidumping duty calculation. In that context, the

statute defines 20% as the level at which sales represent "substantial quantities." In combination,

Commerce's prior decision and the language of the statute suggest that with respect to sales

volumes, substantial means less than a majority but more than 20%.

**B.    Calculation of Stealth's Actual Duties**

If Korean DRAM producers had knowledge that their merchandise was destined for the

U.S., even if the merchandise was being sold through a middleman, those sales would be treated

as U.S. sales and would be used to determine the final manufacturer's rate. Importer-specific

assessment rates would be calculated for each importer, but only to the extent Commerce had

detailed importer-specific information necessary to calculate importer-specific rates within the

data collected from the producers.

If the review showed that the Korean producers did not know their DRAMs were

destined for the United States, Commerce would have to consider the sales practices of the

MEMORANDUM
October 13, 2005
Page 27

resellers from whom Defendant purchased the DRAMs. In that analysis the threshold question would be whether a substantial proportion ($\geq$ 20%) of the resellers' sales were made at prices below the reseller's acquisition costs of the DRAMs. If examination showed that the reseller was covering its acquisition cost, then the reseller's transactions would be ignored and the final manufacturer's rate would apply to the Defendant's entries without any add-on. Based on the expert report prepared by W. Christopher Sorrels, the business practices of middlemen/resellers in the DRAM industry -- in particular their practice of not buying until resale opportunities and prices are known -- make it improbable, if not impossible, for Commerce to have found those same resellers to have made a substantial proportion of their sales at less than acquisition cost. As a consequence, there would be no basis under the statute to add to any final margin determined for the manufacturer.

Even though the reseller analysis would show no incremental dumping, the results published by Commerce showed that dumping was occurring from the manufacturers. But since those manufacturers were not selling direct to Stealth, there would be no way to compute a Stealth-specific rate using the manufacturer's data. Instead, the final overall manufacturer rates would be the most accurate available rates to use for purposes of assessing final antidumping duties on Stealth's entries. Please note that in this scenario Stealth would be assessed final antidumping duties even though Commerce's analysis showed that Stealth's supplier (the reseller) did not itself engage in any dumping and even though the Korean manufacturers did not intend or know they were selling to the U.S. or to Stealth in particular. Stealth is simply presumed to benefit from the manufacturer's overall margin of dumping, even though there is no

MEMORANDUM
October 13, 2005
Page 28

evidence it actually did. This analysis would apply to any importer of Korean DRAMs during

this time that was buying through resellers and middlemen.

The illegal acts leading to the Defendant's guilty plea in these proceedings have no

bearing whatsoever on the analysis of the antidumping laws and the mechanics of the loss of

revenue calculations herein. Following is an example of the proper loss calculation using one of

Stealth's entry at issue. The government appraised a value of $136,800.00 for Entry Number

110-6947780-9. If Stealth had not misrepresented the value, accurately stated it, paid the

deposit, and requested a review, then the proper calculation is as follows:


**Cash Deposit Rate During Time of Entry (LG)(Determined on Oct. 23, 1998)**:
9.04%

**Appraised Value of Entry Number 110-6947780-9**:

$136,800.00

**Cash Deposit for the Entry** = 9.04% X $136,800.00 =

**$12,366.72**

**Final Assessment Rates (LG) (Determined on Nov. 15, 2000)**:

 1.18%

**Actual Duties Assessed on Entry Number 110-6947780-9** =

$1.18% X $136,800.00 = **$1,614.24**

**Difference Between Cash Deposit and Actual Duties Assessed** =

$12,366.72 - $1,614.24 = **$10,752.48**

MEMORANDUM
October 13, 2005
Page 29

Applying this analysis to the all the entries listed by the Government, the total antidumping duties due have been significantly overstated.[12]  The total merchandise processing fee also would be reduced.[13]

## VI.    CONCLUSION

In our view, the United States' loss of revenue calculation as presented to this court is incorrect because is relies on the simplistic application of *estimated* antidumping duty *deposit* rates as the measure of *final* antidumping duty liability.  As the name *"deposits of estimated antidumping duties"* plainly implies, the provision of cash deposits does not establish final liability and the rates used to make deposits of estimated antidumping duties are not the actual or final measure of antidumping for the entries at issue.  Ultimate liability is a function of the final assessment rates calculated by the Department of Commerce in administrative reviews.

---

[12] The actual of loss of revenue to the government should be computed by using the final rates for Hyundai and LG Semicon for the relevant periods.  As presented earlier in this memorandum, these rates were published in the *Federal Register*.  In reviewing the government's spreadsheet, we agree with the cash deposit rates set forth in the spreadsheet.  The government's spreadsheet does not include the final rates.  The rates for Korean DRAMs from those manufacturers for the relevant periods were as follows:

|  | 4/1/98-4/30/99 | | 5/1/99-12/31/99 | |
|---|---|---|---|---|
|  | Cash Deposit Rate (%) | Final Rate (%) | Cash Deposit Rate (%) | Final Rate (%) |
| Hyundai | 3.95 | 2.30 | 3.95 | 2.92 |
| LGS | 9.04 | 1.18 | 9.04 | 2.92 |

[13] The merchandise processing fee, or MPF as it commonly referred, is a fee charged by Customs to process the entry.  It is also based upon the value of the merchandise, but the fee cannot exceed $485 per entry.

MEMORANDUM
October 13, 2005
Page 30

The loss of revenue attributed to the Stealth entries at issue should be based on the final manufacturers' rates, not the cash deposits rates. If Stealth's entries had been subject to an administrative review by Commerce, a number of scenarios could have occurred. Under any of these scenarios, Stealth would have received the final manufacturers' rates because there is no evidence that any amount of incremental "middleman dumping" could be found and data could not exist to permit a Stealth-specific rate to be computed using data collected from the manufacturers, Commerce established method for collecting information.

EXHIBIT 1

| Number of Cases | Average of Antidumping Margins on a Per Order Basis (all margins averaged for each order) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Investigation | 1st AR | 2nd AR | 3rd AR | 4th AR | 5th AR | 6th AR |
| 113 (Investigation only) | 55.31% | | | | | | |
| 14 (Completed 1st AR) | 45.30% | 35.39% | | | | | |
| 17 (Completed 2nd AR) | 57.54% | 40.49% | 41.84% | | | | |
| 11 (Completed 3rd AR) | 40.76% | 8.50% | 13.36% | 14.29% | | | |
| 7 (Completed 4th AR) | 57.08% | 47.37% | 50.31% | 54.38% | 53.98% | | |
| 3 (Completed 5th AR) | 45.45% | 5.64% | 9.11% | 24.34% | 10.99% | 6.78% | |
| 9 (Completed 6th AR +) | 53.40% | 20.35% | 16.62% | 15.61% | 30.59% | 31.19% | 20.75% |
| Overall Average | 52.69% | 29.32% | 29.07% | 25.07% | 36.42% | 25.09% | 20.75% |

| DOC Case No. | Average of Rate (Order) | Average of Rate (1AR) | Average of Rate (2 AR) | Average of Rate (3 AR) | Average of Rate (4 AR) | Average of Rate (5 AR) | Average of Rate (6 AR) | Number of Reviews |
|---|---|---|---|---|---|---|---|---|
| A-351-806 | 90.50 | - | 18.71 | 48.41 | 17.80 | - | | 5 |
| A-122-814 | 31.33 | - | 21.00 | - | - | | | 4 |
| A-405-802 | 40.36 | - | 30.70 | - | | | | 3 |
| A-580-803 | 14.08 | 0.02 | 1.02 | | | | | 2 |
| A-580-812 | 5.45 | 0.05 | 0.05 | | | | | 2 |
| A-580-807 | 4.55 | 0.05 | 2.95 | 0.01 | | | | 3 |
| A-583-803 | 29.15 | 0.09 | | | | | | 1 |
| A-428-810 | 24.58 | 0.20 | 18.05 | 0.27 | 0.70 | 0.45 | | 5 |
| A-588-702 | 34.13 | 0.56 | | | | | | 1 |
| A-122-822 | 17.21 | 0.70 | 6.96 | 0.60 | | | | 3 |
| A-412-810 | 25.82 | 0.92 | 0.57 | 2.10 | | | | 3 |
| A-357-804 | 8.65 | 1.56 | 4.52 | | | | | 2 |
| A-403-801 | 23.79 | 2.06 | 13.80 | | | | | 2 |
| A-533-809 | 171.71 | 2.15 | 31.06 | | | | | 2 |
| A-428-816 | 36.00 | 2.56 | | | | | | 1 |
| A-580-806 | 1.43 | 2.61 | 3.00 | | | | | 2 |
| A-475-801 | 145.58 | 3.15 | | | | | | 1 |
| A-559-801 | 25.08 | 4.65 | 8.07 | 11.03 | 4.38 | 1.85 | 3.86 | 6 |
| A-351-804 | 61.25 | 4.85 | 4.51 | 8.14 | 4.84 | 12.47 | 2.43 | 6 |
| A-583-815 | 22.36 | 5.81 | | | | | | 1 |
| A-557-805 | 16.34 | 6.06 | 0.10 | | | | | 2 |
| A-412-803 | 11.13 | 6.27 | 15.10 | 14.13 | 29.03 | | | 4 |
| A-401-805 | 24.23 | 6.62 | 1.48 | 34.00 | | | | 3 |
| A-570-815 | 19.14 | 7.25 | 24.23 | | | | | 2 |
| A-428-801 | 71.60 | 7.70 | | | | | | 1 |
| A-588-802 | 43.08 | 8.90 | 7.03 | 10.27 | 38.79 | 77.52 | 40.08 | 6 |
| A-421-701 | 16.99 | 9.23 | 0.66 | 0.96 | | | | 3 |
| A-614-801 | 98.60 | 9.25 | 10.54 | 5.85 | | | | 3 |
| A-580-816 | 17.70 | 10.18 | | | | | | 1 |
| A-588-707 | 77.23 | 10.74 | 0.59 | 0.93 | | | | 3 |
| A-588-804 | 49.66 | 10.99 | 23.33 | 53.68 | 12.08 | 69.25 | | 5 |
| A-423-805 | 10.05 | 13.05 | 24.10 | 10.88 | | | 13.72 | 6 |
| A-427-811 | 24.51 | 13.75 | 6.53 | | | | | 2 |
| A-588-703 | 41.32 | 16.83 | 5.68 | 30.12 | 14.47 | 19.88 | | 5 |
| A-588-815 | 77.45 | 18.30 | 24.47 | | | | | 2 |

| Account | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| A-475-703 | 46.46 | 20.79 | 23.57 | 13.31 | 2.26 | 6.64 | 17.73 | 6 |
| A-421-805 | 66.92 | 22.03 | 26.25 | | | | | 2 |
| A-428-820 | 57.72 | 22.12 | | | | | | 1 |
| A-411-801 | 49.51 | 23.29 | 17.93 | 21.97 | 6.54 | 5.85 | 38.67 | 6 |
| A-412-801 | 22.52 | 25.31 | 42.31 | 34.81 | | | | 1 |
| A-538-802 | 18.55 | 26.49 | | | | | | 6 |
| A-570-827 | 33.33 | 27.85 | | | | | | 3 |
| A-549-813 | 42.92 | 29.94 | | | | | | 6 |
| A-427-801 | 31.73 | 31.73 | 31.73 | 1.32 | | | | 1 |
| A-559-802 | 30.31 | 36.25 | 15.53 | | | | | 2 |
| A-582-802 | 24.96 | 39.05 | 36.25 | | | | | 6 |
| A-602-803 | 35.75 | 45.85 | 39.05 | 43.79 | 32.45 | | | 2 |
| A-570-803 | 20.58 | 52.60 | 32.00 | | | | | 4 |
| A-549-807 | 38.44 | 57.34 | 48.00 | 61.85 | 109.43 | 73.69 | 36.30 | 2 |
| A-201-802 | 74.90 | 60.38 | 74.90 | | 66.42 | 33.45 | 33.99 | 6 |
| A-475-802 | 60.79 | 60.79 | | | | | | 6 |
| A-475-811 | 33.39 | 71.33 | | | | | | 2 |
| A-821-807 | 51.01 | 76.20 | | | | | | 1 |
| A-583-816 | 97.85 | 81.87 | | 93.54 | 93.54 | | | 1 |
| A-570-825 | 64.93 | 88.87 | 64.68 | 94.04 | | | | 2 |
| A-351-824 | 93.16 | 93.16 | | 93.16 | 93.16 | | | 4 |
| A-588-807 | 129.71 | 129.71 | 129.71 | 129.71 | 129.71 | | | 4 |
| A-588-813 | 376.67 | 376.67 | 376.67 | | | | | 2 |
| A-570-831 | 11.33 | | | | | | | 6 |
| A-588-810 | 75.54 | | 11.54 | 1.75 | | | | 2 |
| A-351-817 | 76.28 | | 0.87 | | | | | 1 |
| A-570-804 | 32.62 | | | | | | | 1 |
| A-201-805 | 49.25 | | | | | | | 2 |
| A-201-809 | 21.70 | | | | | | | 4 |
| A-201-817 | 103.38 | | | | | | | 4 |
| A-351-809 | 25.88 | | | | | | | 2 |
| A-351-819 | 19.43 | | | | | | | 6 |
| A-351-825 | 125.00 | | | | | | | 2 |
| A-351-826 | 108.13 | | | | | | | 6 |
| A-357-809 | 1.36 | | | | | | | 6 |
| A-357-810 | 50.13 | | | | | | | 3 |
| A-412-805 | 109.22 | | | | | | | 6 |
| A-412-814 | | | | | | | | 1 |

| | |
|---|---|
| A-427-808 | 39.40 |
| A-428-802 | 100.60 |
| A-428-803 | 3.84 |
| A-428-807 | 100.40 |
| A-428-815 | 4.18 |
| A-469-803 | 105.61 |
| A-469-805 | 35.29 |
| A-475-814 | 1.27 |
| A-475-816 | 49.78 |
| A-479-801 | 10.81 |
| A-485-803 | 75.04 |
| A-533-806 | 114.80 |
| A-533-808 | 48.80 |
| A-533-810 | 12.45 |
| A-549-812 | 7.82 |
| A-570-802 | 78.40 |
| A-570-814 | 122.46 |
| A-570-822 | 69.88 |
| A-570-826 | 54.78 |
| A-570-828 | 150.00 |
| A-570-832 | 108.26 |
| A-570-835 | 46.41 |
| A-580-805 | 66.30 |
| A-580-809 | 7.40 |
| A-580-810 | 5.30 |
| A-580-813 | 21.20 |
| A-580-825 | 6.09 |
| A-583-806 | 64.87 |
| A-583-814 | 23.56 |
| A-583-820 | 31.93 |
| A-583-821 | 48.00 |
| A-588-704 | 46.81 |
| A-588-809 | 157.85 |
| A-588-812 | 66.00 |
| A-588-817 | 34.85 |
| A-588-824 | 36.41 |
| A-588-831 | 31.08 |

A-588-833
A-588-835
A-821-805
A-823-806

61.47
44.20
41.77
94.91

# EXHIBIT 2



Aggregate Average Dumping Margin Based on Average Margin Per Order

# EXHIBIT 3

United States Government Accountability Office

# GAO

## Report to Congressional Requesters

September 2005

# INTERNATIONAL TRADE

## Issues and Effects of Implementing the Continued Dumping and Subsidy Offset Act



**G A O**
Accountability ★ Integrity ★ Reliability

GAO-05-979

Appendix III
CDSOA Recipient and Non-Recipient
Companies in Seven Industries

The universe of dry pasta non-recipients[25] is larger than the universe of recipients.[25] We sought to obtain views from a comparable number of non-recipients as recipients, but we had difficulty identifying non-recipient dry pasta companies. To identify these companies, we obtained information from associations or others that were knowledgeable about the industry. Specifically, we obtained company names and contact information from (1) the website of the National Pasta Association, which presently carries out only limited activities on behalf of the industry; (2) an association management company that handles administrative matters for the National Pasta Association; (3) a directory of pasta companies published on http://www.bakingbusiness.com, a division of Milling and Baking News, which is a business news organization that ITC had identified as closely following the pasta industry; and (4) other pasta companies. Many of the companies we identified through these sources were not makers of dry pasta as defined in the orders, but were instead makers of egg noodles, fresh or refrigerated pasta, couscous, and boxed or frozen foods that use pasta, or were flour mills or other companies linked to the production of dry pasta. We surveyed eight non-recipient dry pasta manufacturers, from which we received six completed surveys. The respondents include the fourth-largest dry pasta manufacturer in the United States, several smaller pasta companies that produce durum wheat pasta, one company that produces wheat-free pasta, and one company that produces exclusively organic pasta. The views of these respondents may not be representative of all non-recipients.

# Views on CDSOA from Recipients in the DRAM Industry

## Background

Dynamic random access memory (DRAM) semiconductors are considered commodity products and compete largely on the basis of price; DRAMs of similar density, access speed, and variety are generally interchangeable

---

[25]Whereas only 11 pasta recipient companies have received CDSOA disbursement, the U.S. Census Bureau identified 182 dry pasta companies in its 2002 economic census. See U.S. Census Bureau, Dry Pasta Manufacturing: 2002 Economic Census (Washington, D.C.: December 2004).

regardless of the country of fabrication. Today, four companies produce DRAMs in the United States:[26] Micron Technologies is a U.S. company, Infineon Technologies is a spin-off of the German company Siemens, and Samsung Electronics[27] and Hynix Semiconductor[28] are Korean companies. All of these companies now have production facilities in the United States as well as abroad, but the latter three have entered the U.S. industry within the past decade. The DRAM industry is cyclical in nature, where demand is driven by investments in computers and other end-products. Fabrication facility costs are high and require complete replacement approximately every 10 years. Due to high fixed costs, chip manufacturers cannot afford to scale down production; they must constantly produce chips and invest or go out of business.

One countervailing duty order is currently in effect for DRAMs produced by Hynix only.[29] This duty order came into effect in 2003 and its duty rate is currently 44 percent. Micron Technology received the bulk of distributions in this industry because it was the sole recipient of duties from two antidumping orders dating from the 1990s on DRAMs and other kinds of chips. Payments were made to Micron on DRAMs of 1 megabit and above under one AD order issued in 1993 and revoked in 2000, as well as on an AD order on SRAMs (static random access memory chips) issued in 1998 and revoked in 2002. The vast majority of CDSOA disbursements to the industry (approximately $33 million) in fiscal years 2001 through 2004 were related to these orders. Infineon did not incorporate in the United States until 2000 and, therefore, did not participate in the earlier investigations. Both Infineon and Micron are eligible and received disbursements under the

---

[26]The Department of Commerce's final determination defines the imported merchandise within the scope of its investigation as DRAMs from the Republic of Korea (ROK), whether assembled or unassembled. Processed wafers fabricated outside of the ROK and assembled into finished semiconductors in the ROK are not included in the scope.

[27]Samsung Electronics Co. Ltd. of Korea is associated with Samsung Austin Semiconductor LLC in Texas. Wafers fabricated in the Austin facility are sent to Samsung facilities in Korea for cased DRAM assembly and in some cases module assembly. These do not fall under the scope of the order.

[28]Hynix Semiconductor, Inc. of Korea has two U.S. subsidiaries in California and Oregon. However, DRAM wafers fabricated in Oregon are sent to Korea for assembly. These do not fall under the scope of the order.

[29]The Department of Commerce determined that the Government of Korea directed credit to the Korean semiconductor industry through 1998 and specifically to Hynix and companies that continue to be, or were part of, the Hyundia Group from 1999 through June, 2002.

current order but Hynix and Samsung are not eligible because they opposed the petition. Because DRAMs are a technologically dynamic product, it is expected that Commerce will revoke these orders when the subject products are obsolete. New products open themselves to new petitions and orders, thereby allowing new potential CDSOA recipients.

Table 17 depicts CDSOA recipients for DRAMs in fiscal years 2001-2004.

**Table 17: Fiscal Years 2001-2004 DRAM CDSOA Recipients**

| | Company | Amount paid | Amount claimed | Amount paid as a percentage of total paid to industry |
|---|---|---|---|---|
| 1 | Micron Technology | $33,389,988 | $9,093,423,782 | 99.98 |
| 2 | Infineon Technologies Richmond | 5,974 | 590,776,005 | 0.02 |

Source: GAO analysis of CBP data.

## CDSOA Effects on DRAM Companies

### CDSOA Disbursements Have Mixed Effects on DRAM Companies

The two recipients of CDSOA disbursements reported mixed effects. One recipient reported that, although at the time it was operating at a net loss, CDSOA distributions improved its profitability, investment, employment, and research and development. The company noted that it would be of greater help if payments were made soon after other countries began their unfair trade practices. Another recipient reported that disbursements were immaterial to their operations.

Fiscal year 2004 CDSOA disbursements are equal to less than 1 percent of both companies' sales.[30]

Table 18 presents DRAM recipients' responses to our questionnaire on CDSOA's effects.

**Table 18: CDSOA Effects on DRAM Companies**

| Category | Positive effects | Little or no effects | Negative effects | No basis to judge | Number of respondents |
|---|---|---|---|---|---|
| **Recipients** | | | | | |
| Prices | 0 | 2 | 0 | 0 | 2 |
| Net sales | 0 | 2 | 0 | 0 | 2 |
| Gross profits | 1 | 1 | 0 | 0 | 2 |
| Net income | 1 | 1 | 0 | 0 | 2 |
| Property, plant, and equipment | 1 | 1 | 0 | 0 | 2 |
| Research and development | 1 | 1 | 0 | 0 | 2 |
| Employment | 1 | 1 | 0 | 0 | 2 |
| Ability to compete | 1 | 1 | 0 | 0 | 2 |
| Market share | 0 | 2 | 0 | 0 | 2 |

Source: GAO analysis of company responses to structured questions.

## CDSOA Effect on Company Ability to Compete in U.S. Market

Table 19 shows companies' responses to our question on CDSOA's effect on their ability to compete in the U.S. market.

---

[30]The ratio of a company's fiscal year 2004 CDSOA disbursements to its 2004 new sales may not be representative of this ratio for prior fiscal years or of the average ratio of disbursements to net sales for the company since CDSOA's inception, because of fluctuations in the size of CDSOA disbursements to net sales. Calculating average ratios would help take account of these fluctuations, but we did not calculate such ratios because we lacked consistent information about disbursements and net sales for all CDSOA recipients that responded to our case study questions.

**Table 19: CDSOA Effect on DRAM Companies' Ability to Compete in U.S. Market**

| Increased | Stayed about the same | Decreased | Don't know/no basis to judge | Number of respondents |
|---|---|---|---|---|
| **Recipients** | | | | |
| 1 | 1 | 0 | 0 | 2 |

Source: GAO analysis of company responses to structured questions.

## Company Uses of CDSOA Funds

We also asked companies to describe how they used the CDSOA payments that they received. However, the law does not require that distributions be used for any specific purpose. One recipient uses CDSOA distributions to fund U.S. operations and to invest in new U.S. production equipment. The other recipient also uses distributions in operations.

## Net Sales and Employment Trends

Historically, the DRAM market is subject to periods of "boom and bust." Both CDSOA recipients reported some net losses and have experienced slight declines in production and related workers during the past 4 fiscal years.

## Extent of Overseas Production

One company has DRAM production facilities in three U.S. states as well as Japan, Italy, and Singapore. The other indicated that it has both domestic and foreign production facilities; they also noted that DRAMs manufactured in the United States can be sold abroad, and DRAMs manufactured abroad can in turn be sold here.

## Scope and Methodology

To obtain the views of DRAM-producing companies on CDSOA's effects, we sent a set of structured questions to the two CDSOA recipients. Current CDSOA payments on DRAMs are made on a CV order issued in 2003.

To identify CDSOA recipients, we obtained information from CBP about the companies that have received payments in each of the 4 years that disbursements have been made. CBP identified two companies. We surveyed both recipient companies, and both provided completed surveys.

To identify non-recipients, we consulted the recipient companies to identify their competitors, and we obtained information on domestic producers

from the ITC's final determination on DRAM and DRAM Modules from Korea.[31] There are two U.S. subsidiaries of Korean companies that are considered domestic producers who opposed the petition for the current order. We attempted to contact these companies but were unsuccessful in our efforts. We did not attempt to contact a fifth company that is also considered a domestic producer; this company does not list the major DRAM producers as competitors, and has no fabrication facilities.[32] ITC listed other domestic producers for the purposes of its investigation, but these companies have since ceased DRAM production or have ceased to exist.

# Views on CDSOA from Recipients and Non-Recipients in Crawfish Industry

## Background

Crawfish are freshwater crustaceans that resemble lobsters but are considerably smaller. U.S. commercial production of crawfish is concentrated within a relatively small area of southern Louisiana, where crawfish are harvested in the wild by fishermen and farmed in ponds. Crawfish may be sold whole and live, whole and boiled, or as fresh or frozen tail meat. Whole crawfish and fresh tail meat is consumed primarily in Louisiana and neighboring states, where there is generally a preference for local products in season. Tail meat is also sold more broadly throughout the United States. U.S. producers supply whole crawfish and fresh and frozen tail meat, whereas imports, mainly from China, are primarily frozen tail meat. U.S. businesses that process whole crawfish into tail meat are primarily small, family-owned concerns. Inexpensive imports and poor harvests have driven many domestic crawfish processors out of business in recent years. It is estimated that there were over 100 processors in

---

[31]See ITC, *DRAM and DRAM Modules from Korea*, Investigation No. 701-TA-431 (Final), Publication 3616 (Washington, D.C.: August 2003).

[32]According to the ITC, companies that only package DRAMs into DRAM modules and fabless design houses do not engage in sufficient production-related activities to warrant their inclusion in the domestic industry. Nonetheless, ITC included this company in a list of domestic producers for the purposes of its investigation.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| : | |
| : | |
| v. : | CRIMINAL NO 05-10009-DPW |
| : | |
| : | |
| BERNARD SMITH, : | |
| Defendant : | |
| : | |

## EXPERT REPORT OF W. CHRISTOPHER SORRELS, CPA

This report has been prepared at the request of defendant, Bernard Smith and Stealth Components, Inc. ("Stealth"), through counsel, to describe the process by which antidumping duties are calculated by the U.S. Department of Commerce (the "Department of Commerce" or "Department"), with a particular emphasis on the calculations that were made in the antidumping duty order captioned *Dynamic Random Access Memory Semiconductor of One Megabit and Above from the Republic of Korea* and how such calculations likely would have been made if Stealth had requested the Department to undertake annual administrative reviews of Stealth's imports of DRAMs subject to that order. By affixing my signature to this report I attest under penalty of perjury that all the statements made herein are my own and reflect my expert opinion or understanding of the facts stated.

### Qualifications

My name is Chris Sorrels, and I am currently employed by WCS International LLC as an international trade consultant providing services to companies involved in antidumping proceedings. I graduated *Magna Cum Laude* from Virginia Polytechnic and

State University (Virginia Tech) with a Bachelor of Science degree in Business and a major in Accounting. I am a certified public accountant and a member of the American Institute of Certified Public Accountants. I was employed for two years at Peat Marwick Mitchell & Co as an auditor and business consultant. After promotion to supervisory accountant, I was accepted to the Darden School of Business at the University of Virginia. I graduated with a Masters in Business Administration from Darden in 1988.

Subsequently, I joined the U.S. Department of Commerce's International Trade Administration, where I investigated whether foreign producers were selling products into the U.S. at less-than-fair-value (i.e., "dumped" prices). I was hired as an accountant in the Import Administration's Office of Accounting, was promoted to senior accountant, and was then promoted to Program Manager. As a Program Manager, I was responsible for supervising accountants responsible for approximately 20 concurrent investigations and administrative review proceedings. I was responsible for formulating recommendations to senior management, participating with other Program Managers and Office Directors in development of policy, and reviewing preliminary decisions for adherence to established policies. I also participated in special projects headed by the U.S. Trade Representative in analyzing trade barriers to U.S. exports.

After four years, I left the Department of Commerce and entered private practice as a consultant to foreign and domestic companies involved in antidumping proceedings. During my seventeen years working in the area of antidumping, I have direct experience in more than one hundred (100) antidumping duty proceedings covering a diverse range of products such as semiconductors, televisions, softwood lumber, photographic paper, mechanical transfer presses, newspaper printing presses, various chemical products,

- 2 -

ferroalloys, carbon steel flat products (including plate, hot-rolled, cold-rolled and corrosion-resistant), stainless steel sheet, concrete-reinforcing bar, carbon steel wire rod, welded pipe and tube, oil-country tubular goods, stainless steel wire rod and stainless steel bar.

As a consultant in private practice, one of the first proceedings that I was involved with was the initial investigation of dynamic random access memory ("DRAMs") manufactured in Korea. I advised Hyundai Electronics Co., Ltd. ("Hyundai") in its efforts to respond to the information requested in the Department of Commerce's initial antidumping investigation. I continued to advise Hyundai in the first through fifth administrative reviews covering DRAMs imported during the following time periods: 10/29/92-4/30/94; 5/1/94-4/30/95; 5/1/95-4/30/96; 5/1/96-4/30/97; and 5/1/97-4/30/98. During these time periods I was employed by a small trade consulting firm (eventually as a part-owner). I left the company in the middle of 1998, but was retained by Hyundai on a consulting basis into 1999 for various issues relevant to the fifth administrative review.

The following discussion regarding points made in Arent Fox's legal memorandum is based upon my specific knowledge of the DRAMs proceedings and my knowledge of the Department's practices both as a former employee of the agency, as well as my additional thirteen years experience as a consultant to participants in these proceedings.

## The Antidumping Duty Process in General and as it Related to DRAMs

In general, antidumping margins tend to decline over the life of the dumping order. In an antidumping investigation, foreign producers often receive their first exposure to antidumping rules and regulations. The rules are complex and often times

not intuitive.  Often times, the producers have engaged in normal business practices that by definition will result in antidumping margins.  The investigation results are typically a rude awaking to the demands and requirements of an antidumping environment.  Since the Department of Commerce's less-than-fair-value investigation covers past practices, the dumping margin reflects the mistakes and ignorance of the rules by the foreign producers.  Foreign producers usually hire experienced law firms and other specialists (such as myself) to assist them in responding to the demands of the antidumping investigation.  Law firms and other experts will then educate the producer in the antidumping rules and advise them on procedures to minimize antidumping on future exports to the U.S. market.  The advisors will assist the producer in creating computer programs and analysis tools to determine optimum price points to avoid dumping margins.

The investigation and reviews of DRAMs from Korea are illustrative of the general process.  Hyundai received an 11.16% antidumping margin on its sales during the investigation period.  In anticipation of the antidumping duty order and the likelihood that the order would be in effect for several years, Hyundai implemented an antidumping monitoring program as a result of our advice and was able to reduce its dumping margin to 0.10% in the first administrative review.  As is typical in antidumping duty cases, Hyundai, and other producers, modified their behavior so as to reduce or eliminate antidumping duty margins. As a result of the its efforts, Hyundai's dumping margin stayed low at 0.09% in the second administrative review and was completely eliminated in the third review.

- 4 -

After three administrative reviews with de-minimis antidumping rates, Hyundai requested that the antidumping order be revoked. The Department of Commerce refused to revoke the order because the worldwide market for DRAMs collapsed during the fourth administrative review period, based in part on an over expansion of capacity in Korea and Taiwan. Major DRAM producers had expanded to meet forecasts of future demand that did not materialize. Prices began to fall and the Department of Commerce concluded that, notwithstanding the three administrative reviews with *de minimis* margins, there was a likelihood that dumping of DRAMs had resumed or would resume. The Department therefore refused to revoke the antidumping order.

The Department of Commerce was correct in its decision. While Hyundai could keep Korean prices below U.S. prices, the sales in the home market would have been below Hyundai's full cost of production and therefore disregarded in the Department's antidumping analysis. It became impossible to sell into the U.S. without generating dumping margins. Hyundai's final dumping margin for the fourth administrative review was 3.95%. The final margin for LG Semiconductor, another Korean producer of DRAMs, ballooned to 9.04%. I do not know the specifics of LG Semiconductor's situation, but at that time, LG Semiconductor was entering bankruptcy. In fact, Hyundai ultimately acquired LG Semiconductor and the Department of Commerce calculated a combined antidumping margin for the two companies. Prices continued to be extremely low, but forecasts showed increased demand and expected firming of DRAM prices.

The predicted upturn in the market was always around the corner, but the corner kept being pushed to the future. Antidumping duty margins increased for Hyundai to 10.44% in the fifth administrative review. As I recall, Hyundai was telling its customers

that it would reduce its dumping margins and that it was monitoring and managing its sales in a manner to enable it to lower its dumping margin.

In the sixth administrative review (5/1/98 – 4/30/99), worldwide demand finally caught up with production capacity and Hyundai and LG Semiconductor were able to reduce dumping margins back down to 2.3% and 1.18%, respectively. According to Bernard Smith, Stealth began importing DRAMs from Korea in November 1998 when the worldwide DRAM demand was strong and growing. But because of the time lag caused by the U.S.'s retrospective antidumping system, the deposit rates in effect at this time were still based upon dumping margins found during the depths of the worldwide semiconductor slump (Hyundai at 3.95% and LG Semiconductor at 9.04%).

In my opinion, it would have been reasonable for semiconductor buyers to assume that the actual dumping margins in November 1998 would have been lower than the deposit rates, just as Hyundai was telling its customers. In fact, the producers would have known with reasonable certainty that dumping margins calculated on November 1998 entries were lower than the deposit rates. I know from my time working with Hyundai that they had the ability to calculate reliable dumping margins for entries on a monthly basis. Since Hyundai had taken over LG Semiconductor by the time of Bernard Smith's imports, I assume that the combined Hyundai/LG Semiconductor entity was aware that antidumping margins during this time period would be reduced from the cash deposit rate.

The results of the administrative review conducted by the Department of Commerce for the periods covering Stealth's imports confirmed Hyundai's statements and the reasonable expectations of the market. As noted above, the actual dumping

duties had declined to 2.3% (Hyundai) and 1.18% (LG Semiconductor), proving the expectations to be correct.

## The Economics of Importing DRAMs

Stealth had two legal options for importing Korean DRAMs: 1) not import any DRAMs at all and 2) import the DRAMs at the proper entry value; request an administrative review; and then wait for two years to receive the expected refund of the duty deposits.

Option 2 does not appear to have been a financially attractive option for a small company just getting established. The total appraised value of Stealth's imported DRAMs from Korea in 1999 was $6,067,627. I assume that the appraised value is a reasonable approximation of Stealth actual costs in acquiring the merchandise for delivery to an unaffiliated customer in the U.S. market. According to my discussion with Bernard Smith, his markup on buying/selling DRAMs was between 3-4%, which equates to a little more than $180,000 to $243,000 for Stealth's imports.[1]  The duty deposits alone would have been $383,168 if it had properly declared the entry values. Stealth would have incurred negative cash flow on the importation of DRAMs if it had properly reported its entry values.  In addition to the duty deposits, Stealth incurred selling, general and administrative costs in selling the DRAMs. The vast majority of these DRAMs were imported during calendar year 1999. According to Stealth's 1999 income statement, it incurred $364,504 of selling, general and administrative expenses and a total cost of products sold of $11,170,626 in importing and distributing different product lines for its customers. If the import cost of the DRAMs was $6,067,627, then we can assign

---

[1]  Stealth's income statement for fiscal year 1999 shows that gross sales for all product lines was 5.5% higher than its cost of sales.

- 7 -

approximately $197,804 of overhead expenses to the DRAM sales.[2]  While Stealth could

ultimately turn a profit on these transactions if it had followed the rules, it would have

had to wait a long time – most likely over two years or more -- before it received the cash

refunds from this importation business.  I believe that it would be unlikely for a small

company without substantial financial resources to carry the negative cash flow until it

received the results of an administrative review with refund of any excess dumping duties

deposited.

     Assuming that Bernard Smith had chosen option 2, the only reasonable means of

turning a profit on the DRAM importation business would have been to request an

administrative review; participate in the process; and await the expected refunds,

including interest.  It would have been reasonable for Bernard Smith and Stealth -- or any

person familiar with the DRAM industry -- to expect that an administrative review would

lead to considerable refunds considering (i) the general trend in margins over time; and

(ii) that Hyundai and LG Semiconductor, with far greater liability for the payment of

antidumping duties, were actively trying to reduce their margins.

### The Administrative Review Process was Available to Stealth

     I have reviewed Arent Fox's legal memorandum regarding antidumping

methodology in general and the specific antidumping calculation methodologies used for

resellers.  Based upon my experience at the Department of Commerce and in private

practice, the memorandum provides an accurate description of the Department of

Commerce's methodologies.

     Antidumping reviews are retrospective rather than prospective.  An importer

deposits cash with Customs upon entry of the merchandise but will not know its exact

---

[2]  Stealth's overhead costs therefore amounted to approximately 3.26% of the cost of the products.

liability until after the administrative review period has ended and the Department of
Commerce has reviewed the entries.  The Department of Commerce takes a minimum of
one year to complete its review and often times the review is not completed for 18
months.

Stealth's imports of DRAMs from Korea entered the U.S. during the sixth and
seventh administrative review periods (5/1/98-4/30/99) and (5/1/99-12/31/99).
Participants could request an administrative review of entries for the 5/1/98-4/30/99
period in May 1999 and for 5/1/99-12/31/99 in January 2000.  But the actual dumping
margin and liquidation instructions for the sixth administrative review would not be
known until after the request period for the seventh administrative review.  Because of
the high duty deposits, if Stealth had properly declared the entry value for its
merchandise, then it would have been necessary to request an administrative review of its
entries (otherwise Stealth would likely have incurred a loss on these transactions).

The Department of Commerce is required to accept administrative review
requests from resellers and importers.  The only exception that may occur is if the
Department of Commerce considers it impractical to administer all the review requests it
receives in a particular case.  In some cases the Department has reviewed only a sample
of companies when the review requests become administratively burdensome.  For
example, in the recent reviews in the case on Softwood Lumber from Canada, the
Department received review requests from more than 100 companies.  The Department
selected only eight largest exporters for close examination.  In DRAMs from Korea, the
number of potential respondents in the administrative reviews was relatively small.
Therefore, there would have been no justification for sampling.  If, in the unlikely event,

Stealth requested a review but the Department did not perform such a review and instead chose to use a sample that excluded Stealth, then the Department would have assigned a liquidation rate to Stealth's imports based upon the current average period of review dumping margins found for the companies actually reviewed (excluding the results for any companies that did not participate).

The more likely outcome is that the Department of Commerce would have reviewed Stealth imports because there were only a few companies participating in the review.

## The Antidumping Margin Methodology

The Department of Commerce has established policies and practices that it follows to compute antidumping duty margins. The existence of consistently applied policies and practices allows producers and importers to take steps to curb dumping activity with confidence that the correct results will be achieved. The presence of these policies and practices also enables reliable predictions of what will occur in a particular review scenario. Importers (and other interested parties) rely upon these predictions when they make a decision whether to request administrative review. For example, while working on the DRAM case, I assisted Hyundai in establishing a computerized monitoring system based upon the Department's rules and procedures so that it could determine when it made a sale whether that sale would be dumped or not.

Not all of the many complex rules, policies, and procedures apply to every case, but there are certain rules and procedures that are of universal application in every case. For Stealth, the most critical example of such a rule is determining the identity of the

seller to the U.S. market because that determination dictates the final rate that will apply

to Stealth's imports. The key question is: Will it be the manufacturer's rate or a rate that

is based on the manufacturer's rate plus incremental dumping because another seller is

involved in the transaction (knowledge test)?

Stealth's request for a review would have led to an inquiry whether Hyundai and

LG Semiconductor knew, or should have known, that the distributors they were selling to

intended to resell those DRAMs to the United States. The answer to that question is

either "yes" or "no." The Arent Fox memorandum correctly describes the types of

documents and information that the Department typically examines to answer that

question. If that inquiry led to a conclusion that Hyundai and LG Semiconductor knew or

should have known that the merchandise was ultimately destined for U.S. customers,

even if they did know the exact identity of the U.S. customer(s), the final antidumping

duty assessment rates that the Department calculated for Hyundai and LG Semiconductor

would have applied to Stealth's imports.

In fact, during the DRAMs case, the Department investigated specific allegations

against certain resellers buying LG Semiconductor DRAMs and determined that LG

Semiconductor knew, or should have known, that the DRAMs were destined for the U.S.

market. The Department treated the sales to the resellers as U.S. transactions and LG

Semiconductor's final dumping rate was used as the assessment rate for imports from

those resellers. During the time that I was advising Hyundai, I recall that there was a

significant concern regarding resellers in Hong Kong, Singapore and Taiwan re-exporting

the product to the United States.

If the Department's inquiry resulted in a finding that the Korean producers did not know their DRAMs were destined for the U.S. because an intermediary reseller or middleman was involved, the Department will assign the producer rate to the middle man exports unless it finds that the middle-man has engaged in incremental dumping. Under the middleman methodology, the Department will assess whether the reseller made substantial sales of the product below acquisition cost plus an allocation of the reseller overhead costs.

The Department's regulations covering resellers do not define "substantial sales below cost;" however, the regulations do define "substantial sales below cost" in the context of the producer's home market sales that can be used as the basis for comparison with U.S. prices. The Department will allow home market sales transactions to be included in its dumping analysis if less than 20% of the sales (by quantity) of a particular product are below production cost.

**The Rate Likely to Have Applied to Stealth**

For purposes of determining the rate that likely would have applied had Stealth requested an administrative review, I have considered the rules that the Department applies under the knowledge test as described above. I have reviewed the affidavit of Mr. John Prymmer describing the operations of Hong Kong resellers, especially that resellers did not purchase DRAMs until they had found a buyer for the DRAMs and that the profit markup ranged from 3-5%. Based on the statements of fact made by Mr. Prymmer, the Department of Commerce would not have found substantial below cost sales by resellers of DRAMs. As stated above, the Department's regulations covering resellers do not define "substantial sales below cost;" however, the regulations do define "substantial sales below cost" in the context of the producer's home market sales that can be used as the basis for comparison with U.S. prices. Regardless of the precise percentage that would have been used to define "substantial" in this case, it appears that there would be no basis for the Department to conclude that a substantial portion of sales were below costs. Accordingly, the Department would not determine any incremental dumping for the reseller and assign the producer rate to Stealth imports.

The results of such a review would likely have resulted in a liquidation rate equal to that of the producer (a much lower rate than the deposit rate). Therefore, the true loss in taxes had Stealth behaved in accordance with the law would have been considerably less than the Government's loss figure of $384.530.81

## Conclusion

It is my opinion that if Stealth had declared the full transaction value of its DRAM imports during the period November 1998 through December 1999: (1) Stealth would have requested administrative review of those imports because it would need to recover the bulk of its duty deposits, plus interest, and would have had good reason to believe that the review margins would be far lower than the rates at which deposits of estimated antidumping duties had been made, (2) the Department of Commerce would have reviewed the imports by Stealth because at no time did it have any basis to review less than the entire number of companies for which review requests were made, and (3) Stealth would have received the relevant manufacturers assessment rate (Hyundai or LG Semiconductor, depending on the entry) because either those manufacturers knew (or should have known) their DRAMs were destined for the U.S., or they did not know that the DRAMs were destined for the U.S., the Department would have applied its middleman dumping methodology. Because the Department would not have found that a substantial volume of middleman sales to Stealth had been made at less than acquisition cost, there would be no incremental middleman antidumping margin to add, and the manufacturers' rates would have applied.

Dated: October 14, 2005

W. Christopher Sorrels

## AFFIDAVIT OF JOHN PRYMMER

BEFORE ME, the undersigned authority, on this day did personally appear before me, the undersigned affiant, known to me to be the person so signing, and stated as follows:

1. My name is John Prymmer. I reside at 18th Floor Flat F Valiant Park  52 Conduit Road, Midlevels, Hong Kong. I have been employed in the electronic and computer parts distribution industry since 1986. During this time, I have been a purchaser of all types of electronic and computer components.

2. I am employed as Managing Director of Smith & Associates Far East Ltd, located at Kinwick Centre, 23rd Floor, Suite 2300, 32 Hollywood Road, Central, Hong Kong.  At all times relevant to the matters discussed herein, SAFE  has been involved in the day-to-day buying and selling of computer parts and components as an independent (non-franchised) electronics distributor.  As Managing Director, I am responsible for supervising 38 employees, who, among other duties, buy and sell all types of electronic components.

3. With regard to the independent computer and electronics parts distribution market, at all times, and specifically during the period 1998 to 2000, an independent distributor operates under the basic business model of obtaining a purchase order from one of its customers before purchasing those parts from its sources. This business model is and was at the relevant times generally true for the entire independent computer and electronics parts distribution industry, including those distributors, also called brokers, working in the North American, European and Asian markets

4. My understanding of the industry practice during the period from 1998 to 2000 is that any seller of memory product, including foreign resellers of DRAMs, would not have purchased DRAMs for resale until they had found a buyer for the DRAMs and settled on a profitable price with that customer.

5. In this industry, pricing is the most important factor for each deal, and each deal must stand on its own in terms of profitability.  Brokers or independent distributors do not, as a rule, intentionally sell anything at losses, say, for the purposes of keeping a customer happy.  Rather, their transactions are deal-driven, in which each deal must be profitable.

6. During the 1998 to 2000 period, Asian brokers doing business in memory products, including DRAMs, including those brokers exporting memory products to North America to companies, were operating generally on margins in the 3 to 5 percent range.

7. In my experience,as a buyer in this industry, substantially all sales made by Asia resellers, including resellers located in Hong Kong, Taiwan and Singapore, of memory product, including DRAMs, during the period from 1998-2000, would have been made at a price above acquisition cost to the resellers in order to maintain their profit margin in at least a general 3 percent range.

9. Most of the Korean-produced DRAMs I purchased for my company from 1998-2000 were purchased from Asian resellers/brokers, including Carton Technology

Limited ("Carton"), a Hong Kong company, Top Phil Industrial Co., Ltd ("Top Phil"), a Taiwanese company, Tec Hill Co., Ltd., ("Tech Hill"), a Hong Kong company, and Nextron Technology Limited ("Nextron"), a Hong Kong company.

10. I was requested by Max Stern of the law firm of Stern, Shapiro, Weissberg and Garrison, who represents Stealth Components, Inc., a U.S. distributor of electronic components, and its President, Bernie Smith, to contact the resellers listed in Paragraph  and request information concerning their profit margins for memory products, including DRAMs, for the period from 1998 to 2000.

11. On or about April 12, 2005, I spoke to a woman at Carton known to me as Fanny, with whom I have transacted business in the past , regarding Carton's margins for memory products, including DRAMs, for the period from 1998 to 2000.  She informed me that the market was weak and they sold at low margins at the time.

12. On or about April 12, 2005, I spoke to a woman at Top Phil known to me as Syndia, with whom I have transacted business in the past regarding Top Phil's margins for memory products, including DRAMs, for the period from 1998 to 2000.  She informed me that they were selling DRAMs during that time period for margins between 2.5% and 4%.

13. On or about April 13, 2005, I spoke to a man at Tec Hill known as Simon, with whom I have transacted business in the past, regarding Tec Hill's margins for memory products, including DRAMs, for the period from 1998 to 2000.  He informed me that they didn't sell a lot of the product in to the U.S. and what they did sell was at a relatively low margin.

14. On or about April 13, 2005, I spoke to a woman at Nextron known as Connie, with whom I have transacted business in the past, regarding Nextron's margins for memory products, including DRAMs, for the period from 1998 to 2000.  She informed me that they sold at low margins because of the duties in effect at that time.

15. None of the four above indicated that they were selling at a loss during that time.

I declare under penalty of perjury that the foregoing is true and correct.

John Prymmer

AT Hong Kong:

Sworn to before me and subscribed in my presence this 10th day of Oct. 2005.

Notary Public

My Commission Expires: _N/A_

George Forrai
Notary Public
14/F., Hutchison House, Hong Kong.
Special Administrative Region of the
People's Republic of China

# ADVANCE MICRO WORLD

46540 FREMONT BLVD, SUITE 514
FREMONT, CA 94538
TEL: 510-252-9368
FAX: 510-252-9378

DATE: September 1, 1999

TO:  PURCHASING

FOR INQUIRY, CALL: R.J. / CHRISTINE / SUE / TONY

## FOR SALE

| | Package | Mode | Brand/Part No. | Price |
|---|---|---|---|---|
| 16MX4-6  FPM | TSOP | 5V/4K | SAM.  KM44C16100BS-6 | $Call |
| 16MX4-6  FPM | SOJ | 5V/4K | SAM.  KM44C16100AK-6 | $Call |
| 16MX4-6  EDO | TSOP | 5V/4K | SAM.  KM44C16104CS-6 | $Call |
| | | | | |
| 2MX8-8  PC-100 | TSOP | 3V/SDRAM | NANYA NT56V1680A0T-8AS | $2.20 |
| | | | OKI  MSM56V16800B-8T | $2.25 |
| 2MX8-10  PC-66 | TSOP | 3V/SDRAM | SIEM.  HYB39S16800AT-10 | $2.10 |
| | | | OKI  MSM56V16800B-10T | $2.10 |
| | | | NPNX  NN5216805ATT-10 | $2.05 |
| | | | | |
| 4MX4-6  QUAD | SOJ | 5V/FPM | SAM.  KM44C4103CK-60 | $Call |
| | | | | |
| 4MX4-6  EDO | TSOP | 5V/2K-REF. | SAM.  KM44C4104CS-6 | $4.45 |
| 4MX4-6  EDO | SOJ | 5V/2K-REF. | NANYA  NT511740B5J-60 | $2.87 |
| 4MX4-6  FPM | SOJ | 5V/2K-REF. | NANYA  NT511740B0J-60 | $2.93 |
| | | | GOLD.  GM71C17400BJ-60 | $2.95 |
| | | | | |
| 1MX4-6  QUAD | SOJ | 5V/FPM | SAM.  KM44C1003DJ-60 | $4.50 |
| | | | | |

NOTE: PRICES SUBJECT TO CHANGE WITHOUT NOTICE.

FROM :

10/29/99  22:10    FAX NO. : 989 2 28758817

# TOP PHIL INDUSTRIALCO., LTD.

TEL: 949-733-1326        FAX: 949-733-1326

ASK: Sharon

To: Valuable Customers-Purchasing Dept                    Sep 13 '99

| PART # | DESCRIPTION/BRAND | Q'TY | PRICE | DEL. |
|---|---|---|---|---|
| | **OFFER** | | | |
| | **Samsung(FOB Taiwan)** | | | |
| KM416V1204CT-L6 | 1X16 3.3V EDO TSOP 1K LP | 10000 | 4.15 | 9/13(Min 2K) |
| KM44V16004CS-5 | 16X4 3.3V EDO TSOP 8K 400MIL 50NS | 2400 | 10.30 | " |
| KM44V16104BS-6 | 16X4 3.3V EDO TSOP 4K 400MIL | 2400 | 10.30 | " |
| | | | | |
| | **Nanya(with duty paid FOB LA)** | | | |
| NT511740C5J-6 | 4X4 5V EDO SOJ | 30000 | 3.00 | LA NOW |
| | | | | |
| | **Oki** | | | |
| MSM51V17405B-60SJ | 4X4 3.3V EDO SOJ | 12415 | 3.15 | 9/14 |
| | | | | |
| | **Hyundai(with duty paid FOB LA)** | | | |
| HY5118164CJC-6 | 1X16 5V EDO SOJ | 50000 | 3.25 | LA 9/15 |
| | | | | |
| | **Lgs(with duty paid FOB LA)** | | | |
| GM71C17400CJ-6 | 4X4 5V FPM SOJ | 40000 | 3.10 | LA 9/15 |
| GM71C17403CJ-6 | 4X4 5V EDO SOJ | 50000 | 3.00 | LA 9/13 |
| GM71C17403CT-6 | 4X4 5V EDO TSOP | 8000 | 3.25 | LA NOW |
| GM71V17403CT-6 | 4X4 3.3V EDO TSOP | 13000 | 3.70 | LA 9/15 |

Bought Similar @
$2.45

Bought Similar @
$2.80

From: Victor K. Le  To: Buyer     Date: 9/15/99  Time: 05:14:55



# PQI-USA, Inc.

46540 Fremont Blvd. Suite 516, Fremont  CA 94538
Tel: (510) 651-7281  Fax : (510) 651-7240
E-MAIL : info@pqiusa.com   WEB : http://www.pqiusa.com

SEP 16 1999

## EDO:

| | | | |
|---|---|---|---|
| 1*16-60 | LGS, GM71C18163CT-6 TSOP 5V 1K | $2.95 | |
| 4*4-60 | LGS, GM71C17403CT-6 TSOP 5V 2K | $3.25 | |
| 4*4-60 | PQI, CEF44PQI-60 SOJ 5V 2K | $2.75 | |
| 4X32-60 | NANYA, 16MB 8 CHIPS 4*4 SOJ 5V 2K | $24.25 | |
| 4X32-60 | PQI, 16MB 8 CHIPS 4*4 SOJ 5V 2K | $22.50 | |
| 8X32-60 | NANYA, 32MB 16 CHIPS 4*4 SOJ 5V 2K | $48.25 | |
| 8X32-60 | PQI, 32MB 16 CHIPS 4*4 SOJ 5V 2K | $44.00 | |

## FPM:

| | | | |
|---|---|---|---|
| 4*4-60 | PQI, CFF44PQI-60 SOJ 5V 2K | $2.75 | 9/20 |
| 4X32-60 | PQI, 16MB 8 CHIPS 4*4 SOJ 5V 2K | $23.00 | |
| 8X32-60 | PQI, 32MB 16 CHIPS 4*4 SOJ 5V 2K | $45.00 | |

## SDRAM PC-66:

| | | | |
|---|---|---|---|
| 4*16-F10 | SAMSUNG, KM416S4030BT-F10 | $14.65 | 9/16 |
| 8*8-F10 | SAMSUNG, KM48S8030AT-F10 | $14.75 | |

## SDRAM PC-100:

| | | |
|---|---|---|
| 2*8-8 | FUJITSU, MB81F16822D-102LFN CL2 | $3.75 |
| 4*16-6 | HITACHI, HM5264165DTT-A60 CL2 | $15.25 |
| 4*16-8 | SIEMENS, HYB39S64160AT-8 CL2 | $15.25 |
| 4*16-GL | SAMSUNG, KM416S4030CT-GL | $15.25 |
| 8*8-6 | HITACHI, HM5264805LTT-B60 | $15.75 |
| 8*8-8 | SIEMENS, HYB39S64800BT-8 CL2 | $15.75 |
| 16*8-6 | HITACHI, HM5212805DLTD-A60 CL2 | $29.50 |
| 4X64-6 | HITACHI, 32MB 4 CHIPS 4*16 SDRAM | $60.00 |
| 4X64-8 | SIEMENS, 32MB 4 CHIPS 4*16 SDRAM CL2 | $60.00 |
| 8X64-6 | HITACHI, 64MB 16 CHIPS 4*8 SDRAM | $110.00 |
| | HM5233B85-B60 for new Intel MB & some others | |
| 8X64-6 | HITACHI, 64MB 8*8 SDRAM | $126.00 |
| 8X64-8 | SIEMENS, 64MB 8*8 SDRAM CL2 | $126.00 |
| 16X64-6 | HITACHI, 128MB 16*4 SDRAM CL2 | $248.00 |
| 16X64-8 | SIEMENS, 128MB 8*8 SDRAM CL2 | $248.00 |
| 32X64-6 | HITACHI, 256MB 16*8 SDRAM CL2 | $468.00 |

** ALL PRICES ARE SUBJECT TO CHANGE WITHOUT NOTICE **
PQI'S PARTS CARRY LIFETIME WARRANTY.
PQI ALSO MANUFACTURES A COMPLETE LINE OF PCBs.

From: Chuck O'Connor  To: Joyce Bauer

Date: 12/22/99  Time: 2:37:58 PM

Page 1 of 1



**25691 Atlantic Ocean Dr., #B3, Lake Forest, CA 92630**

Tel: (949) 458-1080    Fax: (949) 458-1081

12/22/99

DEC 2 8 1999

Joyce Bauer
Smith Associates

DB

Dear: Joyce

We are pleased to offer the following products:

| QTY. | PART NUMBER | DESCRIPTION | MFG/DC | PRICE | DELIVERY |
|------|-------------|-------------|--------|-------|----------|
| 4K | IBM01644F5BT3D-50 | 16Mx8-50 TSOJ 8K 3V EDO | IBM/99 | $18.00 | TODAY |
| 10K | TC59SM708FT-80 | 32Mx4-PC100 CL2 SDRAM | TOSH/99 | $18.00 | 1-2 DAYS |
| 10K | UPD45128841G5-A80 | 16Mx8-PC100 CL2 SDRAM | NEC/99 | $19.85 | TODAY |
| 10K | UPD45128841G5-A10 | 16Mx8-PC100 CL3 SDRAM | NEC/99 | $19.20 | TODAY |
| 10K | TC59SM716FT-80 | 8Mx16-PC100 CL2 SDRAM | TOSH/99 | $19.45 | TODAY |
| 10K | UPD45128163G5-A10 | 8Mx16-PC100 CL3 SDRAM | NEC/99 | $18.35 | TODAY |
| 10K | UPD4564163G5-A80 | 4Mx16-PC100 CL2 SDRAM | NEC/99 | $9.65 | 1-2 DAYS |
| 10K | UPD4564163G5-A10 | 4Mx16-PC100 CL3 SDRAM | NEC/99 | $9.35 | 1-2 DAYS |
| 20K | KM432S2030CT-G7 | 2Mx32-7 SDRAM | SAM/99 | $11.85 | 2-3 DAYS |
| 20K | UPD4564841G5-A10B | 8Mx8-PC66 SDRAM | NEC/99 | $8.25 | TODAY |
| 20K | TC5164405BFT-50 | 16Mx4-50 TSOP 8K 3V EDO | TOSH/99 | $8.65 | TODAY |
| 15K | TC5165405BFTS-50 | 16Mx4-50 TSOP 4K 3V EDO SR | TOSH/99 | $9.35 | TODAY |
| 5K | HY51V65804ATC-50 | 8Mx8-50 TSOP 4K 3V EDO | HYN/99 | $9.25 | 1-2 DAYS |
| 20K | HY5117400CJ-60 | 4Mx4-60 SOJ 2K 5V FPM | HYN/99 | $2.93 | 1-2 DAYS |
| 40K | GM71C17403CJ-60 | 4Mx4-60 SOJ 2K 5V EDO | LG/99 | $2.90 | 1-2 DAYS |
| 20K | MB8116400A-60PJ | 4Mx4-60 SOJ 4K 5V FPM | FUJ/99 | $3.00 | 2 DAYS |
| 20K | GM71V17403CT-60 | 4Mx4-60 TSOP 2K 3V EDO | LG/99 | $3.88 | 1-2 DAYS |
| 10K | GM71V17803CT-60 | 2Mx8-60 TSOP 2K 3V EDO | LG/99 | $3.70 | 1-2 DAYS |
| 10K | KM41C4000DJ-60T | 4Mx1-60 SOJ 5V FPM T/R | SAM/99 | $3.75 | 1 DAY |

*Total Service*    * *    *Total Solutions*    * *    *Total Satisfaction*

CASE NUMBER: BO08HR01BO0007
CASE NAME: Stealth Components
AUSA: Carmen Ortiz
Case Agent: S/A Philip J. Shea

| Entry Number | Entry Date | Entered Value | Dumping Deposited | Deposit Rate | MPF Paid | Appraised Value | Dumping Duties Due on Deposit | Collection Rate | MPF Due | Loss of Dumping Duties | Loss of MPF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 110-5191314-2 | 11/04/98 | $5,100 | $461.04 | 9.04% | $25.00 | $62,900 | $5,686.16 | 9.04% | $132.09 | $5,225.12 | $107.09 |
| 110-5194803-1 | 11/09/98 | $5,000 | $452.00 | 9.04% | $25.00 | $39,500 | $3,570.80 | 9.04% | $82.95 | $3,118.80 | $57.95 |
| 110-5199140-3 | 11/13/98 | $2,500 | $226.00 | 9.04% | $25.00 | $5,650 | $510.76 | 9.04% | $25.00 | $284.76 | $0.00 |
| 110-5737294-7 | 11/19/98 | $3,500 | $316.40 | 9.04% | $25.00 | $21,700 | $1,961.68 | 9.04% | $45.57 | $1,645.28 | $20.57 |
| 110-1877847-9 | 11/20/98 | $27,300 | $1,078.35 | 3.95% | $57.33 | $68,100 | $5,285.85 | 3.95%9.04% | $143.01 | $4,207.50 | $85.68 |
| 110-6802249-9 | 11/24/98 | $3,366 | $304.29 | 9.04% | $25.00 | $17,748 | $1,604.42 | 9.04% | $37.27 | $1,300.13 | $12.27 |
| 110-6805566-3 | 11/30/98 | $13,464 | $1,217.15 | 9.04% | $28.27 | $73,441 | $6,638.97 | 9.04% | $154.22 | $5,421.82 | $125.95 |
| 110-6809605-5 | 12/04/98 | $8,280 | $0.00 | 9.04% | $25.00 | $41,400 | $3,742.56 | 9.04% | $86.94 | $3,742.56 | $61.94 |
| 110-6836504-7 | 01/06/99 | $4,880 | $441.15 | 9.04% | $25.00 | $31,232 | $2,823.37 | 9.04% | $65.58 | $2,382.22 | $40.58 |
| 110-6842970-2 | 01/15/99 | $6,922 | $625.75 | 9.04% | $25.00 | $53,767 | $4,860.53 | 9.04% | $112.97 | $4,234.78 | $87.91 |
| 110-6846700-0 | 01/19/99 | $12,000 | $1,084.80 | 9.04% | $25.20 | $78,400 | $7,087.36 | 9.04% | $164.64 | $6,002.56 | $139.44 |
| 110-6847815-4 | 01/21/99 | $7,392 | $668.24 | 9.04% | $26.78 | $24,605 | $2,224.29 | 9.04% | $51.67 | $1,556.05 | $26.67 |
| 110-6849785-7 | 01/26/99 | $3,140 | $283.86 | 9.04% | $25.00 | $22,482 | $2,032.37 | 9.04% | $47.21 | $1,748.51 | $22.21 |
| 110-6852271-2 | 01/29/99 | $7,500 | $296.25 | 3.95% | $25.00 | $53,700 | $2,121.15 | 3.95% | $107.40 | $1,824.80 | $82.40 |
| 110-6878647-3 | 03/01/99 | $5,500 | $497.20 | 9.04% | $25.00 | $35,500 | $3,209.20 | 9.04% | $74.55 | $2,712.00 | $49.55 |
| 110-6881168-5 | 03/02/99 | $2,200 | $86.50 | 3.93% | $25.00 | $9,000 | $355.50 | 3.95% | $25.00 | $268.60 | $0.00 |
| 110-6884024-8 | 03/08/99 | $3,000 | $271.20 | 9.04% | $25.00 | $20,250 | $1,830.60 | 9.04% | $42.32 | $1,559.40 | $17.52 |
| 110-6887200-0 | 03/10/99 | $100,296 | $0.00 | 0.00% | $210.62 | $103,296 | $976.32 | 9.04% | $229.52 | $976.32 | $18.90 |
| 110-6891094-1 | 03/13/99 | $12,752 | $1,152.78 | 9.04% | $25.67 | $85,948 | $7,769.74 | 9.04% | $180.49 | $6,616.96 | $153.71 |
| 110-6891347-3 | 03/13/99 | $6,000 | $542.40 | 9.04% | $25.00 | $40,500 | $3,661.20 | 9.04% | $85.05 | $3,136.80 | $60.05 |
| 110-5758955-7 | 03/18/99 | $5,400 | $488.16 | 9.04% | $25.00 | $34,200 | $3,091.68 | 9.04% | $71.82 | $2,603.52 | $46.82 |
| 110-6895833-8 | 03/19/99 | $10,000 | $904.00 | 9.04% | $25.00 | $64,000 | $5,785.60 | 9.04% | $134.40 | $5,776.56 | $109.40 |
| 110-6896151-2 | 03/23/99 | $5,000 | $452.00 | 9.04% | $25.00 | $32,200 | $2,910.88 | 9.04% | $67.62 | $2,458.88 | $42.62 |
| 110-6903350-3 | 03/27/99 | $6,048 | $546.76 | 9.04% | $25.00 | $17,280 | $1,562.11 | 9.04% | $36.28 | $1,015.35 | $11.28 |
| 110-6905513-0 | 04/05/99 | $1,200 | $108.48 | 9.04% | $25.00 | $8,500 | $768.40 | 9.04% | $25.00 | $659.95 | $0.00 |
| 110-6912634-9 | 04/07/99 | $12,000 | $1,084.80 | 9.04% | $25.20 | $86,000 | $7,774.40 | 9.04% | $180.60 | $6,689.60 | $155.40 |
| 110-6913584-5 | 04/09/99 | $3,600 | $325.44 | 9.04% | $25.00 | $18,900 | $1,708.56 | 9.04% | $39.69 | $1,383.12 | $14.69 |
| 110-6903181-1 | 04/10/99 | $3,696 | $334.12 | 9.04% | $25.00 | $12,701 | $1,148.17 | 9.04% | $26.67 | $814.05 | $1.67 |
| 110-6915246-9 | 04/10/99 | $6,000 | $237.00 | 3.95% | $25.00 | $32,000 | $1,264.00 | 3.95% | $67.20 | $1,027.00 | $42.20 |
| 110-6914627-1 | 04/10/99 | $4,042 | $45.74 | 00/09.04% | $25.00 | $6,342 | $253.66 | 00/9.04% | $25.00 | $207.92 | $0.00 |
| 110-6913439-2 | 04/13/99 | $1,122 | $101.43 | 9.04% | $25.00 | $6,834 | $617.79 | 9.04% | $25.00 | $516.30 | $0.00 |
| 110-6003980-6 | 04/14/99 | $5,000 | $452.00 | 9.04% | $25.00 | $29,500 | $2,666.80 | 9.04% | $61.95 | $2,214.80 | $36.95 |
| 110-6912894-9 | 04/15/99 | $2,440 | $216.96 | 9.04% | $25.00 | $9,552 | $863.50 | 9.04% | $25.00 | $646.54 | $0.00 |
| 110-6921329-5 | 04/16/99 | $2,400 | $216.96 | 9.04% | $25.00 | $20,640 | $1,865.86 | 9.04% | $43.34 | $1,648.90 | $18.34 |
| 110-6921881-5 | 04/20/99 | $3,000 | $271.20 | 9.04% | $25.00 | $17,220 | $1,556.69 | 9.04% | $36.16 | $1,285.49 | $11.16 |
| 110-6005149-6 | 04/21/99 | $8,425 | $761.62 | 9.04% | $25.00 | $61,810 | $5,587.76 | 9.04% | $129.80 | $4,826.14 | $104.80 |
| 110-6926607-9 | 04/22/99 | $7,360 | $665.34 | 9.04% | $25.00 | $53,753 | $3,141.67 | 9.04% | $72.98 | $2,476.33 | $47.98 |
| 110-6927608-6 | 04/23/99 | $500 | $45.20 | 9.04% | $25.00 | $3,920 | $354.37 | 9.04% | $25.00 | $309.17 | $0.00 |
| 110-6929208-3 | 04/24/99 | $5,000 | $452.00 | 9.04% | $25.00 | $28,500 | $2,576.40 | 9.04% | $59.85 | $2,124.40 | $34.85 |
| 110-6931390-5 | 04/28/99 | $1,500 | $135.60 | 9.04% | $25.00 | $10,350 | $935.64 | 9.04% | $25.00 | $800.04 | $0.00 |
| 110-6007274-0 | 05/01/99 | $3,360 | $303.74 | 9.04% | $25.00 | $10,954 | $990.24 | 9.04% | $25.00 | $686.50 | $0.00 |
| 110-6937146-5 | 05/04/99 | $6,048 | $0.00 | 0.00% | $25.00 | $27,475 | $4,291.74 | 9.04% | $57.69 | $4,291.74 | $32.69 |

| Entry Number | Entry Date | Entered Value | Dumping Deposited | Deposit Rate | MPF Paid | Appraised Value | Dumping Duties Due on Deposit | Collection Rate | MPF Due | Loss of Dumping Duties | Loss of MPF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 110-6008695-5 | 05/07/99 | $2,352 | $212.62 | 9.04% | $25.00 | $10,282 | $929.49 | 9.04% | $25.00 | $716.87 | $0.00 |
| 110-6945322-2 | 05/13/99 | $3,000 | $271.20 | 9.04% | $25.00 | $25,700 | $2,323.28 | 9.04% | $53.97 | $2,051.98 | $28.97 |
| 110-6947780-9 | 05/17/99 | $12,000 | $1,084.80 | 9.04% | $25.20 | $136,800 | $12,366.72 | 9.04% | $287.28 | $11,281.92 | $262.28 |
| 110-6949786-4 | 05/18/99 | $1,500 | $135.60 | 9.04% | $25.00 | $17,100 | $1,545.84 | 9.04% | $35.91 | $1,410.24 | $10.91 |
| 110-6951277-9 | 05/19/99 | $14,040 | $1,269.22 | 9.04% | $29.48 | $114,108 | $10,315.36 | 9.04% | $239.63 | $9,046.14 | $210.15 |
| 110-6951257-7 | 05/19/99 | $1,500 | $135.60 | 9.04% | $25.00 | $7,350 | $664.44 | 9.04% | $25.00 | $528.84 | $0.00 |
| 110-6953593-7 | 05/21/99 | $8,100 | $732.24 | 9.04% | $25.00 | $73,800 | $6,671.52 | 9.04% | $154.98 | $5,939.28 | $129.98 |
| 110-6012474-9 | 05/25/99 | $900 | $81.36 | 9.04% | $25.00 | $7,350 | $664.44 | 9.04% | $25.00 | $583.08 | $0.00 |
| 110-6957325-0 | 05/26/99 | $2,400 | $216.96 | 9.04% | $25.00 | $26,800 | $2,422.72 | 9.04% | $56.28 | $2,205.82 | $31.28 |
| 110-6958692-2 | 05/27/99 | $3,900 | $352.56 | 9.04% | $25.00 | $35,600 | $3,218.24 | 9.04% | $74.76 | $2,865.68 | $49.76 |
| 110-6013316-1 | 05/29/99 | $3,648 | $329.78 | 9.04% | $25.00 | $41,136 | $3,718.69 | 9.04% | $86.38 | $3,389.12 | $61.38 |
| 110-6961511-9 | 05/29/99 | $23,364 | $891.71 | 0/9.04% | $49.06 | $209,178 | $17,689.29 | 0/9.04% | $439.27 | $16,797.58 | $390.21 |
| 110-6952466-7 | 06/01/99 | $13,992 | $1,264.88 | 9.04% | $29.38 | $114,574 | $10,357.49 | 9.04% | $240.60 | $9,092.61 | $211.22 |
| 110-6965274-0 | 06/02/99 | $2,352 | $212.60 | 9.04% | $25.00 | $9,542 | $862.60 | 9.04% | $25.00 | $649.98 | $0.00 |
| 110-6015798-8 | 06/09/99 | $2,040 | $184.42 | 9.04% | $25.00 | $11,320 | $1,023.33 | 9.04% | $25.00 | $838.91 | $0.00 |
| 110-6015623-4 | 06/09/99 | $17,880 | $1,616.35 | 9.04% | $37.55 | $79,573 | $7,193.94 | 9.04% | $167.12 | $5,577.59 | $129.57 |
| 110-6967845-5 | 06/12/99 | $12,956 | $316.40 | 9.04/0% | $27.21 | $33,556 | $2,178.84 | 9.04/0% | $70.47 | $1,862.24 | $43.26 |
| 110-6016580-9 | 06/15/99 | $1,022 | $92.39 | 9.04% | $25.00 | $4,880 | $441.15 | 9.04% | $25.00 | $348.76 | $0.00 |
| 110-6017010-6 | 06/15/99 | $8,750 | $791.00 | 9.04% | $25.00 | $77,500 | $7,006.00 | 9.04% | $162.75 | $6,215.00 | $137.75 |
| 110-6966110-5 | 06/17/99 | $33,800 | $2,556.70 | 9.04/3.95% | $70.98 | $261,680 | $17,700.88 | 9.04/3.95% | $485.00 | $15,144.18 | $414.02 |
| 110-6981708-7 | 06/19/99 | $15,192 | $1,373.36 | 9.04% | $31.90 | $96,185 | $8,695.12 | 9.04% | $201.98 | $7,321.76 | $170.08 |
| 110-6018343-0 | 06/22/99 | $2,450 | $96.78 | 3.95% | $31.50 | $9,240 | $364.98 | 3.95% | $25.00 | $268.20 | $0.00 |
| 110-6018677-1 | 06/23/99 | $6,336 | $572.77 | 9.04% | $25.00 | $54,570 | $4,933.13 | 9.04% | $114.60 | $4,360.36 | $89.60 |
| 110-6979836-0 | 06/23/99 | $4,705 | $425.24 | 9.04% | $25.00 | $10,465 | $946.04 | 9.04% | $25.00 | $521.28 | $0.00 |
| 110-6019411-4 | 06/26/99 | $600 | $54.24 | 9.04% | $25.00 | $5,900 | $533.36 | 9.04% | $25.00 | $479.12 | $0.00 |
| 110-6988164-0 | 06/26/99 | $1,050 | $94.92 | 9.04% | $25.00 | $8,850 | $800.04 | 9.04% | $25.00 | $705.12 | $0.00 |
| 110-6990931-4 | 06/28/99 | $3,600 | $325.44 | 9.04% | $25.00 | $19,530 | $1,765.51 | 9.04% | $41.01 | $1,440.07 | $16.01 |
| 110-6019350-3 | 06/29/99 | $1,500 | $135.60 | 9.04% | $25.00 | $15,030 | $1,356.00 | 9.04% | $31.50 | $1,220.40 | $6.50 |
| 110-5841927-5 | 06/29/99 | $600 | $54.24 | 9.04% | $25.00 | $6,000 | $542.40 | 9.04% | $25.00 | $488.16 | $0.00 |
| 110-6020764-3 | 07/02/99 | $576 | $52.07 | 9.04% | $25.00 | $5,568 | $503.35 | 9.04% | $25.00 | $451.28 | $0.00 |
| 110-6998629-6 | 07/07/99 | $3,000 | $271.20 | 9.04% | $25.00 | $7,875 | $711.90 | 9.04% | $25.00 | $440.70 | $0.00 |
| 110-6021925-9 | 07/08/99 | $4,200 | $379.68 | 9.04% | $25.00 | $29,820 | $2,695.73 | 9.04% | $62.66 | $2,315.93 | $37.66 |
| 110-7002000-2 | 07/10/99 | $3,600 | $325.44 | 9.04% | $25.00 | $34,800 | $3,145.92 | 9.04% | $73.08 | $2,820.48 | $48.08 |
| 110-6022496-0 | 07/12/99 | $3,000 | $271.20 | 9.04% | $25.00 | $25,700 | $2,323.28 | 9.04% | $53.97 | $2,052.08 | $28.97 |
| 110-6022492-9 | 07/12/99 | $3,000 | $271.20 | 9.04% | $25.00 | $26,500 | $2,395.60 | 9.04% | $55.65 | $2,124.40 | $30.65 |
| 110-7006126-1 | 07/15/99 | $3,000 | $271.20 | 9.04% | $25.00 | $27,920 | $2,523.97 | 9.04% | $58.63 | $2,252.77 | $33.63 |
| 110-7004900-1 | 07/15/99 | $288 | $26.04 | 9.04% | $25.00 | $3,278 | $296.38 | 9.04% | $25.00 | $270.34 | $0.00 |
| 110-7007322-5 | 07/15/99 | $3,000 | $271.20 | 9.04% | $25.00 | $28,000 | $2,531.20 | 9.04% | $58.80 | $2,260.00 | $33.80 |
| 110-7006685-6 | 07/16/99 | $2,700 | $244.08 | 9.04% | $25.00 | $25,350 | $2,291.64 | 9.04% | $53.24 | $2,047.56 | $28.24 |
| 110-7006839-9 | 07/16/99 | $2,400 | $94.80 | 3.95% | $25.00 | $12,000 | $477.16 | 3.95% | $25.36 | $382.36 | $0.36 |
| 110-6024682-3 | 07/21/99 | $9,000 | $813.60 | 9.04% | $25.00 | $84,000 | $7,593.60 | 9.04% | $176.40 | $6,780.00 | $151.40 |
| 110-6025035-3 | 07/22/99 | $8,340 | $110.60 | 3.95/0% | $25.00 | $12,640 | $499.28 | 3.95/0% | $26.54 | $388.68 | $1.54 |
| 110-7020116-4 | 07/28/99 | $300 | $11.85 | 3.95/0% | $25.00 | $9,340 | $51.35 | 3.95/0% | $25.00 | $39.50 | $0.00 |
| 110-7029578-6 | 08/06/99 | $864 | $78.11 | 9.04% | $25.00 | $12,936 | $1,169.41 | 9.04% | $27.16 | $1,091.30 | $2.16 |
| 110-6028718-1 | 08/07/99 | $3,168 | $286.39 | 9.04% | $25.00 | $17,865 | $1,615.00 | 9.04% | $37.52 | $1,328.61 | $12.51 |
| 110-7031116-1 | 08/07/99 | $900 | $81.36 | 9.04% | $25.00 | $9,850 | $890.44 | 9.04% | $25.00 | $809.08 | $0.00 |
| 110-6028773-4 | 08/07/99 | $15,000 | $1,354.50 | 9.04% | $31.50 | $132,500 | $11,964.75 | 9.04% | $278.25 | $10,610.25 | $246.75 |
| 110-6028721-5 | 08/11/99 | $900 | $81.36 | 9.04% | $25.00 | $9,850 | $890.44 | 9.04% | $25.00 | $809.08 | $0.00 |
| 110-7026673-8 | 08/11/99 | $900 | $35.55 | 3.95% | $25.00 | $9,540 | $376.83 | 3.95% | $25.00 | $341.28 | $0.00 |
| 110-7037497-9 | 08/07/99 | $300 | $11.85 | 3.95% | $25.00 | $3,100 | $122.45 | 3.95% | $25.00 | $110.60 | $0.00 |
| 110-7043840-2 | 08/24/99 | $166,001 | $592.50 | 0/3.95% | $348.75 | $219,571 | $2,705.75 | 0/3.95% | $461.10 | $2,113.25 | $112.60 |
| 110-7047605-5 | 08/25/99 | $3,564 | $0.00 | 0.00% | $25.00 | $21,168 | $0.00 | 0.00% | $44.45 | $0.00 | $19.45 |
| 110-7046873-0 | 08/26/99 | $11,494 | $1,038.55 | 0/9.04% | $25.00 | $100,384 | $5,241.75 | 0/9.04% | $210.00 | $4,203.02 | $185.00 |

| Entry Number | Entry Date | Entered Value | Dumping Deposited | Deposit Rate | MPF Paid | Appraised Value | Dumping Duties Due on Deposit | Collection Rate | MPF Due | Loss of Dumping Duties | Loss of MPF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 110-7048382-0 | 08/26/99 | $9,120 | $360.24 | 3.95% | $25.00 | $129,920 | $5,131.84 | 3.95% | $272.83 | $4,771.60 | $247.83 |
| 110-6033820-8 | 08/27/99 | $9,280 | $838.91 | 9.04% | $25.00 | $95,120 | $8,598.85 | 9.04% | $199.75 | $7,759.94 | $174.75 |
| 110-7053665-8 | 09/01/99 | $3,200 | $289.28 | 9.04% | $25.00 | $13,800 | $1,247.52 | 9.04% | $28.98 | $958.24 | $3.98 |
| 110-7057240-8 | 09/03/99 | $9,450 | $0.00 | 0.00% | $25.00 | $62,100 | $0.00 | 0.00% | $130.41 | $0.00 | 105.41 |
| 110-6035846-1 | 09/08/99 | $3,000 | $118.50 | 3.95% | $25.00 | $82,100 | $3,242.95 | 3.95% | $172.41 | $3,124.45 | $147.41 |
| 110-7062430-8 | 09/09/99 | $80,000 | $3,160.00 | 3.95% | $168.00 | $83,000 | $3,278.50 | 3.95% | $174.30 | $118.50 | $6.30 |
| 110-6036858-5 | 09/09/99 | $3,000 | $118.50 | 3.95% | $25.00 | $84,000 | $3,318.00 | 3.95% | $176.40 | $3,199.50 | $151.40 |
| 110-7070795-4 | 09/18/99 | $21,510 | $253.12 | 0/9.04% | $45.17 | $42,310 | $2,133.44 | 9.04% | $88.85 | $1,880.32 | $420.74 |
| 110-7075364-4 | 09/22/99 | $30,600 | $2,308.14 | 9.04/3.95% | $64.26 | $289,800 | $21,876.51 | 9.04/3.95% | $485.00 | $19,568.37 | $329.49 |
| 110-7076280-1 | 09/23/99 | $18,000 | $1,627.20 | 9.04% | $37.80 | $174,900 | $15,810.96 | 9.04% | $367.29 | $14,183.76 | 281.18 |
| 110-7078101-7 | 09/24/99 | $9,720 | $0.00 | 0.00% | $25.00 | $145,800 | $0.00 | 0.00% | $306.18 | $0.00 | $41.58 |
| 110-7035520-7 | 10/12/99 | $45,176 | $162.72 | 0/9.04% | $94.87 | $64,976 | $1,952.64 | 0/9.04% | $136.45 | $1,789.92 | $41.58 |
| 110-7096735-0 | 10/13/99 | $21,810 | $54.24 | 9.04/0 | $45.80 | $28,410 | $650.88 | 9.04/0% | $59.66 | $596.64 | $13.86 |
| 110-6045566-2 | 10/20/99 | $1,200 | $47.40 | 3.95% | $25.00 | $12,200 | $481.90 | 3.95% | $25.62 | $434.50 | $0.62 |
| 110-6048317-6 | 10/23/99 | $5,064 | $200.03 | 3.95% | $25.00 | $54,016 | $2,133.63 | 3.95% | $113.43 | $1,933.60 | $88.43 |
| 110-5209735-8 | 10/25/99 | $5,400 | $213.30 | 3.95% | $25.00 | $57,560 | $2,275.20 | 3.95% | $120.96 | $2,061.90 | $95.96 |
| 110-5212148-9 | 10/27/99 | $15,000 | $1,356.00 | 9.04% | $31.50 | $69,500 | $6,282.80 | 9.04% | $145.95 | $4,926.80 | $114.45 |
| 110-6048037-8 | 10/28/99 | $22,900 | $0.00 | 3.950% | $31.50 | $240,340 | $5,533.95 | 3.950% | $485.00 | $5,533.95 | $460.00 |
| 110-5217767-1 | 11/03/99 | $10,395 | $0.00 | 0.00% | $25.00 | $94,446 | $0.00 | 0.00% | $198.33 | $0.00 | $173.33 |
| 110-8401322-5 | 11/05/99 | $10,650 | $35.55 | 9.04% | $25.00 | $19,050 | $367.35 | 3.95% | $331.80 | $15.00 | $15.00 |
| 110-8402102-0 | 11/10/99 | $1,500 | $59.25 | 3.95% | $25.00 | $16,600 | $655.70 | 3.95% | $34.86 | $650.45 | $9.86 |
| 110-8404397-4 | 11/17/99 | $13,900 | $701.75 | 9.04/3.95% | $29.19 | $139,910 | $7,195.97 | 9.04/3.95% | $293.81 | $6,494.22 | $264.62 |
| 110-8404780-0 | 11/18/99 | $3,900 | $352.56 | 9.04% | $25.00 | $42,380 | $3,831.15 | 9.04% | $89.00 | $3,478.59 | $64.00 |
| 110-5231479-5 | 11/26/99 | $15,000 | $1,356.00 | 9.04% | $31.50 | $70,000 | $6,328.00 | 9.04% | $147.00 | $4,972.00 | $115.50 |
| 110-8406937-5 | 11/26/99 | $47,424 | $0.00 | 0.00% | $99.59 | $58,704 | $0.00 | 0.00% | $123.27 | $0.00 | $23.68 |
| 110-8407509-1 | 11/29/99 | $4,800 | $433.92 | 9.04% | $25.00 | $26,400 | $2,386.56 | 9.04% | $55.44 | $1,952.64 | $30.44 |
| 110-8416393-9 | 12/04/99 | $6,000 | $237.00 | 3.95% | $25.00 | $59,200 | $2,338.40 | 3.95% | $124.32 | $2,313.40 | $99.32 |
| 110-5855193-1 | 12/13/99 | $7,750 | $611.53 | 9.04/3.95% | $25.00 | $43,500 | $3,245.25 | 9.04/3.95% | $91.35 | $2,633.72 | $66.35 |
| 110-5855723-1 | 12/15/99 | $9,000 | $355.50 | 3.95% | $25.00 | $79,500 | $3,299.80 | 3.95% | $166.95 | $7,944.30 | $141.95 |
| 110-8438207-5 | 12/23/99 | $6,900 | $623.76 | 9.04% | $25.00 | $34,040 | $3,553.78 | 9.04% | $71.48 | $2,930.02 | $46.48 |
| 110-8438139-0 | 12/23/99 | $10,500 | $0.00 | 9.04% | $25.00 | $93,300 | $8,434.32 | 9.04% | $195.93 | $8,434.32 | $171 |
| 110-5861689-6 | 01/10/00 | $9,350 | $0.00 | 3.95/9.04% | $25.00 | $81,100 | $0.00 | 0.00% | $170.31 | $0.00 | $145.31 |
| 110-5861911-2 | 01/18/00 | $2,700 | $0.00 | 3.95/9.04% | $25.00 | $15,480 | $0.00 | 0.00% | $31.96 | $0.00 | $6.96 |
| 110-6062082-1 | 01/19/00 | $1,400 | $0.00 | 3.95% | $25.00 | $10,280 | $0.00 | 0.00% | $25.00 | $0.00 | $0.00 |
| 110-5867099-2 | 02/03/00 | $5,550 | $0.00 | 9.04% | $25.00 | $153,000 | $0.00 | 0.00% | $321.30 | $0.00 | $296.30 |
| 110-5870660-6 | 02/16/00 | $7,350 | $0.00 | 3.95% | $25.00 | $51,500 | $0.00 | 0.00% | $108.15 | $0.00 | $83.15 |
| 110-5874982-0 | 03/02/00 | $8,750 | $0.00 | 9.04% | $25.00 | $59,500 | $0.00 | 0.00% | $124.95 | $0.00 | $99.95 |
| 110-5897451-9 | 05/23/00 | $18,000 | $0.00 | 10.44% | $37.80 | 31,800 | $0.00 | 0.00% | $66.78 | $0.00 | $28.98 |
| **Total** | | $1,313,771 | $56,187.30 | | $4,364.89 | $6,761,581 | $430,862.41 | | $14,220.59 | $375,843.57 | $9,879.15 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.  05-10009-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| BERNARD SMITH, | ) | |
| Defendant | ) | |
| | ) | |

## **AFFIDAVIT OF DOUGLAS STERLING**

Douglas Sterling, being duly sworn, states the following under the pains and penalties of perjury:

1. My name is Douglas Sterling.  I am Vice President of Operations for Stealth Components, Inc. ("Stealth" or the "Company").  In this position, I am, in effect, "second in command" at Stealth.  I am involved in and oversee all aspects of the Company's operations, and am basically charged with carrying out the administrative functions which Mr. Smith would otherwise handle, including overseeing Human Resources ("HR") issues.  My duties include overseeing purchasing and sales, making sure that purchases are appropriate for the sales being made.  I also ensure that purchases are not made from suppliers who have proven to be unreliable in the past, as well as checking the credit of customers and buyers.  I am also responsible for participating attempts to collect accounts.

2. I have been employed by Stealth since 2000, and have held my current position for approximately four years.  Prior to taking my current position, I was Director of Purchasing for Stealth.  Prior to coming to Stealth, I was employed in the production of electronic components.

3. Stealth is a broker for electronic components, specializing in semiconductors and other electronic components in the secondary market, i.e. it buys from manufacturers' or brokers' overstocks and sells to customers who experience parts shortages or need unusual or  hard-to-find components.  These shortages tend to arise suddenly and must be filled with great speed.  For instance, a manufacturer of computers might discover that it has a "spot" shortage of a particular part which would prevent further production.  This "spot" market is extremely competitive, and profit margins are exceedingly thin, often a matter of pennies per item.

4. Stealth is often considered a "gray market" supplier.  While the items Stealth provides are perfectly legal, they may be excess inventory or otherwise not originally intended for the use our customers may envision.  The company name, in fact, is intended to represent that the company operates in the nooks and crannies of the market.  Unlike "black market" suppliers, Stealth does not knowingly deal in counterfeit components and takes pains to insure that it does

not supply counterfeit components.

5. Over the past several years, Stealth has developed an expertise in supplying manufacturers in Europe with components bought in the United States or elsewhere. This type of transaction now represents the majority of Stealth's sales.

6. Because of the nature of the transactions in which Stealth takes part, which occur without any face-to-face contact and with buyers and sellers on different Continents, and because of the extremely time-sensitive nature of the transactions, it is critical that the parties (especially the buyers) have complete trust in the broker. Buyers must also trust not to supply counterfeit materials.

7. I work closely with the President of Stealth Components, Bernard Smith, and have worked closely with him since the start of my employment.

8. Mr. Smith is critical to the continued success of Stealth Components. He is the company's founder, and his contacts, managerial expertise, and experience are critical to Stealth's success. Mr. Smith is committed to Stealth, arriving each day before 4:00 a.m.

9. Although the company has expanded greatly, Mr. Smith retains considerable control over Stealth's costs, expansion opportunities, and operation. Because the company is still fairly new, there is no managerial depth which would provide for a succession plan. Although I am involved in all aspects of management of the company, I would not be able to perform the functions Mr. Smith does.

10. Indeed, Mr. Smith continues to be the most successful sales representative at Stealth. Other than Mr. Smith, Stealth now employs 18 sales representatives. The table below summarizes Stealth's revenue and Mr. Smith's contribution over the past several years:

| Sales by Year | | | | | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 7/30/2005 |
| Bernard Smith | $ 1,384,034 | $ 1,690,034 | $ 1,601,816 | $ 2,022,003 | $ 1,070,704 |
| Stealth Total | $ 2,494,046 | $ 3,542,713 | $ 5,594,921 | $ 8,342,193 | $ 3,015,769 |
| **Smith Contribution** | 55.49% | 47.70% | 28.63% | 24.24% | 35.50% |

As this table demonstrates, Mr. Smith's contribution is much greater than any other individual sales representative. Indeed, Mr. Smith takes in considerably more in sales every year than he takes in salary.

11. Mr. Smith often provides vital expertise and assistance even in the sales he does not make personally. Further, his name is clearly associated with Stealth Components by buyers and sellers, and his reputation is such that buyers and sellers trust Stealth because of that association.

12. The loss of Mr. Smith for any substantial period of time would devastate the operations of Stealth. There is no doubt in my mind that if Mr. Smith were absent for any substantial period, Stealth Components would be forced out of business.

13. Stealth currently employs 23 individuals other than the President, one of whom is part-time. These include a Vice President of Operations, an Accounting Manager, several Account Executives and Senior Account Executives whose primary activity is sales, Procurement Specialists, whose primary activity is to purchase items for subsequent sale, a Shipping Manager, and a Shipping and Receiving Specialist.

14. The following chart provides a profiles of Stealth employees:

| Description | Stealth Profile |
|---|---|
| Average Length of Service | 26.9 Months |
| Gender | 13 Female / 11 Male (54.1%/45.8% respectively) |
| Marital Status | 17 Single / 7 Married (70.8%/29.1% respectively) |
| Dependent children | 8 employees have 12 dependent children among them |
| Highest education level achieved | • 5 employees have a Master's degree (in Business or Management or Information Systems).<br>• 16 employees have a four-year college degree.<br>• 3 employees have a high school diploma. |
| Specialized skills | 11 employees have foreign-language fluency. |
| Job status at time of hire by Stealth Components | • 9 were unemployed.<br>• 6 were employed.<br>• 1 joined the company directly from high school.<br>• 7 joined directly from college |
| Average base salary | $38,552.20 |

15. Salaries for Stealth employees range from $29,000 to approximately $75,000. The Company also offers Account Executives and Senior Account Executives a commission plan, over and above base salary. For 2004, this represented approximately 38% of their total cash compensation. Purchasing Department members (Procurement Specialists) also participate in a bonus plan, over and above base salary, which is dependent on gross profits.

16. Stealth also has a defined contribution 401(k) plan. With a defined contribution plan, the plan defines the contributions that an employer can make and not the benefit that the employee will receive at retirement. Stealth matches 50 percent of the contribution made by employees, up to a limit of three percent of the employee's compensation.

17. In addition to the base compensation and commission schedule the Company pays the total premium cost for a comprehensive health insurance plan for individuals and nearly half the total premium cost for families. The health insurance plan currently being provided by the Company is a rich, comprehensive HMO-style plan through Anthem Blue Cross/Blue Shield.

18. Almost all eligible employees are currently enlisted in the health insurance plan.

3

19. Stealth also offers a dental plan through MetLife Dental. Stealth pays the majority of the total premium for employees enrolled in this plan.

20. Stealth also provides short and long term disability coverage to all employees.

21. Five current employees of Stealth are in the United States as part of the H1B visa program. Stealth was the sponsor for these visas. An additional employee is on Optional Practical Training, and Stealth intends to sponsor that employee for an H1B visa. I understand that continued employment is a condition for these employees remaining in the United States.

Signed under the pains and penalties of perjury this *13* day of *October* , 2005.

Douglas Sterling

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                   )
UNITED STATES OF AMERICA           )
                                   )
       v.                          )        CRIMINAL NO. 05-10009-DPW
                                   )
BERNARD SMITH                      )
                                   )
_____)
```

### AFFIDAVIT OF RICHARD R. MACKENZIE JR.

1)  I am a Certified Public Accountant with the accounting firm Brown & Brown, LLP (the
"Firm").  The Firm maintains its principal office at 90 Canal Street, Boston,
Massachusetts.  I graduated Babson College in 1993 with a Bachelor of Science in
Accounting and Economics.  I am an Accredited Senior Appraiser with the American
Society of Appraisers and a Certified Business Appraiser with the Institute of Business
Appraisers.  These designations require five years of full time equivalent experience and
peer review of work product.  I have led and participated in a variety of assignments,
including valuation of closely-held businesses, professional practices, intangible assets,
and segment valuation of publicly traded companies.  My work has been used in estate
and gift tax filings, financial statement reporting for publicly traded companies, marital
dissolutions, partnership and corporate disputes, and solvency analysis, among other
matters.  As a Certified Public Accountant and Business Appraiser, I am frequently asked
to evaluate the financial performance of a company; the anticipated cash flows; and the
dependence upon management, customers and suppliers and how this affects cash flow
that inures to the benefit of the entity.

2)  I was engaged by Attorney Max Stern of Stern, Shapiro, Weissberg & Garin LLP

("SSWG") to analyze the impact of Mr. Bernard Smith's contribution to the financial success of Stealth Components Inc., ("Stealth" or the "Company"). Specifically, I was asked to look into the extent of Mr. Smith's financial contribution to Stealth and the impact upon the company and its employees of an absence of Mr. Smith and consequent inability to continue in his current role.

3)  In order to perform this analysis, I interviewed Bernard Smith, Martha Maskalenko (Accounting Manager), Amy Lynn (Human Resources Coordinator), Douglas Sterling (Vice President of Operations) and various other employees. I also conducted a site visit of the facilities in New Hampshire. I conducted industry research for the electronic components brokerage industry and into the current local New Hampshire economic conditions. My findings and conclusions as a result of this analysis are set forth in the following paragraphs.

4)  Stealth was incorporated in the state of Nevada in 1996, with capital contributed by Rob Ackerly and Lee Ackerly who are the principals of Smith & Associates Inc. an electronics broker dealer. The Ackerly's originally held 100 percent of the common stock but granted Mr. Smith a 25 percent share in Stealth as a result of his efforts.

5)  Stealth is a broker of electronic parts and equipment and operates within the secondary, or gray, market. Brokers act as middle agents within the supply chain manufacturers, and their customers, face inventory shortages, or when there is a need to locate unusual (or older) parts that are no longer available directly from the manufacturer.

6)  Stealth Components currently has 23 employees, in addition to the President. These include a Vice President of Operations, an Accounting Manager, a Human Resources Manager, several Account Executives and Senior Account Executives whose primary

activity is sales, Procurement Specialists, whose primary activity is to purchase items for subsequent sale, a Shipping Manager, and a Shipping and Receiving Specialist. Like many small companies, it operates with few administrative personnel who do not directly contribute to the profitability of the Company.

7)   Mr. Bernard Smith is the key person in the management and operation of the Company. The Company does not have the depth of management that provides for a succession plan ensuring its survival in the event of the absence of Mr. Smith. Mr. Smith is the most productive individual salesperson – his sales are more than twice that of the next two highest salespersons combined. Moreover, Mr. Smith's personal network of customers and suppliers and his depth of knowledge in the industry, which far exceeds the other Account Executives, enable him to locate product and identify potential customers and thus assist the entire sales force. For instance, Mr. Smith has contacts within the industry that are not generally known by other brokers. As a result, he has been able to obtain large volumes of difficult to obtain parts which resulted in sales for another sales representative in the office.

8)   In order to quantify the impact of Mr. Smith's absences, I examined the sales and gross profits in total and by individual Account Executives. I determined that the most appropriate source of information would be the Stealth Components financials for the year ended 2004, since these financial statements reflect the most recent full year of operations, have been subject to scrutiny by the company's accountants, are reconciled to the company's 2004 tax return and are likely to be most indicative of future results. Reviewing that information, I determined that Mr. Smith was directly responsible, in sales made personally by him, for $965,597 of the $3,189,006 of Gross Profit (line 3 of

the 1120S) or approximately 30 percent of the earnings. As of the year ended December 31, 2004, the Company generated $908,786 of Net Income (Page 4, Schedule M-1 line 1 of the 1120S). This is shown in Exhibit A to this Affidavit.

9) Based upon the above, in my opinion if Mr. Smith was unable to continue to in his current role Stealth would lose, on average, approximately $5,000 a month of net, based solely on sales generated personally by Mr. Smith. This is calculated by subtracting Mr. Smith's contribution from Net Income [$908,786 - $965,597 = ($56,811)], as shown in Exhibit A. In making this calculation, I have assumed that although the company will not incur the expense of Mr. Smith's salary ($75,000 in 2004; $100,000 in 2005), it will have to incur a comparable expense to fulfill his administrative role.

10) From a financial perspective, the loss would irreparably impair the operation of Stealth and place all of the current and prospective employees in jeopardy. This is further supported by the Company's purchase of a keyman life insurance policy in the amount of one million dollars ($1,000,000). Mr. Smith contributes significantly more in sales than he takes in salary. The investor group realizes that his untimely death would cease operations and have an immediate impact on cashflow available to fund operations.

11) Since, as noted above, Mr. Smiths contribution enhances the sales and gross profits of other Account Executives, I have endeavored to examine Mr. Smith's total financial impact upon the Company. According to Mr. Smith's estimate, he contributes approximately 20 percent to the overall gross profit of others. If that is the case, his true financial contribution would be approximately $1,410,279 calculated as follows [{($3,189,006 - $965,597) x 20%} + $965,597] or, stated as a percentage of Gross Profit,

44.22 percent in total.[1]  These calculations are shown on Exhibit A.  Given these estimates, I would expect Stealth to lose on average approximately $42,000 a month. This is calculated simply by subtracting Mr. Smith's contribution from Net Income [$908,786 - $1,410,279 = ($501,493)].[2]

12)   I have analyzed the measures required to avoid operating the company at short term loss. In order to mitigate the financial loss that would be experienced by the absence of Mr. Smith, the Company would need to reduce staffing levels.  However, this short term fix would have longer consequences.  As productive members of the sales staff are terminated, we must factor in their respective gross profit contribution.  By examining the U.S. Income Tax returns for Stealth Components Inc. for the year ended 2004, and knowing that Mr. Smith contributed $965,597 of the $3,189,006 of Gross Profit (line 3 of the 1120S), the remaining sales staff generated $2,223,409 in Gross Profit ($3,189,006-$965,597=$2,223,409 unadjusted for Mr. Smith's guidance).  As seen on Line 8 of the tax return, the salaries and wages for all other employees except Mr. Smith totaled $1,070,091.  This implies that for each dollar in expenses saved during the year, approximately two dollars in Gross Profit is sacrificed ($2,223,409 / $1,070,091 = $2.08). The short term solution would be to reduce staff each month by the shortfall in earnings. However this measure sacrifices future profitability and creates a downward spiral in earnings from which the company would have difficulty recovering.

13)   In sum, the Company could continue to operate for a period of time at a lower earnings

---

[1]  If we were to make a more conservative estimate of 10 percent, the total contribution to Gross Profit would be approximately $1,187,938 [{($3,189,006 - $965,597) x 10%} + $965,597] or 37.25 percent in total.
[2]  At the 10 % level, I would expect Stealth to lose on average approximately $23,000 a month. This is calculated simply by subtracting Mr. Smith's contribution from Net Income [$908,786 - $1,187,938 = ($279,152)]

level. The loss in earnings could be mitigated by a reduction in employees. However, without an additional infusion of capital, this would only sustain operations for a short period of time. Absent the capital infusion, the Company would go into a downward spiral and would ultimately fail.

Signed under the pains and penalties of perjury this _14_ th day of October 2005.

Richard R. MacKenzie Jr. CPA ASA CBA

EXHIBIT A
Stealth Components Inc.
Historical Comparative Statements of Operations

| | 1/31/2004 | 2/29/2004 | 3/31/2004 | 4/30/2004 | 5/31/2004 | 6/30/2004 | 7/31/2004 | 8/31/2004 | 9/30/2004 | 10/31/2004 | 11/30/2004 | 12/31/2004 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R. Smith Gross Profit | 74,097 | 72,693 | 83,221 | 99,534 | 69,168 | 72,024 | 51,289 | 82,188 | 95,994 | 68,903 | 109,753 | 86,731 | 965,597 |
| Other Individual Gross Profit | 111,900 | 241,318 | 238,051 | 248,484 | 276,638 | 262,424 | 173,305 | 145,926 | 128,240 | 144,965 | 114,940 | 137,229 | 2,223,409 |
| Total Gross profit | 185,997 | 314,011 | 321,272 | 348,018 | 345,806 | 334,449 | 224,594 | 228,114 | 224,225 | 213,868 | 224,693 | 223,960 | 3,189,006 |
| OPERATING EXPENSES: | | | | | | | | | | | | | |
| Compensation to Officers | 18,533 | 18,533 | 18,533 | 18,533 | 18,533 | 18,533 | 18,533 | 18,533 | 18,533 | 18,533 | 18,533 | 18,533 | 222,401 |
| Salaries & Wages | 89,174 | 89,174 | 89,174 | 89,174 | 89,174 | 89,174 | 89,174 | 89,174 | 89,174 | 89,174 | 89,174 | 89,174 | 1,070,091 |
| Repairs & Maintenance | 404 | 404 | 404 | 404 | 404 | 404 | 404 | 404 | 404 | 404 | 404 | 404 | 4,850 |
| Bad Debts | 5,332 | 5,332 | 5,332 | 5,332 | 5,332 | 5,332 | 5,332 | 5,332 | 5,332 | 5,332 | 5,332 | 5,332 | 63,979 |
| Rents | 9,460 | 9,460 | 9,460 | 9,460 | 9,460 | 9,460 | 9,460 | 9,460 | 9,460 | 9,460 | 9,460 | 9,460 | 113,522 |
| Taxes & Licenses | 16,730 | 16,730 | 16,730 | 16,730 | 16,730 | 16,730 | 16,730 | 16,730 | 16,730 | 16,730 | 16,730 | 16,730 | 200,764 |
| Depreciation | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 1,383 | 16,590 |
| Advertising | 327 | 327 | 327 | 327 | 327 | 327 | 327 | 327 | 327 | 327 | 327 | 327 | 3,924 |
| Pension & profit Sharing Plans | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 6,895 |
| Employee Benefit Programs | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 47,438 | 47,438 | 47,438 | 47,438 | 47,438 | 47,438 | 47,438 | 47,438 | 47,438 | 47,438 | 47,438 | 47,438 | 569,255 |
| Total operating expenses | 189,356 | 189,356 | 189,356 | 189,356 | 189,356 | 189,356 | 189,356 | 189,356 | 189,356 | 189,356 | 189,356 | 189,356 | 2,272,270 |
| Operating Income (Loss) | (3,359) | 124,655 | 131,916 | 158,662 | 156,450 | 145,093 | 35,238 | 38,758 | 34,869 | 24,512 | 35,337 | 34,604 | 916,736 |
| OTHER (INCOME) EXPENSE: | | | | | | | | | | | | | |
| Interest expense | | | | | | | | | | | | | |
| Interest Income | (207) | (207) | (207) | (207) | (207) | (207) | (207) | (207) | (207) | (207) | (207) | (207) | (2,483) |
| Other | 869 | 869 | 869 | 869 | 869 | 869 | 869 | 869 | 869 | 869 | 869 | 869 | 10,433 |
| Other (income) / expense | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 7,950 |
| Income before minority interest and joint ventures | (4,022) | 123,993 | 131,253 | 157,999 | 155,788 | 144,430 | 34,576 | 38,096 | 34,206 | 23,850 | 34,675 | 33,942 | 908,786 |
| Minority interest | | | | | | | | | | | | | |
| Equity in joint ventures | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pretax Income | (4,022) | 123,993 | 131,253 | 157,999 | 155,788 | 144,430 | 34,576 | 38,096 | 34,206 | 23,850 | 34,675 | 33,942 | 908,786 |
| Income taxes | | | | | | | | | | | | | |
| Net Income / (Loss) from Operations | (4,022) | 123,993 | 131,253 | 157,999 | 155,788 | 144,430 | 34,576 | 38,096 | 34,206 | 23,850 | 34,675 | 33,942 | 908,786 |

Source: Management prepared financial statements and Brown & Brown, LLP's calculations.

| | Smith Contribution | | Total Gross Profit | | Percent of Gross Profit | |
|---|---|---|---|---|---|---|
| Mr Smiths Contribution | 965,597 | ÷ | 3,189,006 | = | 30.28% | |

| | Net Income | | Average Annual Loss | | Average Monthly Loss | |
|---|---|---|---|---|---|---|
| Loss Per Month in Smith Absence | 908,786 | - | (56,811) | = | (4,734) | |

| | Total Gross Profit | | Smith's Factor | | Months | | Average Monthly Loss | | Smiths Contribution to Others | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mr. Smiths Estimated Adjusted Gross Profit at 20% | 3,189,006 | x | 20% | x | 12 | = | (4,734) | = | $  444,682 | = |

| | Total Gross Profit | | B&H Factor | | | | | | Smiths Contribution to Others | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mr. Smiths Estimated Adjusted Gross Profit at 10% | 3,189,006 | x | 10% | = | | | | | $  222,341 | = |

| | Salaries & Wages | | Contribution of Others | | | | Gross Profit Lost per Dollar Saved in Salaries | |
|---|---|---|---|---|---|---|---|---|
| | 1,070,091 | ÷ | 2,223,409 | = | | | $  2.08 | |

| | Smith Contribution | | Smith Contribution | | Smith Adjusted Contribution | | Percentage of Gross |
|---|---|---|---|---|---|---|---|
| | 965,597 | + | 965,597 | = | 1,410,279 | | 44.22% |

| | Smith Contribution | | Smith Contribution | | Smith Adjusted Contribution | | Percentage of Gross |
|---|---|---|---|---|---|---|---|
| | 965,597 | = | 965,597 | = | 1,187,938 | | 37.25% |

BROWN&NBROWN

Dear Judge Woodlock,

Through this letter I hope that I am able to show you the type of person Bernie is as a husband, father, and part-owner of his company, Stealth Components. I have known Bernie for almost 10 years; 6 of which we have been married. We have a 2-year old son named Peter, and we are expecting another child in March 2006.

Bernie and I met in Houston, Texas shortly after graduating from college. After a couple of dates, I was immediately impressed by Bernie's caring and loving demeanor for his family and close friends. He was a great listener with an incredible interest in my background and upbringing. Being born in The Netherlands and having grown up in South & Central America in the 1980's, mainly in El Salvador, I lived through a 10-year civil war. My experiences as a child in this country made for a very sheltered life since my family tried to protect us from any possible kidnappings and actual bombings of our home.

Moving to the United States at 18 years of age without a single family member was also one of the most challenging times of my life. I attended Baylor University in Waco, Texas -- a very conservative, small-town, family-oriented university where my parents felt I would best fit in due to my background.

Upon graduation, I moved to Houston on my own again. This time I was faced with living in a big city and all of its new experiences. At the time I met Bernie I was feeling very lonely and missed my family immensely. However this all changed when I met Bernie, whose great sense of humor and optimistic view of life made me feel more and more comfortable with my new environment. From the moment we met, he has unselfishly done everything he can to make me happy which he continues to do today with our son. Thanks to Bernie being such a loving husband and wonderful father, I am now very comfortable to call the United States my home. Even though I always miss my family living abroad, I can't image raising our kids and living anywhere else.

Bernie works very hard, putting in long hours at work. After coming home from the office in the afternoons, Bernie is never too tired to spend time with his family and be fully involved with the upbringing of our 2 year-old son Peter. He loves to spend the afternoons playing with him and teaching him new things. When I look around me, and see how little time most fathers actually spend with their children, I feel so fortunate that Bernie spends each afternoon with his son. Bernie always has the energy to watch Peter until he goes to bed at 7:30. Not only is this great for Peter, but I rely on Bernie's help in the afternoons to get things done since I have no family in this country who can offer to watch Peter once in a while. With another child on the way, I will rely even more on him to help with all the needs of a newborn.

I also had the opportunity to see Bernie at work when I joined Stealth Components in 2001 until 2003 as the office manager. From my desk I could see and hear everything he did all day since our office was one large open room. He believes everyone can learn

from each other at all times; so he sits at a desk amongst all his employees where they listen to each other making cold calls, putting orders together, and solving problems with customers or vendors. Bernie is their mentor – he always listens to others and guides them through the numerous issues that arise during the day.

One of Bernie's biggest virtues is the patience he has for anyone he hires. He gives all his employees ample of time to learn the business and develop their own business style. All he expects from people is to put in as much effort as possible, since he himself is an extremely hard worker. Bernie and the sales force start work at 3AM in order to take full advantage of the open European market.

The future of our family and the families of 23 employees all depend on Bernie continuing to guide Stealth Components. We have overcome many obstacles due to this process in the past few years; yet throughout, we have always stayed focused to keep the company ongoing in a positive direction. Bernie has always been and will always be a warm-hearted employer who truly cares about the livelihoods of his employees.

On a personal level we have tried to make a happy home for Peter despite the continued stress and sorrow we have felt over the last four years. Through all this, our son is developing into a wonderful, smiling child, and we attribute this to the time and effort that both of us spend with him. I know Bernie fully regrets his actions and if it were at all possible he would turn back the clock and make much better decisions.


Sincerely,

Annemarie Smith

Dear Judge Woodlock,

We are writing to you about Bernard Smith so that you may learn more about him as our son, a father and employer.

Bernie, as everyone calls him, has always had a strong work ethic and the desire to overcome adversity. As a toddler he had to conquer his stammering with months of speech therapy. In high school after two epileptic seizures, he spent the next four years on medication to control his condition and every six months underwent sleep deprived MRI's. He found time to coach Little League baseball and was president of his high school's Student Council. While attending a Quaker college in North Carolina, he participated in a Big Brother program, spending much time with a 9- year old boy whose father was absent from the young child's life.

During the summer months of his college years, he started a two- man company, washing windows, cleaning gutters, and repairing screens of private homes. Neither poison ivy, cobwebs, bee stings, nor climbing on ladders two stories high would deter him from completing his commitment to his customers.

After graduation from college, Bernie taught English and American culture for one year to high school students in the Czech Republic. During that year, he learned the Czech language and was often mistaken for a native. Returning to his apartment one evening, he was accosted by two men, one of whom threatened him with a knife. When he telephoned us from Prague, he was near hysteria, imagining his life could have ended on a dark sidewalk, in a foreign country, alone.

Upon returning to the States, he found a job in Houston, Texas starting at the bottom- the mailroom of a computer chip brokerage firm. Within a few months he moved into sales and used that experience to start Stealth Components in the basement of a rented house in Massachusetts. Without any professional guidance, at age 25, Bernie was getting "on the job" training. It was a monumental task for a young man with a college degree in English. He was the sole salesman, purchaser, shipper and he loved it.

Slowly, Bernie did well enough to move to an above ground office and eventually moved to Newburyport, MA., and began to hire a small staff. Since his company was so small he hired women as part time employees since they had young children at home, but needed an extra income. When possible health benefits were provided. Working conditions for employees were excellent – flexible working hours, good benefits and great location. Requiring more space, Bernie moved to his present location in Portsmouth, NH., at the former Pease Air Force Base and has provided employment and very generous benefits to over 25 employees and their families , who continue to enjoy flexible working hours to fit their family's needs.

Bernie, himself, works from 3:15 AM until early afternoon so that he can then go home and spend time with his son, Peter, who will be 2 years old in September. He is the most patient and caring parent and husband. Not many fathers are ready to spend 4 to 5 hours

each day with a small child after a full day of running a company.  With another baby expected in March 20, 2006, he will have that much more reason to continue his working schedule.  The memory of his Big Brother experience impressed him to see the need of a hands-on father.  His own father taught him how to fish, play baseball, basketball and attended every ice hockey practice and game.   Through his father's business experience he instilled in Bernie the importance of treating people fairly, with respect and honesty.

We implore you to take these qualities into consideration and see Bernie as a valuable asset to his company and community and recognize that he is not a danger to society.  He has never been in trouble before, has totally cooperated with the authorities, did not gain personally from any transactions, but passed the savings onto his customers.  We see poor judgment by a 27-year old who was trying to stay competitive to stay in business.

We hope that we can appeal to your judgment of fairness and kindheartedness when you consider Bernie's future.  We thank you in advance for your time and consideration.

Sincerely,

September 7, 2005

Honorable Douglas P. Woodlock
U.S. District Court
One Courthouse Way
Boston, MA

Dear Judge Woodlock:

I am writing to convey what I know of the character of Mr. Bernard Smith, Jr. I have known Mr. Smith for over ten years. We are brothers in law, I being married to his sister, Christine. I have known him to be diligent in work, healthful in his lifestyle and committed as a family man. In my profession as a physician I believe that I have gained some insight into human character. Mr. Smith has always seemed to me to be of good moral character. Hearing of his professional dealings I have always noted him to be fair and kind in his conduct.

He is extremely important to his family and business. Both will be severely hurt by any period of imprisonment. Two years ago, Mr. Smith and I both became fathers. Our sons are only one month apart. When I think of what Mr. Smith's absence would do to his relationship with his young son, my heart sinks.

Mr. Smith is extremely remorseful for his conduct. I am sure he has learned a very serious lesson. I hope that Mr. Smith's contrition combined with his immense importance to his family and business will be fairly considered in his sentencing.

Sincerely,

Matthew J. Collins, M. D.

Honorable Douglas P. Woodlock
U.S. District Court
One Courthouse Way
Boston, MA

Dear Judge Woodlock:

I wanted to say a few words about my brother, Bernie Smith. It has been a long four years for our family since June 2001. Since that time, in spite of his profound sorrow and regret for his mistakes, I have seen my brother continue to develop as an individual and as a businessperson.

As we grew up together, I quickly understood that Bernie was not a "fighter." He stuttered as a child, which doctors at the time attributed to the fact that our mother spoke to us in Ukrainian as we were growing up at home. This sometimes brought him trouble with other kids, but he would not lash out, either physically or verbally. Rather, he either withstood or ignored the abuse. He was, and remains to this day, a gentle person with a compassionate nature. When he was elected class president of our local high school, I realized that his reluctance to defend himself as a child had translated into an enviable ability to earn the respect of, and to communicate with, people of all kinds.

In college, Bernie began to excel in German language studies, then signed up to teach English in the Czech Republic for little money after he graduated. His patience, language skills and an innate ability to get along with others – particularly teenagers – made him a successful teacher. However, the experience of living and working in another country such as the Czech Republic in 1994, not long after the fall of communism in that country, invoked in him an appreciation for the freedoms and abundance of the United States.

Today, Bernie is a committed and loving husband to his wife, Annemarie, and father to his son, Peter. He enjoys nothing more than spending time with Peter, taking care of his yard, running with his dog, and fishing or skiing with his employees. When my husband and I recently received some difficult news about the baby we are expecting, Bernie listened and supported us.

Stealth has continued to flourish because he has dedicated himself to his company and his employees like very few people I know. He rises at 2:30 a.m. daily and works until mid-afternoon to maximize access to his non-American customers and to have more time with his son. He is committed to both his company and his family, and works hard at both.

Bernie built his company through his own efforts, and he started it completely alone. Even when he had hired his first employees, he lacked the protection, wisdom and guidance that working with more senior, experienced managers, salespeople, lawyers or human resources staff would have given him.

Bernie has learned when to ask for advice, both legal and professional. His sales ability continues to be unparalleled at the company and he worries daily about how to motivate

and inspire his salespeople now that Stealth is large enough to have its own bookkeeper and human resources personnel. His personal and professional development, work ethic and dedication are evident in Stealth's continued growth and development. I am proud to have Bernie as a brother.

Sincerely,

Christine Smith Collins

August 19, 2005

Dear Judge Woodlock:

Since 1998, I have been Bernie Smith's mentor and of his company, Stealth Components Inc. As Bernie's father-in-law, I took a keen interest in the success of the young company.

With no formal business administration background, but a strong desire to develop his own business, he had to compete with the established brokers in the components business.

Due to the lack of business experience, the company remained small, operating under low margins in the first years of its existence, barely breaking even month-to-month.

Together we developed a new business strategy based on servicing the wide open European market and the sourcing from Asia.

Moreover, we established a solid financial control system with best practices in the field of leadership management, import and export, and employment.

Starting every single day at 3:15 A.M., Bernie and the gradually growing Stealth team aggressively pursued the European market. Staying focused, Stealth Components and Bernie gained great respect among many European companies in Scandinavia, The Netherlands , Belgium, Germany, Austria and other countries.

His customers praise him for his honesty, fast service, and profound knowledge of the trade.

Stealth Components, like any other small business, depends solely on the leadership of Bernie. He works extremely hard with the support of his family, and is highly respected by his customers and also by the 23 employees working for Stealth Components.

On a monthly basis, I follow through the business development and twice a year I meet Bernie and his staff to give advice and assure myself that business is done in a correct way.

Bernie is a very decent person with clear goals for his company which makes him invaluable to the survival and ultimate success of Stealth Components.

Sincerely,

Peter J Allen

Marjolein Aben
9 Marloes Road
Basement Flat
W8 6LQ London

August 19, 2005

Dear Madam/Sir,

I am writing to you with regards to Bernie Smith, whom I have known since 1997, approximately 8 years. Within this time, I have spent considerable time with Bernie in his home environment as he is married to my sister. I have had the pleasure to get to know Bernie very well since I have spent almost all of my vacations in the past 8 years  with Bernie and my sister  for more or less 2 weeks at a time, either in their home in the US, at my house in London, or my mother's home in The Netherlands. I feel that one gets to know one's character very well when you spend so many hours a day together.  Between vacations, I am in regular contact with Bernie on the phone and by e-mail.

The first time I met Bernie was in 1997 when I went to Boston College on a one-year exchange programme from my university in England. Bernie and my sister were living in Malden then. As my sister was travelling for work, Bernie, having known me for only a few days, kindly took me to the university with all my luggage and helped me with registration. Bernie proved to be very helpful to me during that year – if I needed help with anything, given I was so far away from my own environment, Bernie was always ready to help, especially if my sister was travelling. That year, I spent almost every other weekend at Bernie and my sister's home.

Throughout the years, there have been occasions when I have turned to Bernie for advice and he has always encouraged me to be truthful, especially when it comes to relationships with people. Bernie is also very open to honesty from the other end, where he is willing to listen to other people's opinions and advice and thinks about them, whereas most other people would get very defensive.

Bernie also works very hard.  Generally he goes to the office at 3am to make sure he is there when Europe starts working. As I work in London, I go to work at 9 am UK time. Sometimes when I get to the office, Bernie will have already written me an e-mail, that, whilst the US is 6 hours behind!!! He enjoys his work

and is very kind to the people that work for him.  He has had to learn how to manage a business practically by himself and has grown a business from one person (himself) to more than 20.

Bernie is very much a family man. The times when I visit, and I generally stay for two – three weeks at a time, he comes home from work late afternoon (3–4pm given he has been working since 3–4am) and spends most of his time with my sister, playing with his son, Peter, and the dog, Bailey. Often he'll cook and after dinner with the family (8–9pm) he will go to sleep. In the weekends he always stays with his family, and when alone goes for a run, mows the lawn, washes the car, etc.,  Last time I was on holiday, which was last Christmas, Bernie said there was nothing he'd rather do than spend time at home with his family. He spends a lot of time with my sister and their almost two–year old son. Seldom have I seen fathers spend so much time with their children. Bernie is a great father and when their new baby is born in March, I am sure he will be a great father to him or her too.  Bernie has strong ties with all of his family. I am aware that he speaks to his parents practically every day, and when my mother visits Bernie and my sister (she lives in Holland), she spends 6–8 weeks at a time at their home. He always makes her feel very welcome and he certainly always makes me feel welcome.

Bernie is also very open and interested in other people as well as very good humoured which is quite good when you have the family-in-law at your house 24hs a day for a couple of weeks.

Bernie is very much family to me as well as a friend. When I was baptised over a year ago, I asked Bernie to be my godfather/sponsor, not only because he regularly goes to Church, but also because he has shown to me live the values as we are taught to do so – honesty, kindness towards others, working hard and strong family values.

Bernie is genuinely a very good person, concerned with working hard and building a strong family. I'm proud to have him as my brother-in-law.


Please do not hesitate to contact me if you have any questions.

Yours Sincerely,
Marjolein Aben

September 12. 2005

Dear Judge Woodlock,

As a mother-in-law I cannot wish for a better husband and father as Bernie for my daughter and grandson.  Every half year I get the opportunity to spend almost 2 months with them and am able see what a caring person he is towards his family and people around him.  Even though I spend a long time at their house it is never too much for him and I always feel welcomed.  I think it is very difficult to find a son-in-law who accepts this.

He is a wonderful father to Peter and spends a lot of time playing with him after work and in the weekends.   Even though he works very tough hours he is never too tired to go for long walks with Peter and their dog Bailey.  From the moment Peter was born, Bernie has played an active role in his upbringing.  It is important for a child to have a father who is involved because this will impact the person he will become later.  Peter is a very happy, confident child which I attribute a lot to Bernie's involvement.

I also admire the way he built up his company from nothing and now has employees who work for him.  Over the years the company has grown considerably and I have seen Stealth Components go from a basement office by himself to an office filled with 20 plus desks.

Since my daughter has no direct family in this country, she depends a lot on Bernie.  It would not be easy for her to be without a husband especially in a time when they are expecting another child.

Sincerely,

Paula Rietveld

Martha Maskalenko
15 Rye Street
Portsmouth NH 03801

Dear Judge Woodlock,

My name is Martha Maskalenko and I have been the Accounting Manager with Stealth Components since July of 2003. Prior to joining Stealth I was employed by an international manufacturing company for 7 years, when I left I held the position of Assistant Controller.

The decision for me to join Stealth came quite easily. The company was different than any other company that I had been interviewing with. I interviewed with the Office Manager first. When she said that I would be meeting with the President next I got a little nervous. But then Bernie walked into the room with his dog "Bailey" walking right in behind him. I was immediately put at ease and impressed with the warm, friendly atmosphere of Stealth. It also became quite clear that Bernie genuinely cares about his employees. As we discussed the benefits package I was surprised to see how generous the benefits were, especially for a small company. For example, Stealth pays for 100% of the medical insurance for single employees and 61% for married employees. Stealth also offers a 401K plan with a matching company contribution, 15 days of PTO (paid time off) available within the first year of employment and 8 paid holidays each year.

Going beyond the benefits package Bernie has created an atmosphere that is truly rewarding to work in. The adage "work hard, play hard" is perfect for Stealth. Bernie certainly recognizes and rewards his employee's efforts. When I joined Stealth we had 16 employees with all employees reporting to Bernie. Now we have Team Leaders on the sales floor, the Shipping Clerk was promoted to Supervisor, she now has a direct report. We have hired a Systems Administrator and a Human Resource Manager. The staff is encouraged by the growth knowing that there is room for advancement. Stealth has a very diverse work force. Bernie recruits heavily at the local colleges. This has been the first professional job for many employees while others were previously employed elsewhere with families to support. Bernie recognizes the challenges that working parents face and is extremely sensitive to their needs.

Bernie Smith is an integral part of this company, aside from the obvious reason being that he is the President, Bernie is the driving force behind Stealth Components. In 2004 Bernie alone contributed to 30% of the total Gross Profit of the company. Through July of 2005 he has contributed to 28 % of the total Gross Profit. He sits out on the sales floor front and center as a school teacher would. He is constantly watching, coaching and advising the sales staff encouraging and supporting them every step of the way.

Although Stealth Components is a small company it is the sum total of such small businesses that constitute one of this country's most important assets by providing employment and otherwise stimulating the economy.

Sincerely,

Martha Maskalenko
Accounting Manager
Stealth Components

August 21, 2005

To Whom It May Concern:

It is my pleasure to submit this letter in support of Bernie Smith. I have known Bernie since July 2003 when I was hired by Stealth Components Inc. My position at Stealth Components as an Account Executive is to manage and grow targeted key accounts as well as generate new accounts in the U.S. and International markets.

Working at Stealth Components has been a great opportunity for me. I have received great support from Stealth Components and Bernie Smith in particular both as the President of the company as well as a compassionate and considerate man.

Bernie is actively supportive in both a corporate as well as personal capacity. In the past two years, Bernie has made sure that every employee receives full health benefits including dental and visual as well as a 401 K plan. When I had problems with my visa status because of time line applications, I received unlimited support from Bernie himself. He made sure that the entire Stealth HR office, as well as the lawyers gave my case their highest priority. It is cases like this that show how Bernie reaches out to make sure that employees are taken care of personally and professionally.

Bernie possesses a work ethic and ability that employees can appreciate every day. He knows his responsibility as a company leader and works quickly to understand and resolve any problem. He is a great motivator and teacher and works with his employees to diagnose issues and keep a pulse on every day sensitive and confidential business matters. I can not see myself or any other employee at Stealth doing as well without his guidance and leadership. Bernie's leadership skills set him in a tier that is in the top one percent. He is exceptional. In today's environment, this level of superiority should not be allowed go unnoticed or unappreciated.

I have the highest regard for Bernie both professionally and as a friend.

If I may be of further assistance, please contact me at (603) 740 1399.

Sincerely,

Massi Pupino
Account Executive
Stealth Components Inc.

August  22, 2005

FROM: Paul Michael de Iongh

TO: Whom it may concern

My name is Paul Michael de Iongh. I am presently an account executive at Stealth Components Inc. under the direction of Bernie Smith. I was first introduced to Bernie during my interview process in August of 2003. My start date at Stealth Components began on September 2, 2003.

It has now been about two years since I began working at Stealth Components and I have become a top producer. My success has been rewarded with a handsome salary increase twice. In addition to having seventeen days off, medical insurance, 401K, and bonuses, Bernie added dental and vision insurance to the mix of perks. As a direct result I have been able to have a nice home built for me and my family. In addition, my wife is able to be a stay-at-home mom with our nine month old son. My employment at Stealth Components has made all of these things possible.

In the mix of slower economic growth on a global level, the industry of electronic components is consistent. This translates into job security and steady earnings with steady pay increases. These things matter a great deal to me. I am able to sustain my family the best way that I see fit. I do not want my wife to have to work so that our son is trapped in day care all day. After having a child all I think about is his well being. This job provides well being for all of us. Bernie has made all of this possible. He is a hard worker and keeps the company well organized. In my two years here, the company has grown and has made necessary changes along the way to help sustain its growth.

Along the way I have been able to know Bernie both professionally and personally. On a professional level he is all about working hard and succeeding at what you do. On a personal level he is down to earth and like a friend you have always had. These are great qualities to have. He takes time to keep all of his employees sane by periodically letting us go home earlier than our already early 12:30 P.M. work day. He more often than not (all expenses paid) will take us all out to a local restaurant, take us on a weekend ski trip in the winter and provides us with lunch every Wednesday. He also takes the initiative to help his sales team succeed. An example I can think of is a part that I needed my purchasing department to obtain for a customer. The purchasing department found a small quantity, but nowhere near the full quantity. Bernie took a good portion of the day to find the parts for my order so both my customer and I would be happy.

My two years at Stealth Components has been both rewarding and beneficial to me, my family and the company. I am happy here and enjoy the time I am able to spend with my family. I appreciate all that Bernie does to make help with the continued success here at Stealth Components.

To whom it may concern:

I am writing this letter on behalf of Bernie Smith.

I have known Bernie for over three years now, and over this period of time, I have seen Bernie take a company that started with himself in 1 to approximately 23 employees.

I began work at Stealth Components on September 30th, 2002 as a sales representative, and within six months or so, I learned the electronic component business from Bernie. From the day I joined Stealth Components, I saw Bernie as a mentor, nothing less. I knew that following footsteps in learning how to sell electronic components, would eventually provide more income for myself as well as for my family. In the year, I was able to make approximately $69,000. Once Bernie saw that I could sell, he positioned me to sell to larger accounts in different geographical areas. With Bernie's help and guidance throughout 2003, I was able to net $74,000, and in 2004, $85,000. Just a year and a ha ago, Bernie learned of my management potential, so he promoted me to Team Leader of a sales group. With this promotion, and with Berni leadership, I am looking forward in the upcoming years to be making earnings in the six figures. Financially, in these past three years, I hav experienced a positive change in my life style that I never imagined possible.

While making these earnings, my financial stress has been minimal and my overall health is good. The benefits Stealth Components/Berni offers its employees is outstanding:
a good health insurance through Blue Cross Blue Shield _HMO, dental insurance through Met Life Dental and an Optical program that offe good discounts throughout major eye wear optical centers. In addition to this, Bernie offers a 401K plan that the amount that you contribute matched at 50% and vested at 100% at five years.

Since I've been working for Stealth Components, I find Bernie and the decisions he makes on a daily basis at work impeccable. The dedica and time Bernie contributes day in day out to me and to make Stealth Components a profitable company is an above and beyond effort. I remember a moment when I had a business deal with one of my customers in Hungary (Flextronics). I received an order totaling $6000 in revenue. Due to the nature of how fast this business is, the parts we were quoted by our vendors, were sold. Because of Bernie's attitude of never giving up and always believing that it can be done, he took charge, found and bought the electronic components from a small vendor t save the deal. The company netted $3500 Gross Profit and I made $350 that day. Another situation where Bernie's came through was with customer in Spain. I was very close to lose a $85,000 revenue/$40,000 Gross Profit order to a company in Spain (Grupo Epelsa) and Bernie made the decision that I should visit them. As soon as I told the customer (Grupo Epelsa) that I was going to visit them, they faxed me the order, I visited them and the company made $40,000 Gross Profit. I made $4,000 that day. All in all, the professional as well as personal relationship I have with Bernie is outstanding.

As you might envision, this company means the world to me. As for Bernie, I see him as a leader to this company where his presence for th continual success is essential. On a personal note, Bernie and I have shared some good moments. Occasionally, we go running together dur lunch hours and go out on company lunches/dinners to positively improve company morale. At times, we play bocce and do other outdoor activities such as cookouts with employees to reduce some of the stress. This personal relationship that we have makes business decisions o daily basis with less complexity.

I find that the professional commitment that Bernie has given me to teach me the business he started in 1996 can only be awarded by contin to increase the business to its full potential. I do think that Bernie's presence at work is a key element to the success of this company as he i core of this company. In my life, I have never met a more dedicated individual, holding such a high position. His humble demeanor at hom with his wife and son changes very little while he is at Stealth Components. When my grandfather was murdered in Mexico, he personally called me to say how very sorry he was of the situation. He offered an ear in case I wanted to talk to him about it all.

Overall, I find this company to have changed my future tremendously. I see a long-term future with Stealth as it has provided for me and m family a better life style. It has financially reduced a lot of the stress and has overall allowed me to live a more healthy life.

If you have any questions of what I think of Stealth Components Inc. and what I think and feel about Bernie, I can be reached at the below number.

Sincerely,

Ruben Gutierrez
978-388-8948