UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)   CRIMINAL NO. 05-10009-DPW<br>BERNARD SMITH, )<br>Defendant )<br>) | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND OPPOSITION
TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT**

**I.     Introduction**

The United States of America, by and through its attorneys Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Carmen M. Ortiz, Assistant U.S. Attorney, respectfully submit this sentencing memorandum in opposition to defendant's objections to the amount of loss and role in the offense enhancement, as recommended by the government and in the Presentence Report ("PSR"). First, the government asserts that the correct loss amount is $384,539.81, as noted in the PSR (¶ 41), as that is the total amount of antidumping duties that the defendant was required to deposit with Customs[1] at the time he entered the merchandise into the United States, which amount he avoided the payment of because of his fraud scheme. The defendant's assertion that loss should be determined by the additional amount of duty the defendant would have had to pay *if* his company had not misrepresented the value of goods imported *and if* he had requested an administrative review, results in speculation and completely ignores the actual facts of this case. Second, the defendant's contention that his role was no greater than that of his employee or foreign vendors, whom he solicited to participate in the

---

[1]"Customs" refers to the former United States Customs Department, which was reorganized, and is currently known as the Department of Homeland's Security, Immigration and Customs Enforcement.

1

offense conduct, is incorrect. The government's investigation revealed that the defendant initiated the scheme of understating the value of merchandise imported in order to lessen the amount of antidumping duties his company had to pay; and that he solicited and directed his employee to participate in this fraud scheme. Furthermore, it was at the behest of the defendant that a foreign vendor began to create the phony invoices that were presented to Customs, in the manner directed by the defendant. In such capacity, the defendant acted as an organizer and leader of the criminal activity, and his conduct warrants a two level enhancement pursuant to U.S.S.G. §3B1.1(c).

## II. Statement of Relevant Facts and Additional Evidence

The essential facts regarding the defendant's scheme to undervalue electronic components imported from Korea, referred to as "Dynamic Random Access Memory" ("DRAMS"), in order to reduce the amount of antidumping duty that his company, Stealth Components, Inc. ("Stealth"), was required to pay are undisputed.[2] During the relevant period, from on or about November 4, 1998 through on or about May 23, 2000, defendant Bernard Smith ("Smith"), who was President and partial owner of Stealth, imported DRAMs that were subject to antidumping duties in accordance with the policy of the U.S. Department of Commerce ("Commerce"). These antidumping duties were country and manufacturer specific, and were calculated as a percentage of the stated entry value, as reported on the purchase invoice. (PSR ¶ 14). At the time of entry, Stealth was required to deposit antidumping duties with Customs for each

---

[2] Defendant pled guilty on May 9, 2005 to conspiracy and six counts of entering goods into the United States by means of false statements. (Copy of Rule 11 hearing transcript is attached hereto at Tab 1).

Case 1:05-cr-10009-DPW   Document 20   Filed 10/17/2005   Page 3 of 15

shipment of DRAMs that it imported into the United States. Id.[3] The purpose of the antidumping regulatory scheme is to prevent foreign merchandise from being sold in the United States at less than fair market value, in order to protect industry in the United States from being materially injured from goods being "dumped" at a much lower price. (PSR ¶¶ 12-13; 27).

As noted in the PSR (¶ 19) and not contested by the defendant, a review of entry documents by Customs identified over 130 entries in which Smith presented false invoices from November 1998 through May 2000. At each entry, Smith deposited with Customs a significantly lesser amount of duty that was owed because of the undervaluing of the imported DRAMs. Over the course of this scheme, Smith represented a total value for goods entered to be $1,313,771.00, when in fact, the true appraised value of the goods entered was $6,761,581.00. The total amount of duty that Smith failed to deposit at the time of entry because of this fraudulent scheme was $384,530.81. (PSR ¶ 19). The defendant chose to defraud the government and not contest the deposit rate through an administrative review, causing the deposit rate to become the final rate as to his company.

According to former Stealth employees Joshua Jacobs ("Jacobs") and Scott Farmer ("Farmer"), Stealth began undervaluing DRAM from Korea at the direction of Smith.[4] They have stated to the government that Smith's actions of undervaluing DRAM followed a meeting at

---

[3]There is no dispute between the parties that Stealth was required to make payments to Customs on the date of entry at the "cash deposit rate," which rate the defendant could have contested by way of an administrative review. (PSR ¶ 28). In the instant case, the defendant did not seek an administrative review and the cash deposit rate became the final rate. (PSR ¶ 29).

[4]See Report of Investigation dated 3/19/01, attached hereto at Tab 2. This report contains statements made by Scott Farmer (referred to in the report as "SA-521") and Joshua Jacobs (referred to in the report as "SA-522") of their disclosure to the U.S. Customs Service, of Smith's fraud scheme to undervalue DRAM imported from Korea.

3

Smith & Associates (his uncles' company in Houston, Texas), and that Smith engaged in this practice to minimize the payment of antidumping duties. The defendant directed Jacobs to write "please undervalue" on his DRAM purchase orders. The ensuing shipment would include a phony invoice containing understated values, while the true invoice would be faxed directly to Stealth for payment. Jacobs has also stated that Smith directed him as to how to describe the type of DRAM imported, so that the description in the phony invoice matched the lowered declared value (e.g., a 16 megahertz part was listed as a slower and less expensive 4 megahertz part).[5]

On numerous occasions, Smith engaged in this scheme with David Lu ("Lu") of Carton Technologies (now known as Carton Electronics), a Hong Kong supplier of Korean DRAM. (PSR ¶ 18). Carton was the supplier that provided the most number of DRAM shipments to Stealth, by presenting fraudulent invoices to Customs. On numerous dates and at various times, Smith asked Lu to create undervalued invoices for Korean DRAM, which were to be presented to Customs at the time the DRAMs were entered into the United States. Lu has provided that he was asked by Smith to create undervalued invoices for Korean DRAM and that he complied at Smith's "express request."[6] Although Lu received purchase orders from Jacobs requesting him to undervalue the DRAM components, Lu stated that it was Smith who set up the undervaluation scheme and who paid the bills. Id.

---

[5] Id.

[6] See Report of Investigation dated 11/01/02, attached hereto at Tab 3. This report contains statements made by David Lu in an interview with agents from the U.S. Customs Service. Also, see copies of purchase orders sent to Lu, in which Smith instructs Lu as to the price and description that Lu is to use in preparing the phony invoices, attached hereto at Tabs 4 and 5. Tab 4 contains a purchase order dated 8/26/99, with accompanying fake invoice and accurate invoice as prepared by Carton Technologies. Note the specific instructions on the back of the purchase order from "Bernie" that: "These detailed descriptions will help us get the parts through U.S. Customs quickly." Tab 5 contains 3 sample purchase orders with Smith's instructions to Lu about pricing and descriptions for the fraudulent invoices.

Finally, the defendant admitted in a civil deposition that from time to time, it was *he* who asked two to three foreign vendors to lower the prices on invoices so that they wouldn't have to pay as much in duties and taxes.[7] As a result of lowering the amount of duties he paid, Smith was able to offer a lower cost to Stealth's customers. Id. Furthermore, at the Rule 11 hearing before this Court the defendant affirmed that he both initiated the scheme and solicited both Jacobs and Lu to participate in the scheme.[8]

## III.  Argument

### A.  The Loss Amount as Calculated by the Government and U.S. Probation Department is Accurate and Should be Adopted by this Court

There is no question that the amount of duty that the defendant *evaded* based on his criminal conduct was $384,530.81, as the government and the Probation Department have calculated. (PSR ¶ 19; Addendum to PSR at 35-36). Over the course of a year and a half, the defendant falsified invoices in over 130 entries of DRAM, and understated the true value of the goods imported by over $5 million. (PSR ¶ 19). In fact, given that the government has focused on the duties evaded based only on DRAMs imported through Carton Technologies, the actual loss is greater because the defendant has admitted that he was importing goods through the use

---

[7] See excerpt (pages 665-69) from a transcript of a civil deposition taken of Smith on January 11, 2001, in a law suit brought by him on behalf of Stealth Components, against Joshua Jacobs and Scott Farmer, attached hereto at Tab 6. The questions in this excerpt are being answered by Bernard Smith and on pages 67-68, Smith admits that *he* asked two to three vendors to put a lower price on invoices in order to pay less in duties and taxes.

[8] See transcript of Rule 11 hearing, attached hereto at Tab 1. In describing how the defendant committed the offense conduct, the government described how Smith directed Mr. Jacobs and Mr. Lu in the scheme and the defendant did not deny any of the acts. See Tab 1 at 12-16. The only objection defendant had to the government's recitation of the evidence was regarding the calculation of loss amount. See, Tab 1 at 16-19. Furthermore, at the Rule 11 hearing the Court specifically asked Smith if he did the things the government said he did, and he responded "Yes." See Tab 1 at 18-19.

of phony invoices from *two to three vendors*, including Top Phil.[9] The truth is that if this fraudulent scheme had not been discovered, the defendant would have gotten away with not paying antidumping duties in a greater amount than $384,530.81, as that amount solely pertains to entries from Carton Technologies. (PSR ¶ 19).

Defendant's attempt to reduce the loss amount by claiming that he is entitled to the rate he would have received *if* he had not committed the crime and *if* instead, he had requested an administrative review, calls for consideration of a hypothetical situation which is unnecessary, given the facts of this case. The defendant acknowledges that if he had not understated the true value of the DRAMs imported and not requested a review, he would have been obliged to pay the duty at the rate as finally liquidated - which was the cash deposit rate. (Addendum to PSR, Defense Objection #5 at 34). The fact is that the defendant was able to avoid depositing the actual amount of duty owing, causing him to evade the payment of $384,530.81 at the time the DRAMs entered the United States. Although defendant now argues that he could have simply requested a review, the fact is that he didn't because it was easier and financially more beneficial for him to defraud the government.[10] Even if defendant had requested a review, he still would have had to deposit the amount owing at the cash deposit rate, while the review process took place. There are no assurances in the results of a review, and at best, the defendant could have

---

[9] Tab 6 at 67-68.

[10] The process of an administrative review is extensive and the investigation conducted by Commerce after a petition is filed involves the exporting company (e.g. Carton Technologies in this case) to complete a lengthy questionnaire and to provide any additional information that is requested by the import administration conducting a review. The period of investigation can last up to 12 months and is burdensome. The entire process is not as simplistic as defendant purports to represent it. See, Import Administration Antidumping Manual, Introduction (Revised January 1998), pages 5-9 (excerpt that provides a general overview of the process from the Manual's Introduction is provided herein at Tab 7 ).

had the cash deposit rate reduced and he would have gotten a refund.  In the alternative, no change would have occurred or the rate could have increased.  However, it cannot be ignored that in this case, the defendant chose to engage in criminal activity because it was better for him to deposit less money at the time of entry and gain the competitive edge that he did in offering lower prices to his customers.[11]

The defendant concedes that the close to $385,000 amount is accurate for purposes of what duties he had to pay, however, he argues that the same amount should not be used (for purposes of calculating the guideline range), because of his failure to request a review and resultant "default." (Addendum to PSR, Defense Objection #5 at 33-35).  Rather, defendant claims that the rate afforded to other manufacturers (Hyundai Electronics Industries Co. and LG Semicon, Ltd.) who did request a review and were accorded a lower final rate, should be used in calculating his loss amount.  (PSR ¶¶ 30-31).

There is no support for defendant's position that if he had requested an administrative review, Stealth (an importer and reseller of DRAM) would have been assessed the same rates as the manufacturers.  In fact, the focus of an administrative review is on the *entry* of merchandise and importers of the same merchandise can have different antidumping duties because the rates are specific to each importer. See, Consolidated Bearings Company v. United States, 348 F.3d 997, 1005 (Fed. Cir. 2003).

> "The character of the merchandise does not control the
> assessment of duties, but the market forces in play at the
> time of each separate import transaction.  The simple fact
> that one importer imports the same merchandise as another
> importer does not necessarily lead to the conclusion that they

---

[11] Tab 6 at 67-68.

>are subject to the same antidumping duties.  Because sales prices vary from exporter to exporter and from time to time, separate entries of the same good may have different duties." Id.

As a result, if Stealth had requested an administrative review, based on the criteria that would have been looked at by the Commerce Department, the end result could have been a lower or higher rate than the deposit rate, or no change at all.

In the instant case, there is no need to entertain the defendant's hypothetical, given that the defendant chose to defraud the government, chose not pay the amount of duty he was required to pay, and chose not to seek an administrative review of the cash deposit rate he was required to pay.  Commerce's consistent practice is to liquidate at the original cash deposit rate for the unreviewed reseller, rather than the manufacturer's review rate. See, Consolidated Bearings Company v. United States, 412 F. 3d 1266, 1272 (Fed. Cir. 2005).  The defendant has no statutory right nor any basis to claim that Stealth, as an importer and reseller of the same merchandise manufactured by either Hyundai Electronics Industries Co. or LG Semicon, Ltd., would have received the same rate that these manufacturer's received as a result of *their* administrative reviews. Id. at 1268.

Finally, the government understands that it bears the burden of establishing an accurate loss amount, and it has done so in this case.  The defendant's position that he is entitled to a lower loss amount because his criminal conduct was a "widespread" practice and he expected a reduction in rates, is without merit.  (PSR ¶ 24).  In the first place, defendant's argument is akin to justifying criminal behavior because "everyone else is doing it."  It is no different than trying to justify cheating on a tax return because a lot of people cheat on their returns or claiming that it is okay to sell marijuana because a lot of people sell marijuana and it's not as bad as selling

cocaine.  As the Probation Department noted, " to hypothetically go back in time where defendant did not undervalue the DRAM products and calculate the duty based on the manufacturers' deposit rate after the request for a review by defendant, essentially negates the criminal conduct of the defendant and does not appropriately ascertain the duty "evaded" by the defendant." (Addendum to PSR at 36).  It is important to note the severity of this offense, in that, the defendant directed this scheme for over a year and a half, and he undervalued the goods imported by more than $5million.  The amount of loss for sentencing purposes should be the amount of duty the defendant failed to deposit and intended to avoid - approximately $385,000.

### B.     U.S.S.G. § 3B1.1(c) is the Appropriate Guideline Enhancement as the Defendant was an Organizer and Leader in the Fraud Scheme

The defendant was clearly the organizer and leader of the scheme to understate the value of Korean DRAM he imported from foreign vendors.  He initiated the scheme, he directed Jacobs and Lu in the process of creating phony invoices that understated the true value of the DRAMs imported, and as President and owner of Stealth he benefitted the most financially because his company enjoyed a competitive edge over others similarly situated.[12]

The First Circuit has stated that there are two ways in which a defendant can be deemed an "organizer, leader, manager, or supervisor" under U.S.S.G. § 3B1.1:  "the defendant must have exercised some degree of control over others involved in the commission of the offense *or*

---

[12] The defendant contests the sufficiency of the government's evidence regarding role in the offense on the basis that  the unsworn statements by Jacobs, Farmer and Lu are not enough.  The government submits that the investigative reports attached herein at Tabs 2 and 3, copies of the purchase orders at Tabs 4 and 5, in addition to defendant's admissions in the civil deposition, and defendant's affirmation of the evidence at the Rule 11 hearing, when taken together, prove the defendant's role in the offence by a preponderance of the evidence.  See, United States v. Cali, 87 F.3d 571, 578 (1st Cir. 1996) citing United States v. Joyce, 70 F.3d 679, 682 (1st Cir. 1995) (government must prove role in the offense by a preponderance of the evidence and may do so by relying on circumstantial evidence).

he must have been responsible for organizing others for the purpose of carrying out the crime." United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. 1990)(emphasis added).  Smith's actions satisfy either of these two factors to warrant a role enhancement.

First, Smith exercised control over Jacobs and Lu.  Smith, in initiating the scheme, told Jacobs how they were going to request the undervaluing of the DRAM, directing Jacobs in the amount that the DRAM were to be understated and in what fashion they were going to be described in the phony invoices.[13]  The defendant claims that the government is merely relying on Smith's position as Jacobs superior, and cites several cases for the proposition that a superior position in an organization is insufficient for establishing leadership in the context of § 3B1.1(c). (Addendum to PSR, Defense Objection #6 at 37).  This is a red herring; the government has never contented that the defendant led Jacobs in the scheme *solely* because he was his superior. The government's leadership claim has been based on the defendant's specific instructions to Jacobs, not on an organizational chart.

The defendant has also argued that Jacobs was independent of the defendant since Jacobs worked on commission and had a separate customer base, but Jacobs was an employee, not an independent contractor.  Jacobs may have had an objective compensation arrangement, but this does not change the fact that he was obliged to follow the instructions of the defendant.  All that is required under Fuller is that the defendant exercised "*some* degree of control over others."  Id. at 1220 (emphasis added).  The defendant's explicit instructions to Jacobs, combined with the defendant's vested authority as President of Stealth, easily satisfy this degree of control requirement.

---

[13] See Tab 2.

Further, with respect to Smith exercising a leadership role in this criminal enterprise, Lu prepared phony invoices at the direction of Smith, using the price and the description of the DRAM that Smith requested.[14]  Lu prepared the phony invoices at Smith's "express request," and contrary to defendant's assertion, there is no evidence that Lu would have participated in the scheme with Stealth, but for Smith initiating it.[15]

The defendant has argued that the dealings between Stealth and Lu were simple buyer-seller transactions, which did not entail any arguable control.  (Addendum to PSR, Defense Objection #6 at 37).  However, the facts do not bear this out.  Lu did not act independent of Smith.  Lu only falsified invoices on the shipment of goods that Smith requested - Lu did not select the shipments that phony invoices would be prepared for; did not select the price that would be used in the fraudulent invoices; nor did Lu select the description for the DRAM that would be shipped on the presentation of a fake invoice.  There is no doubt that Smith controlled Lu in the execution of the scheme, and that Smith relied on Lu's participation in order for the scheme to succeed.[16]

---

[14] See Tab 3; see also copies of a purchase orders sent to Lu, in which Smith requests the price and description that Lu is to use in preparing a phony invoice, attached hereto at Tab 4 and 5.

[15] Although defendant has claimed that Lu "volunteered" to understate the merchandise and that he did the same for other customers (PSR ¶ 33), there is no evidence that this is the case.  In fact, nowhere in Smith's civil deposition does he claim to have passively accepted a vendor's offer to undervalue invoices; he clearly admitted to being the one requesting the undervaluing and never stated that vendors merely "offered" to create phony invoices.  In the present case, Lu prepared the phony invoices, quoting the price and description, per Smith's request or Jacobs' - who as Smith's employee, operated at Smith's direction.

[16] Unlike the facts in Fuller, where the court found that in a "buyer-seller" relationship, the assistance that the defendant received from a buyer of marijuana did not constitute control by the defendant because "[t]he only instances of [the defendant] receiving "assistance" from [the buyer] occurred in the context of [the buyer] acting as an independent buyer, and not a participant whose activities were directed or organized by [the defendant].  897 F.2d at 1221.  The facts before this Court are easily distinguishable from those in Fuller, given that Smith directed Lu's creation of the phony

Secondly, Smith organized others in carrying out his scheme. Defendant contends that the scheme was just a "series of simple, one-on-one transactions" and required no organization. (Addendum to PSR, Defense Objection #6 at 36). This reasoning assumes that only highly complex crimes fall under U.S.S.G. § 3B1.1(c) - an assertion that is completely unsupported by the text of the guidelines or any relevant precedent. One may be classified as an organizer if he coordinates others so as to facilitate the commission of criminal activity, but he does not need to play an extensive role in a complex scheme as is required for U.S.S.G. §3B1.1(a), but not §3B1.1(c). See, United States v. Tejada-Beltran, 50 F.3d 105, 112 (1st Cir. 1995)(extensive criminal enterprise required to establish organizer status under U.S.S.G. §3B1.1(a) compared to United States v. Frankhauser, 80 F.3d 641, 654-655 (1st Cir. 1996)(limiting the reach of Tejada-Beltran to U.S.S.G. §3B1.1(a) and noting that only greater responsibility must be reflected in the defendant's actions relative to another participant for §3B1.1(c) to apply). Therefore, while Smith's scheme did not require complex logistics, it still constituted organization under U.S.S.G. §3B1.1(c). Smith organized Jacobs and Lu by directing their activities in the fraud, especially Lu, who relied on Smith's instructions (and Jacobs), in order to prepare the phony invoices.

The defendant also states that Lu was undervaluing the merchandise of other customers; this is completely irrelevant to the issue of the defendant's role in this offense. Lu has stated that it was the defendant who requested the fake invoices, and the defendant admitted to making such requests to other vendors in his deposition.[17]

---

invoices. While the marijuana sales in Fuller were arms-length transactions, Smith's scheme was totally dependant upon Lu's assistance.

[17] Copies of the purchase orders attached hereto at Tabs 4 and 5 clearly demonstrate that it was Smith who instructed Lu as to the preparation of the phony invoices.

Finally, Application Note 4 of U.S.S.G. § 3B1.1 lists several factors which this Court should consider in determining whether a role enhancement is warranted. They are: exercise of decision making authority; nature of participation in the commission of the offense; recruitment of accomplices; claimed right to a larger share of the fruits of the crime; degree of participation in planning the offense; nature and scope of the illegal activity; and degree of control and authority exercised over others. The defendant satisfies a number of these factors. First, Smith exercised decision making authority in his role as President of Stealth and over which shipments he directed Lu to prepare phony invoices for. Second, the nature of the defendant's participation in the commission of the offense was substantial, as he personally participated in the fraud *and* directed the participation of Jacobs, Lu, and others. Third, the defendant recruited Jacobs and Lu by approaching them and soliciting their cooperation. That they were willing participants is irrelevant to the fact that it was *Smith* who solicited their involvement in the fraud scheme. Fourth, as President and part owner of Stealth, the defendant benefitted more from the offense than did anyone else. Smith obtained a competitive edge over other companies and was able to avoid depositing up front, the amount of antidumping duty that he was obligated to pay initially. Fifth, the defendant planned the offense in that he initiated it, and he organized it by directing and supervising the acts of others (e.g., Jacobs and Lu). Six, as President and the employer of Jacobs, the defendant clearly exercised control and authority over Jacobs. Although Jacobs had his own customer base and worked on commission, he was hired by Smith, was a salaried employee, and was eventually fired by Smith.[18] There can be no doubt that in light of the role the defendant played in this fraud scheme, a two level increase is merited under U.S.S.G.

---

[18] See Tab 2.

§3B1.1(c).

## IV. Sentencing Recommendation

The PSR has calculated a total offense level of 16 and found the defendant to be in criminal history category I. (PSR at ¶¶ 37-48; ¶ 51). As a result of these calculations, the advisory sentencing range is 21 to 27 months. (PSR at ¶ 89). Pursuant to the PSR, and for reasons noted above, the government recommends that the Court sentence the defendant to 24 months imprisonment, followed by 2 years of supervised release, a $10,000 fine, and $ 700 mandatory special assessment.

The government bases its recommendation on the PSR and on the fact that Smith executed a lengthy and extensive scheme to defraud the government when he understated the value of goods imported into the United States for over a year and a half and by more than $5 million. The defendant solicited others to help him in the scheme and directed their criminal conduct during the course of the fraudulent scheme. By choosing to commit fraud and not abide by the law, the defendant was able to evade the payment of antidumping duties in an amount close to $385,000 and gain a competitive edge over others similarly situated - exactly what the antidumping duty requirement is intended to prevent. If the defendant's criminal activity had not been discovered, the government would have lost approximately $385,000 in duties it was owed. Defendant's claims that he was only doing what others were doing and that he did not intend this loss because he believed the rates would eventually get reduced, should not persuade this Court to speculate what would have happened if the defendant had followed the law. To do so, would negate defendant's criminal responsibility and send a wrong message about breaking the law because "others are doing it."

**V.      Conclusion**

For the foregoing reasons, the United States requests that the Court reject the defendant's objections to the PSR and sentence him as recommended by the government, pursuant to the advisory guideline range as indicated in the PSR.

Respectfully submitted,

Michael J. Sullivan
United States Attorney

By:
    /s/ Carmen M. Ortiz
CARMEN M. ORTIZ
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

Suffolk, ss                                                                                       Boston, Massachusetts

I, Carmen M. Ortiz, Assistant U.S. Attorney, do hereby certify that I have served a copy of the foregoing by hand delivery to:

Max Stern
Stern, Shapiro, Weissberg & Garin, LLP
90 Canal Street, Suite 500
Boston, MA 02214-2022

    /s/ Carmen M. Ortiz
CARMEN M. ORTIZ
Assistant U.S. Attorney

Dated: October 17, 2005